FILED

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

2004 MAY 25   PM 3:33

CLE___
C_____        ___URT

CARLIE CLAY,

        Plaintiff,

vs.                                   Case No. 5:04-cv-192-Oc-10GRJ

WYETH, *et al.*,

        Defendants.

---

### WYETH'S OPPOSITION TO PLAINTIFF'S MOTION FOR REMAND

In 2002, the judge overseeing the MDL diet drug proceedings found that pharmacies and sales representatives were being fraudulently joined in "a sham" designed "to prevent the adjudication of lawsuits against [Wyeth], the real target, in a federal forum." *Anderson v. Am. Home Prods. Corp.*, PTO 2567, 220 F. Supp. 2d 414, 425 (E.D. Pa. 2002). Last year, in denying requests to dissolve the MDL, the Court again cited "widespread efforts fraudulently to join [defendants] as a tactic to thwart removal." *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, PTO 2984, slip op. at 6-7 (E.D. Pa. Aug. 25, 2003) (Ex. 1). Likewise, the magistrate assigned to this case and a Northern District of Florida court have both recently concluded that sales representatives were fraudulently joined in diet drug cases. *See Fowler v. Wyeth*, No. 3:04-cv-83/MCR, slip op. at 8-10 (N.D. Fla. May 14, 2004) (Ex. 2); *Petty v. Wyeth*, No. 3:04-cv-82/MCR, slip op. at 7-9 (N.D. Fla. Apr. 28, 2004) (Ex. 3); *Lewis v. Wyeth*, No. 3:04-cv-81/MCR, slip op. at 7-9 (N.D. Fla. Apr. 28, 2004) (Ex. 4); *Sobkowski v. Wyeth*, No. 5:04-cv-96-Oc-10GRJ, slip op. at 7-19 (M.D. Fla. May 17, 2004) (Report and Recommentation of Magistrate Judge Gary Jones) (Ex. 5).

These findings raise a strong inference of fraudulent joinder here, where Plaintiff appears to have done the same thing. Plaintiff's efforts to evade that inference defy both reason and fact. They

14

defy reason when, having sued a multi-billion dollar defendant, Wyeth, she insists that she intends to pursue to judgment a retail pharmacy and a working-class Wyeth employee. They defy fact in that she does not even allege she obtained her diet drugs from Eckerd, and the sales representative – Matthew Sullivan – never promoted Pondimin, and had no knowledge concerning Redux outside that supplied by Wyeth.[1] Plaintiff fails to rebut these facts. She submits internal Wyeth documents in an effort to show that sales representatives were instructed to conceal the true risks of Redux, ignoring those documents' clear statements that representatives are to provide full information about the drug to physicians. Her only evidence that Eckerd promoted Pondimin or Redux is an unsigned, *draft* agreement from which the diet drugs later were stricken. None of this provides any basis to conclude that her tactics – precisely parallel to those the MDL Court found to be part of a pattern of fraudulent joinder – fall outside that paradigm.[2] Plaintiff's Motion to Remand should be denied.

## FACTUAL BACKGROUND

Plaintiff Carlie Clay alleges she sustained serious and permanent injuries, including heart damage, as a result of using the diet drugs Pondimin and Redux in 1996 and 1997. *See, e.g.*, Compl. ¶ 2 & Ex. A (Notice of Removal Ex. 1); Second Am. Master Compl. ¶ 34 (Notice of Removal Ex. 2) ("Master Complaint"). Wyeth distributed and sold Pondimin and Redux. Wyeth also promoted Redux to physicians. Pondimin (fenfluramine) or Redux (dexfenfluramine), in combination with the diet drug phentermine, was known as the "fen-phen" combination. Pondimin and Redux were

---

[1] Plaintiff also sued sales representative Veronica Cazin. For the same reasons set forth herein as to Mr. Sullivan, Plaintiff has no basis for claims against Ms. Cazin. Ms. Cazin, however, is a California citizen, Cazin Decl. ¶ 2 (Notice of Removal Ex. 29), a fact Plaintiff does not challenge. Since she is diverse, no fraudulent joinder analysis is necessary as to Ms. Cazin.

[2] Citing a recent Alabama decision remanding a diet drug case, Plaintiff implies that if the sales representative and Eckerd truly believed they were fraudulently joined, they would have filed motions to dismiss rather than answers to the Complaint. *See* Pl.'s Mem. of Law at 3 & Ex. A-9. This argument misses the mark in two respects. First, had the state court granted motions to dismiss filed by these defendants, Plaintiff doubtless would have argued that the dismissals could not supply a basis for removal because they were not voluntary acts of the Plaintiff. *See, e.g., S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996) Answers simplify removal while fully preserving defendants' objections to the legal sufficiency of the complaint. Second, the fraudulent joinder arguments set forth herein are based largely on the absence of a *factual* basis for claims against these defendants, and thus would not be appropriate in a motion to dismiss.

voluntarily withdrawn from the market in September 1997 due to concerns over reports of heart valve damage in association with the drugs.

Mr. Sullivan worked as a field sales representative for Wyeth in the 1990s, and is still with the company. Sullivan Decl. ¶ 2 (Notice of Removal Ex. 28). His job was to visit offices of physicians to make them aware of Wyeth's products so that they could consider whether to prescribe those products to their patients. *Id.* He was assigned to promote, or "detail," Redux, but he was not assigned to detail – and did not detail – Pondimin. *Id.* ¶¶ 2-3. Typically, his detailing visits regarding Redux and other products lasted less than five minutes. *Id.* ¶ 2. During these visits, he provided physicians with FDA-approved package inserts and other company information for the Wyeth products he was assigned. *Id.* He had no specialized medical or pharmacological education other than training provided by Wyeth. *Id.* ¶ 4. The information he conveyed to physicians was derived exclusively from information provided by Wyeth. *Id.* ¶ 5. He had no other source of knowledge about the drugs he detailed. *Id.* ¶ 6. Specifically, he had no knowledge of a link between valvular heart disease and Redux (or Pondimin, which he did not detail) before that allegation was first publicized. *Id.* ¶ 7.

Eckerd is a pharmacy chain based in Florida. Nowhere in her Complaint, however, does she allege she purchased Pondimin or Redux at Eckerd. *See* Compl. ¶ 3 & Ex. A.

## **ARGUMENT**

### **I.      Plaintiff, Not Wyeth, Misstates the Legal Standard for Fraudulent Joinder.**

Fraudulent joinder exists when there is no "'reasonable basis for predicting that the state law *might* impose liability on the facts involved.'" *Crowe v. Coleman*, 113 F.3d 1536, 1542 (11th Cir. 1997). The Court should resolve contested issues of fact or law in favor of the plaintiff. *Id.* at 1538. But the Court can look beyond the complaint's allegations and consider evidence in the record. *Id.*

Plaintiff accuses Wyeth of "wrongfully apply[ing]" the "no reasonable basis" standard, and asserts that a party alleging fraudulent joinder must show that there is "no possibility" of a cause of

action against the resident defendant. Pl.'s Mem. of Law at 7. The "no possibility" language does appear in some Eleventh Circuit opinions, *see, e.g.*, *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998); *Samples v. Conoco*, 165 F. Supp. 2d 1303, 1319-20 (N.D. Fla. 2001), but Plaintiff is incorrect in asserting that the Circuit has never adopted the "no reasonable basis" standard. *See Crowe*, 113 F.3d at 1542 ("[R]esolving all contested issues of fact in favor of the plaintiff, there need only be a 'reasonable basis for predicting that the state law *might* impose liability on the facts involved.'"); *see also Tedder v. F.M.C. Corp.*, 590 F.2d 115, 117 (5th Cir. 1979) ("If there is no arguably reasonable basis for predicting that state law might impose liability on the resident defendants under the facts alleged, then the claim is deemed fraudulent and lack of diversity will not prevent removal."); *Bobby Jones Garden Apartments, Inc. v. Suleski*, 391 F.2d 172, 176-77 (5th Cir. 1968) ("[T]he question is whether there is arguably a reasonable basis for predicting that the state law might impose liability on the facts involved.").[3]

The "no possibility" language recited in some opinions has never permitted plaintiffs to "possibly establish liability by the mere hypothetical possibility that . . . an action could exist." *Griggs v. State Farm Lloyds*, 181 F.3d 694, 701 (5th Cir. 1999). Potential for liability "must be reasonable, not merely theoretical." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 1992). In other words, the "no possibility" language "cannot be taken literally." *In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 280 n.4 (S.D.N.Y. 2001).

Whatever the formulation, Plaintiff cannot avoid a finding of fraudulent joinder with speculation – *e.g.*, that evidence might exist to rebut the sworn statements supporting Wyeth's Notice of Removal. As with "a summary judgment motion, in determining diversity the mere

---

[3] Under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), decisions of the old Fifth Circuit are binding upon the Eleventh Circuit. Moreover, contrary to Plaintiff's claim, the Fifth Circuit continues to apply the "no reasonable basis" standard. Just recently, that court rejected an argument that the lower court had erred by applying the "no reasonable basis" standard instead of the "no possibility" standard. *See Ross v. Citifinancial, Inc.*, 344 F.3d 458, 462 (5th Cir. 2003). Other circuits have adopted the "no reasonable basis" standard as well. *See, e.g.*, *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990); *Coyne v. American Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999).

assertion of 'metaphysical doubt as to the material facts' is insufficient to create an issue if there is no basis for those facts." *Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 816 (5th Cir. 1993) (quoting *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  The Court will not "in the absence of any proof, assume that the non-moving party could or would prove the necessary facts." *Badon v. RJR Nabisco Inc.*, 224 F.3d 382, 393-94 (5th Cir. 2000).  Plaintiff contends that *Sellers v. Foremost Ins. Co.*, 924 F. Supp. 1116 (M.D. Ala. 1996), a case cited by Wyeth, establishes "its own new [evidentiary] standard" and stands alone in fraudulent joinder jurisprudence.  Pl.'s Mem. of Law at 12-13.  She urges this Court to reject *Sellers* in favor of *Pritchard v. Hancock Fabrics, Inc.*, 198 F. Supp. 2d 1288 (N.D. Ala. 2002).  But *Sellers* is good law, and *Pritchard* is inapposite.

   To begin with, the Rule 11 standard articulated in *Sellers* is not novel, as Plaintiff contends. *Sellers* rests on established law under Rule 11 that a plaintiff's factual contentions must either have evidentiary support or be "likely to have" such support.  Based on this unexceptional principle, *Sellers* concluded that when faced with a charge of fraudulent joinder, a plaintiff must at least satisfy Rule 11 by "provid[ing] some showing that her claim against the resident defendant *has evidentiary support* or is *likely to have evidentiary support* after reasonable opportunity for discovery." *Id.* at 1119 (emphasis added).  Contrary to Plaintiff's assertion, other decisions in this Circuit have relied upon *Sellers*, including *Wright v. Metropolitan Life Ins. Co.*, 74 F. Supp. 2d 1150 (M.D. Ala. 1999) and *Hornberger v. Am. Home Prods. Corp.*, No. 8:03-cv-724-T-23TGW (M.D. Fla. June 20, 2003) (Ex. 6).

   Furthermore, the obligation to counter a fraudulent joinder charge with evidence is not new. In at least six diet drug decisions, district courts of this Circuit have found fraudulent joinder based on a lack of evidence.  *See Fowler*, slip op. at 8-10 (Ex. 1); *Petty*, slip op. at 7-9 (Ex. 2); *Lewis*, slip op. at 7-9 (Ex. 3); *Long v. Wyeth*, No. 6:03-cv-421-Orl-31JGG, slip op. at 4 (M.D. Fla. May 13, 2003) (Notice of Removal Ex. 21); *Kearney v. Wyeth*, No. 6:03-cv-288-Orl-31KRS, slip op. at 2-4 (M.D. Fla. May 8, 2003) (Notice of Removal Ex. 23); *Campana v. Am. Home Prods. Corp.*, No. 1:99cv250 MMP, slip op. at 4-8 (N.D. Fla. Mar. 8, 2000) (Notice of Removal Ex. 24); *see also*

*Sobkowski*, slip op. at 9 (magistrate report and recommendation holding that "[a]lthough . . . Plaintiff has filed her own affidavits, her evidence does not refute the evidence in Wyeth's affidavits.") (Ex. 5). Other jurisdictions also apply this standard. *See, e.g., Badon*, 224 F.3d at 393 (finding fraudulent joinder where plaintiffs "never tendered any summary judgment type (or other) evidence to either refute [the defendants'] affidavits or to support any of their allegations"); *In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d at 281 (finding fraudulent joinder of sales representatives based on affidavits).

*Pritchard* does not give Plaintiff the free pass she desires. In that case, the plaintiff sued a business operator and a non-diverse security guard for negligently failing to protect her during a robbery. On removal, the court viewed the guard's affidavit as providing merely one "version of his role in the events." 198 F. Supp. 2d at 1290. In other words, the court faced a "he said, she said" situation and decided that the plaintiff might be able to rebut the affidavit. *Id.* at 1290-91. In *Sellers*, by contrast, the evidence presented to the court showed that the non-diverse defendant "had nothing to do with" the claims asserted, *Sellers*, 924 F. Supp. at 1119, akin to the guard having shown that he was out of town at the time of the events. Plaintiff glosses over this distinction.

Plaintiff also urges the Court to rely upon recent decisions of Judge Steele departing from other decisions of Florida federal courts, which have refused to remand diet drug cases or have stayed the proceedings to allow the MDL Court to decide the issue. The contrarian remand of *Parent v. Wyeth*, for example, does not rest on good law. The Court in *Parent* did not find that the plaintiff had put forward competent evidence to rebut Wyeth's submissions and establish a factual basis for her claims. Instead, the Court held that the complaint itself created "factual disputes that must be resolved in favor of plaintiff at this stage." *Parent v. Wyeth*, No. 2:03-cv-626-FTM-29SPC, slip op. at 3 (M.D. Fla. Dec. 19, 2003) (Pl.'s Mem. of Law. Ex. A-7). *Parent* is inconsistent with Eleventh Circuit precedent requiring plaintiffs to counter, with evidence, affidavits that demonstrate fraudulent joinder, and it is at odds with the rulings of this Court and the Northern District of Florida

6

in *Kearney*, *Long*, and *Campana* finding fraudulent joinder on the basis of uncontroverted affidavits.[4] If allegations alone were sufficient to create a factual dispute, plaintiffs would *always* prevail on a motion to remand. Even an affidavit showing that a non-diverse employee defendant did not work for Wyeth at the relevant time, or for that matter was dead, would merely create a factual issue. But in both *Crowe* and *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553 (11th Cir. 1997), the Court of Appeals held that courts "addressing the issue of fraudulent joinder . . . can consider any submitted affidavits and/or deposition transcripts." *Cabalceta*, 883 F.2d at 1561; *accord Crowe*, 113 F.3d at 1538. If affidavits could only serve to create a factual dispute about the complaint's allegations – a dispute that would *always* be resolved in the plaintiff's favor at the remand stage – then it would make no sense for courts to consider this evidence.[5]

In short, the law does not require the departure from common sense that Plaintiff urges. She may not defeat removal by making a baseless claim against a non-diverse defendant, then barring any inquiry into the flimsiness of her charge.[6]

---

[4] For the same reasons, the Court also should not follow *Hroncich*, *Piccirillo* and like decisions of Judge Steele, *see* Pl.'s Mem. of Law at 5-6 & Exs. A-8, B, which employ the same discrepant reasoning as *Parent*.

[5] Moreover, *Crowe* held that "the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed. R. Civ. P. 56(b)." *Crowe*, 113 F.3d at 1538. Of course, courts are not to "weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." *Id.* at 1538. But the summary judgment-type procedures prescribed by the Court of Appeals would be meaningless if plaintiffs did not have to provide some factual basis – beyond the complaint – for claims against defendants alleged to be fraudulently joined. *Cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) ("[A] party opposing a properly supported motion for summary judgment *may not rest upon mere allegation or denials of his pleading*, but must set forth specific facts showing that there is a genuine issue for trial." (citing Fed. R. Civ. P. 56(e) (emphasis added)). The Fifth Circuit has clarified that in determining fraudulent joinder, "factual controversies [are to be resolved] in favor of the nonmoving party, but *only* when there is an actual controversy, that is, when *both* parties have submitted *evidence* of contradictory facts," *Badon*, 224 F.3d at 393-94 (emphasis added).

[6] Plaintiff's counsel make much of the fact that Wyeth recently chose not to remove 24 similar cases Plaintiff's counsel have filed in Lee County – cases that would go to the Fort Myers Division and thus to Judge Steele – as if this somehow demonstrated Wyeth's knowledge that its removal of diet drug cases is inappropriate. Far from it. The decision not to remove those cases merely reflects Wyeth's acknowledgment that further removals to Judge Steele's jurisdiction would be fruitless, in light of his continued departures from other rulings of this Court and Eleventh Circuit precedent. Moreover, Wyeth questions whether the recent flurry of diet drug cases filed by these and other counsel in Lee County are properly venued, or are an egregious display of forum-shopping aimed at defeating removal.

## II.     Plaintiff Has No Reasonable Basis for Claims Against the Sales Representative.

Plaintiff lacks a reasonable basis for claims against the sales representative defendant because he did not personally participate in any tort.  He never detailed Pondimin, a fact Plaintiff does not challenge. As to Redux, he had no independent knowledge or control over the messages he conveyed to physicians, and thus no reason to believe the information he imparted was incorrect.  For these and other reasons, Plaintiff cannot recover on any of her causes of action against the sales representative.

### A.     The Sales Representative Did Not Personally Participate in Any Wrongdoing.

Under Florida law, corporate employees cannot be held personally liable for the wrongful action of the company unless they personally participated in the tort.  *Checkers Drive-In Rests., Inc. v. Tampa Checkmate Food Servs., Inc.*, 805 So. 2d 941, 944 (Fla. 2d DCA 2001); *see also McElveen v. Peeler*, 544 So. 2d 270, 272 (Fla. 1st DCA 1989); *Orlovsky v. Solid Surf, Inc.*, 405 So. 2d 1363, 1364 (Fla. 4th DCA 1981). Employees may be jointly liable only "[t]o the extent that they aid in producing something which they should realize is likely to harm others."  Restatement (Second) of Agency § 350, cmt. c (1958), *cited in Kerry's Bromeliad Nursery v. Reiling*, 561 So. 2d 1305, 1307 (Fla. 3d DCA 1990); *see also* 27 Am. Jur. 2d, Employment Relationship § 488 ("[T]hat an employee was acting under directions will . . . protect him from liability for the employer's negligence unless the employee knew or had reason to know that the acts were . . . liable to cause injury.").

Plaintiff does not contest the fact that Mr. Sullivan never detailed Pondimin. *See* Pl.'s Mem. of Law at 7.  As to Redux, the sales representative marketed this drug based on materials and information provided by Wyeth.  As noted above, he has sworn that he had no knowledge of a link between valvular heart disease and diet drugs before that allegation was first publicized; no role in creating the package insert or other materials related to Redux that he provided to physicians (or in creating materials for Pondimin, which he did not detail); no source of knowledge about Redux and Pondimin independent from Wyeth; and no independent training with which to evaluate the safety

or efficacy of Redux and Pondimin.  *See* Sullivan Decl. (Notice of Removal Ex. 28).

Plaintiff fails to rebut the sales representative's sworn statements. Among the multitude of remand exhibits, Plaintiff offers only one piece of evidence – a collection of Redux sales force training and sales materials – to suggest that Wyeth sales representatives generally knew that company claims about Redux were false.  *See* Pl.'s Mem. of Law at 8 & Exs. C-1, C-2.  But nothing in these exhibits instructs or even insinuates that sales representatives should withhold truthful information about the safety of Redux, as Plaintiff claims.  Plaintiff seizes on boilerplate language that sales representatives should not share internal company documents with the doctors they visit. But the sales materials explicitly state that "Wyeth-Ayerst places a high priority on clearly communicating the risks and benefits of Redux™ . . . to health care providers and patients." Pl.'s Mem. of Law Ex. C-2 at 439.  Likewise, the training materials state that it is "important to give a full presentation to each physician" regarding Redux, including information on "efficacy and safety data, adverse events, contraindications and warnings." Pl.'s Mem. of Law Ex. C-1 at 424.

Moreover, the Food and Drug Administration ("FDA") itself had approved Wyeth's diet drugs as "safe and effective" – as recently as April 1996, in the case of Redux.  In order to obtain the FDA's approval to sell a drug in interstate commerce, a manufacturer submits a New Drug Application ("NDA").  21 U.S.C. § 355(b).  When the FDA approves the NDA, it approves both the pharmaceutical, finding that it is safe and effective, and the final version of the product labeling. *See* 21 U.S.C. §§ 355(c), 355(d)(7). Thus, to the extent sales representatives told physicians that a Wyeth diet drug was "safe and effective," they were merely repeating what the FDA had determined in approving the drugs.  They had no knowledge to the contrary.  Sullivan Decl. ¶¶ 5-7 (Notice of Removal Ex. 28).  Indeed, according to the Master Complaint, which Plaintiff adopts by reference, Wyeth concealed from the world the risk of valvular heart disease – the disease Plaintiff claims to have.  Plaintiff offers nothing to contradict the sales representative's averments that he,

like the rest of the world, knew nothing about that issue before it was widely publicized.[7]

The cases upon which Plaintiff relies do not rescue her from this factual vacuum. In neither *Albertson v. Richardson-Merrell, Inc.*, 441 So. 2d 1146 (Fla. 4th DCA 1983), nor *Little v. Wyeth-Ayerst Laboratories, Inc.*, No. 99-2244-CIV-T-17F (M.D. Fla. Dec. 9, 1999) (Pl.'s Mem. of Law Ex. A-1),[8] did the Court consider evidence, like that offered here, that the sales representative lacked any basis to challenge the company's information about the health risks of the drug at issue. Indeed, *Albertson* reversed dismissal of a complaint, so the Court did not go behind the pleadings.

Faced with similar evidence about the knowledge and activities of sales representatives, several courts have held that sales representatives were fraudulently joined. *See, e.g., Fowler*, slip op. at 8 ("Defendants Coe and Berry had no independent knowledge or control over the messages that Wyeth provided to physicians . . . .") (Ex. 2); *Petty*, slip op. at 7 (same) (Ex. 3); *Lewis*, slip op. at 7 (same) (Ex. 4); *Westbrook v. Wyeth*, No. 03-1918, slip op. at 3-4 (W.D. La. Feb. 2, 2004) (finding fraudulent joinder in part because sales representatives "were not aware of any association between Pondimin and Redux and valvular heart disease until it was first publicized by the media") (Ex. 11); *Turner v. Wyeth*, No. A-03-CA-466-SS, slip op. at 7 (W.D. Tex. Sept. 17, 2003) (relying on

---

[7] The alleged association between Pondimin and Redux and valvular heart disease was first publicized in July 1997, two months after Plaintiff filled her only Redux prescription. *See* Compl. ¶ 3 & Ex. A (Notice of Removal Ex. 1). On July 8, 1997, the FDA published a medical advisory about that risk, based on an announcement the same day by the Mayo Clinic that it had observed valvular heart disease in patients who had used these drugs. *See* FDA July 8, 1997 Public Health Advisory (Ex. 7). That same day, a Wyeth official sent a voicemail to the sales representatives, followed by an e-mail, advising them of the Mayo Clinic announcement and of the fact that "Wyeth-Ayerst has reviewed the case reports from the Mayo Clinic and is concerned about the potential association of a rare and unusual valvular disorder" with the diet drugs. *See* July 8, 1997 E-mail from Laroux Jooste (Ex. 8). Wyeth sent prescribing physicians a letter on July 24, 1997, advising them that it was adding a warning to the product label about that risk. *See* July 24, 1997 Letter from Wyeth to Physicians (Ex. 9). Also on July 24, another Wyeth official distributed a "bulletin broadcast" voicemail to the sales representatives, advising them "about some developments related to the recent Mayo Clinic observations," which the official referred to as "the initial reports of cardiac valvular disease." *See* July 24, 1997 E-mail from Bruce Reid and Voicemail Script (Ex. 10). The message also referred to the Mayo Clinic's observations as a *"new development." Id.* (emphasis added). These documents further support Mr. Sullivan's declaration that Wyeth had never previously informed him of any risk of valvular heart disease associated with Pondimin and Redux.

[8] Plaintiff cites five other cases – *Wrisley, Morris, Martin, Snell* and *Hildebrand* – that merely adopt the *Little* holding. *See* Pl.'s Mem. of Law at 5 & Exs. A-2 to A-6.

uncontroverted evidence that "detailers merely pass on the FDA-information provided to them by Wyeth") (Ex. 12); *Northcutt v. Wyeth*, Civ. No. 03-2665, slip op. at 5 (S.D. Tex. Aug. 13, 2003) ("There is no allegation nor presentation of any facts that would create an independent duty owing from these individual employees to [the plaintiff], apart from the duty owing by Wyeth, that was violated.") (Notice of Removal Ex. 25); *see also Sobkowski*, slip op. at (magistrate's report and recommendation finding fraudulent joinder in part because the sales representatives "did not have any independent knowledge of the danger which Redux allegedly presented.") (Ex. 5).

### B. Plaintiff Fails to State Claims for Strict Liability, Misrepresentation or Fraud Against the Sales Representative Defendant.

That the sales representative did not personally participate in a tort demonstrates why he cannot be individually liable as a general matter, and in particular why Plaintiff's negligent failure-to-warn allegations (Master Complaint Count II) fail as they relate to this defendant. Turning to the other claims in the Master Complaint, it is also apparent that Plaintiff has fraudulently joined the sales representative. Count I, a strict liability claim, necessarily fails as to Mr. Sullivan. Florida, like other states, applies strict liability to *manufacturers*. *See West v. Caterpillar Tractor Co.*, 336 So.2d 80, 87 (Fla. 1976). Here, it is undisputed that the sales representative played no role in the design, production, or manufacture of Pondimin. Sullivan Decl. ¶ 10 (Notice of Removal Ex. 28). Courts have recognized that pharmaceutical sales representatives cannot be strictly liable. *See Fowler,* slip op. at 8 n. 7 ("Coe and Berry were neither manufacturers of Pondimin nor within the drug's distributive chain.") (Ex. 2); *Petty,* slip op. at 8 n.6 (same) (Ex. 3); *Lewis,* slip op. at 7 n.6 (same) (Ex. 4); *Gieras v. Am. Home Prods. Corp.*, No. CI 01-10866, slip op. at 2 (Orange County Cir. Ct. Mar. 18, 2003) (Notice of Removal Ex. 32); *see also Anderson*, PTO 2567, 220 F. Supp. 2d at 424-425; *In re Rezulin Prods. Liability Litig.*, 133 F. Supp. 2d 272, 287 (S.D.N.Y. 2001).

Counts III and IV, which allege misrepresentation and fraud, are "too general, vague [and] conclusory" to state valid claims against the sales representative. *Myers v. Myers*, 652 So. 2d 121,

1215 (Fla. 5th DCA 1995); *see also* Fla. R. Civ. P. 1.120(b) (fraud must be pled with particularity). They fail to indicate whether Wyeth, Eckerd, or the sales representative made the alleged misrepresentations, and when. *See* Master Compl. ¶¶ 46, 60. They also do not indicate whether the misrepresentations were to Plaintiff, her prescriber, or cryptically described "other dispensing entities." *See id.* Instead, the allegations rely heavily on "and/or."[9] The MDL Court has twice held that sales representatives were fraudulently joined in part because the fraud claims against them were not pleaded with sufficient particularity. *See Amiker v. Wyeth*, PTO 3391, slip op. at 10 (E.D. Pa. Apr. 2, 2004) (Ex. 13); *Anderson*, PTO 2567, 220 F. Supp. 2d at 424.

Plaintiff also will not be able to present any evidence to support the fraud claim. She misunderstands the import of PTO 2828, an MDL injunction against introducing evidence of intentional misconduct. That Plaintiff disclaims seeking punitive damages is immaterial. As a member of the settlement class approved by the MDL Court, *see In re Diet Drugs,* PTO 1415, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000), Plaintiff may not use evidence that directly or indirectly injects punitive damages into the case. Thus, in PTO 2828, Judge Bartle barred a plaintiff from introducing evidence of deliberate or intentional misconduct, because such evidence "is designed to demonstrate willful, wanton or malicious conduct rather than negligence or strict liability." *In re Diet Drugs*, PTO 2828, slip op. at 6 (Apr. 8, 2003) (Notice of Removal Ex. 31). Plaintiff's fraud claim will fail because she will not be able to introduce the evidence to support it.[10]

---

[9] With no sense of irony, Plaintiff responds: "Plaintiff specifically alleged that the misrepresentations made by the Defendants, employees and/or detail persons or Representative of Defendants were perpetuated directly or indirectly by the Defendants, employees, agents and/or detail persons or Representative of Defendants." Pl.'s Mem. of Law at 11-12. In further support of her claims, Plaintiff cites paragraph 37 of the Master Complaint, but those are negligence allegations. That they may be sufficiently particular does not save the misrepresentation and fraud claims.

[10] Plaintiff cannot escape this rule by arguing that it will be left to the state court to determine admissibility. "The prohibition in . . . the Settlement . . . overrides any contrary or inconsistent state evidentiary, procedural, or substantive rule of law." *Id.*, slip op. at 39. Although Judge Bartle did not specifically rule on the admissibility of each of thousands of pieces of evidence that a plaintiff might seek to use at trial, he did rule on many exhibits, and he expressed confidence "that the state trial judge will see to it that the terms of the [Settlement] will be upheld in accordance with this PTO." *Id.*

In sum, Plaintiff has not even begun to meet her burden of providing a basis for her claims against the sales representative. She cannot obscure that fact with all manner of irrelevancies.

**III.**   **Plaintiff Has No Reasonable Basis for Claims Against Eckerd.**

Plaintiff's claims as to Eckerd also are meritless. She does not even allege that she obtained her diet drugs there. She has no evidence to back her claim that Eckerd distributed diet drugs. Plaintiff further alleges that Eckerd issued co-promotional pieces with Wyeth, but where are they? Plaintiff produces not a scintilla of evidence to establish any basis for Eckerd's liability. Further, in arguing that her claims against Eckerd are timely, Plaintiff contends her injuries are latent – an argument she is estopped from making. To be sure, Plaintiff cites cases finding that Eckerd was not fraudulently joined. But none involved, as here, a challenge to the plaintiffs' evidentiary basis for their claims or a statute of limitations inquiry.

**A.**   **Plaintiff's Claims Against Eckerd Have No Factual Basis.**

Plaintiff does not allege she purchased Pondimin at Eckerd. *See* Complaint ¶ 3 & Ex. A. On that basis alone, Eckerd has no connection to this lawsuit. Nowhere in her Motion to Remand, however, does Plaintiff address this deficiency. Instead, she accuses Wyeth of misunderstanding her case. Casting about for a theory, she contends that Eckerd is sued not in its role as a retail pharmacy, but as a distributor and promoter of diet drugs. Pl.'s Mem. of Law at 11.

Eckerd, however, has provided sworn statements refuting the allegations of distribution and promotion. *See* Robert Verscharen Aff. (Eckerd's Vice President of Pharmacy Purchasing and Formulary Management) (Ex. 14); Eckerd Corporation's Answers to Wyeth's Interrogatories, *Bennett v. Wyeth*, No. 3:03-cv-224 (N.D. Fla. June 10, 2003) ("Answers to Interrogatories") (Notice of Removal Ex. 8). Specifically, Eckerd averred that it has never been an intermediary distributor of Pondimin or Redux. Verscharen Aff. ¶6; Answers to Interrogatories ¶ 2. Eckerd further averred that it has never sponsored co-promotional pieces for Pondimin or Redux.

Verscharen Aff. ¶ 4; *see also* Answers to Interrogatories ¶ 3.[11]

Plaintiff fails to rebut this evidence, as was required to avoid a finding of fraudulent joinder. She has put forward nothing to demonstrate that Eckerd distributed diet drugs. Indeed, other than casting aspersions on Wyeth's ability to comprehend her case, she hardly mentions distribution at all. As to promotion, Plaintiff purports to offer evidence that she had a basis for suing Eckerd as a promoter of diet drugs. But the document she tenders is so far afield, and her interpretation of it so strained, that her reliance upon it demonstrates just the opposite – that there is no such basis.

The document is titled "Reimbursement Agreement," Pl.'s Mem. of Law Ex. H, and Plaintiff repeatedly refers to it as the "agreement" between Wyeth and Eckerd to co-promote diet drugs. Pl.'s Mem. of Law at 13-14. This document is a draft. It is labeled "DRAFT." It has spaces for signatures, but neither Wyeth nor Eckerd signed it. *Moreover, Plaintiff has, but did not attach, the subsequent revision in which Pondimin and Redux were stricken – literally lined through – from the draft.* Ex. 15. Since when is a draft, unsigned document a binding "agreement"? If this is Plaintiff's "evidence" of co-promotion by Eckerd – rather than copies of joint advertisements, an unsigned draft agreement from which diet drugs were stricken – she has no good-faith basis for the allegation. In short, there is no factual basis for any of Plaintiff's claims against Eckerd.[12]

## B.     Plaintiff Is Estopped from Arguing that Her Injury Is Latent, and Therefore Can State No Claim Against Eckerd.

Even if Plaintiff had a factual basis for her claims, Eckerd still would be fraudulently joined. In its Notice of Removal, Wyeth noted the massive publicity surrounding the withdrawal of diet drugs from the market in 1997, which was sufficient to put Plaintiff on inquiry notice of her alleged

---

[11] Plaintiff claims, without elaboration, that Wyeth's reliance on these answers to interrogatories "is contrary to Florida law and Federal precedent." Pl.'s Mem. of Law at 13. It is difficult to divine Plaintiff's basis for this charge. There is nothing inappropriate in one defendant asking another to swear truthfully to facts through formal discovery. Nor are Eckerd's answers mere denials of the allegations in Plaintiff's Complaint. They are sworn evidence, the product of Eckerd's own due diligence, confirming the lack of any factual basis for Plaintiff's claims.

[12] Further, there is no reason to believe that evidence supporting these claims will ever be found. No such evidence has been uncovered in six years of diet drug litigation.

injuries. Indeed, the MDL Court recently held that a physician was fraudulently joined because that publicity put the plaintiff on notice of her claims and the statute of limitations had run. *Ferrell v. Wyeth*, PTO 2996, slip op. at 12-17 (E.D. Pa. Sept. 5, 2003) (Notice of Removal Ex. 10).

To escape the running of the statute of limitations, Plaintiff asserts that she "did *exactly* what Wyeth claims [she] should have done" – she consulted a physician after her use of diet drugs, but at no time prior to an echocardiogram, taken in 2000 or later, did she learn of a heart valve injury. Pl.'s Mem. of Law at 16 (emphasis in original).[13] This response dooms her claim. She cannot allege that the Pondimin and Redux she took in 1996 and 1997 caused a latent injury manifested in 2000 or later. In approving the Nationwide Class Action Settlement Agreement with Wyeth, the MDL Court conclusively determined, based on the body of scientific data on the subject, that diet drug-related heart valve damage is not latent – *i.e.*, any such damage is "detectable by echocardiogram shortly after the patient[] discontinue[s] use of diet drugs." *In re Diet Drugs*, PTO 1415, 2000 WL 1222042, at *46 (E.D. Pa. Aug. 28, 2000); *see also Ferrell*, PTO 2996, slip op. at 7 ("There is no latency period between ingestion of Pondimin and any [valvular] injury.") (Notice of Removal Ex. 10).[14]

Moreover, the MDL Court has not only repeatedly held that such injuries are not latent, but also concluded that plaintiffs are collaterally estopped from making this argument, because it was litigated and decided in connection with approval of the Settlement:

> [P]laintiffs are class members and were thus parties to the Settlement . . . . The issue of latency was actually litigated in the fairness hearing and is the same issue that the plaintiffs are now raising to defeat the bar of the statute of limitations. Judge Bechtle's determination of no latency, that is that class members' injuries occurred within a short time after ingesting fen-phen, was an essential finding, for it directly affected the adequacy of class representation. . . . Finally, PTO No. 1415, in which Judge Bechtle approved the Settlement Agreement, is a final and valid judgment, upheld on appeal. Thus, plaintiffs are collaterally estopped from relitigating the issue of latency . . . .

---

[13] Plaintiff does not provide the date of her echocardiogram, but the premise of her argument is that it was performed within the past four years. *See* Pl.'s Mem. of Law at 18.

[14] This conclusion is supported by the numerous scientific studies attached as Exhibit 17 to Wyeth's Notice of Removal.

*Alexander v. Wyeth*, PTO 3230, slip op. at 14-15 (E.D. Pa. Jan. 29, 2004) (Notice of Removal Ex. 18); *accord French v. Wyeth*, PTO 3281, slip op. at 12-13 (E.D. Pa. Feb. 18, 2004) (Notice of Removal Ex. 19).[15]

Although Plaintiff has filed this lawsuit pursuant to her "intermediate opt-out" right under the Settlement, she remains a member of the settlement class, bound by the Settlement and the rulings of the MDL Court. *See In re Diet Drugs*, PTO 2828, slip op. at 2 (Apr. 8, 2003) (Notice of Removal Ex. 31) (holding that the Settlement binds class members even after they elect downstream opt-out rights). Thus, she too is collaterally estopped from contending that her alleged heart valve injury is latent. Because any diet drug injury she suffered was not latent, her assertion that she did not develop an injury until years after her use of the drugs eviscerates her claim against Eckerd.[16]

---

[15] As stated in Wyeth's Notice of Removal, Plaintiff is also *judicially* estopped from arguing latency, because she – through her class counsel – argued that there was no latency period when the Settlement was before the MDL Court for approval. *See* Notice of Removal at 12 n.7; *see also Williams v. Kloeppel*, 537 So. 2d 1033, 1037 (Fla. 1st DCA 1988) ("[W]hen a court accepts a party's allegation in one suit, that party will be estopped to assert a contrary position in a later action involving the same parties and subject matter.").

[16] In arguing that Plaintiff is collaterally and judicially estopped from contending that diet drug injuries are latent, Wyeth in its Notice of Removal relied, in part, on the findings of the MDL Court in approving the Settlement, and on the statements Plaintiff's own class counsel made regarding the lack of a latency period. Plaintiff claims that the Settlement Agreement prohibits Wyeth from citing these materials, and therefore that Wyeth's estoppel arguments are barred. She is grasping at straws. First, these materials are not necessary to the argument. This Court need look no further than the MDL's recent decisions in *Alexander* (PTO 3230) and *French* (PTO 3281) to find that Plaintiff is collaterally estopped from arguing latency. Second, the Court's decisions in *Alexander* and *French* implicitly disposed of Plaintiff's argument. And third, section VIII.F.3 of the Settlement Agreement is not the complete prohibition Plaintiff wishes for.

Rather, that section bars the parties from doing two things, except as necessary to enforce the Settlement's terms: (1) "introduc[ing] or offer[ing]" the terms of the Settlement, or statements made in connection with the Settlement's negotiation, execution or implementation; and (2) "otherwise rely[ing]" on the terms of the Settlement. Settlement Agreement § VIII.F.3 (Ex. 16). Wyeth has done neither of these things. Wyeth relied not upon the Settlement's terms, but upon the findings of the MDL Court, and statements of class counsel, in connection with approval of the Settlement.

By its terms, section VIII.F.3 does not prohibit reliance on these materials. It prevents Wyeth from "introduc[ing] and/or offer[ing]" these items – as in introducing or offering them into evidence. But it does not preclude reliance on them for other purposes, such as citing them to the Court in pretrial motions. This distinction makes sense in the context of the Settlement. The parties of course might not want evidence of the settlement negotiations to be presented to a jury. But for issues (such as latency) that the MDL Court conclusively decided, there is no reason to preclude parties from advising this and other court of the MDL Court's findings. To hold otherwise would allow Plaintiff to argue counter to the premises of the Settlement from which she now is benefiting.

In any event, the MDL Court retained *"exclusive jurisdiction . . . to interpret and enforce the Settlement in accordance with its terms."* *In re Diet Drugs*, PTO 1415, 2000 WL 1222042, at *72 (emphasis added). Plaintiff's argument should, therefore, be directed to the MDL Court.

**IV.     Plaintiff Has No Intent to Pursue Eckerd or the Sales Representative to Judgment.**

In addition to there being no basis for the claims against them, Eckerd and the sales

representative are fraudulently joined because Plaintiff has no intent to pursue them to judgment.

Both the MDL Court and the Middle District of Florida have found in diet drug cases that a

plaintiff's lack of intent to pursue a defendant demonstrates fraudulent joinder. *See Anderson*, PTO

2567, 220 F. Supp. 2d at 422; *Long*, slip op. at 5 (Notice of Removal Ex. 21); *see also generally*

*Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 98 (1921); *Triggs v. John Crump Toyota*, 154 F.

3d 1284, 1291 (11th Cir. 1998); *Samples v. Conoco*, 165 F. Supp. 2d 1303, 1321 (N.D. Fla. 2001).[17]

Indeed, the improper joinder of sales representatives and pharmacies is not a new tactic in the diet

drug litigation.  These defendants are part of an ongoing "sham" described by the MDL Court:

> What has been transpiring can only be characterized as a sham, at the unfair expense
> not only of AHP [Wyeth] but of many individuals and small enterprises that are
> being unfairly dragged into court simply to prevent the adjudication of lawsuits
> against AHP [Wyeth], the real target, in a federal forum.

*Anderson*, PTO 2567, 220 F. Supp. 2d. at 425.  Commenting in particular on the joinder of pharmacies

in two Mississippi cases, the Court stated that "there is a pattern [in the diet drug litigation] of

pharmacies being named in complaints, but never pursued to judgment, typically being voluntarily

dismissed at some point after the defendants' ability to remove the case has expired." *Id.* at 424.[18]

Despite the MDL Court's admonition, Plaintiff's counsel have perpetuated in Florida this

very "sham" of joining a pharmacy for the sole purpose of thwarting removal.  To wit:

---

[17] Plaintiff cites the *Samples* case for the proposition that "the inquiry need not examine the motive of Plaintiff in pursuing a judgment against a Defendant." Pl.'s Mem. of Law at 19.  This misses Wyeth's point, which is that she *does not intend* to pursue a judgment against the sales representative or Eckerd at all.

[18] Plaintiff argues that the MDL opinion is inapposite because Eckerd is sued not as a retail pharmacy, but as a promoter and distributor of diet drugs.  *See* Pl.'s Mem. of Law at 20.  Plaintiff again misses the point.  Regardless of the capacity in which Eckerd is sued, Eckerd is fraudulently joined because Plaintiff has no intent to pursue a judgment against it. Although the MDL Court ultimately found that the Mississippi pharmacy was fraudulently joined because there was no "reasonable basis in fact" for the claims against it, *id.* at 425, the opinion also relied heavily on the pattern of pharmacies not being pursued to judgment, *see id.* at 424, and as such is persuasive here.

- Plaintiff's counsel have recently filed 173 diet drug cases in Florida. They have joined Eckerd in every case, and it is the *only* pharmacy they have sued in these cases. Their joinder of Eckerd is indiscriminate, without regard to whether the plaintiff actually obtained his or his diet drugs there. Indeed, of the 125 plaintiffs for whom counsel have provided pharmacy information, 103 – a staggering 85 percent – acquired their diet drugs from Walgreens or some other pharmacy. It is no coincidence that Eckerd is the only major pharmacy chain based in Florida.

- Plaintiff's counsel are old hands in this litigation, but their penchant for joining Eckerd is new. From 1998 to 2000, they filed nearly 300 diet drug cases against Wyeth in Florida. Never before was it their practice to sue Eckerd. This, too, is no coincidence. In most of those cases, manufacturers and distributors of phentermine – the drug paired with Pondimin (fenfluramine) to form "fen-phen" – were the non-diverse and non-consenting defendants of choice.[19] The widespread practice of naming phentermine defendants, however, virtually ceased in 2002 after the MDL Court conclusively determined that these defendants were fraudulently joined because the plaintiffs' bar had no intent to pursue them. *See Anderson*, PTO 2567, 220 F. Supp. 2d at 420-22. Eckerd is merely Plaintiff's counsel's newest vehicle for keeping diet drug cases in state court.

As to sales representatives, in this case and others Plaintiff's counsel particularize no claims to these defendants. They simply rely on a Master Complaint with generic allegations against "Defendants" – allegations clearly directed at Wyeth – and check off the names of the sales representatives to whom they want them to apply as well. *See* Master Compl.; Compl. ¶ 4. In fact, the only portion of the Master Complaint that refers specifically to sales representatives does not allege that they did anything wrong. *See* Master Compl. ¶¶ 15-17.

Plaintiff's counsel's scattershot joinder of sales representatives further evinces a lack of intent to pursue them to judgment. As with Eckerd, they have named sales representatives in every case, though in many instances those representatives did not even detail the prescribing physician – and indeed, did not have the slightest connection to the case. In the most flagrant example of this practice, counsel sued 19 representatives in one case, but thereafter conceded they would need to

---

[19] Even phentermine defendants that did not destroy diversity could keep cases in state court by refusing to consent to removal, which they often did. Indeed, Judge Bartle noted significant evidence that phentermine defendants had reached agreements whereby plaintiffs would dismiss them in exchange for their refusal to consent to removal. *Id.* at 421-22.

dismiss 16 of those defendants. *See* Pl.'s Mot. to Remand, *Margolies v. Wyeth*, No. 8:03-cv-2190-T-24EAJ (M.D. Fla.). That Plaintiff's counsel shoot first, and ask questions later, speaks volumes. They could first conduct discovery to confirm which, if any, sales representatives have a link to the cases, but that would do nothing to block Wyeth's removal of the cases to federal court.

Faced with the charge that they do not intend to pursue Eckerd or the sales representative, the only response Plaintiff's counsel muster is that they are necessary defendants in these cases because otherwise Wyeth could point the finger at them as *Fabre* or "empty chair" defendants. *See* Pl.'s Mem. of Law at 18. Unless they are in the case, so the theory goes, the plaintiff would not be able to recover the share of liability attributed to Eckerd or the sales representative. This cannot be a serious argument. Wyeth has stated in this case and others that there is no evidence that it co-promoted diet drugs with Eckerd, or that the sales representatives committed any tort. Consistent with counsel's obligations under Rule 11, Wyeth could not seek to argue otherwise at trial. Indeed, Wyeth would be judicially estopped from making such arguments. *See Williams*, 537 So. 2d at 1037 ("[L]itigants are not permitted to take inconsistent positions in judicial proceedings.").

In short, Plaintiff's counsel's conduct is consistent with the MDL Court's determination that a pattern of fraudulent joinder pervades the diet drug litigation. In the face of that pattern, the law does not require the Court to suspend common sense. Plaintiff has Wyeth, the multi-billion dollar defendant. She cannot credibly contend that she needs, and intends to obtain, judgments against Eckerd and the sales representative. She knows, Wyeth knows, and the Court knows that these defendants are joined to defeat diversity.

## CONCLUSION

For the foregoing reasons, and those set forth in Wyeth's Notice of Removal, Wyeth

respectfully requests that the Court deny Plaintiff's Motion to Remand.[20]

Respectfully submitted,

*[signature]*

**Matthew J. Moore**
Florida Bar No. 0476587
**James B. Murphy, Jr.**
Florida Bar No. 287598
**SHOOK, HARDY & BACON L.L.P.**
100 North Tampa Street, Suite 2900
Tampa, FL 33602-5810
Ph: 813-202-7100/Fax: 813-221-8888

Attorneys for Wyeth, Matthew Sullivan
and Veronica Cazin

---

[20] The Motion to Remand also seeks fees and costs. There is no basis for the Court to grant this request. Removal of this case was proper, for the reasons set forth above. Even if the Court were to find that removal was improper, however, that finding would not automatically trigger the award of attorney's fees. *See Valedes v. Wal-Mart Stores, Inc.*, 199 F.3d 290, 292-93 (5th Cir. 2000). When the argument supporting removal is at least colorable or involves an unsettled area of law, courts in this Circuit have repeatedly declined to tax the defendant for removal under 28 U.S.C. § 1447(c). *See, e.g., Martin v. Mentor Corp.*, 142 F. Supp. 2d 1346, 1349 (M.D. Fla. 2001); *Dunlap v. New York Life Ins. Co.*, 958 F. Supp.
*Footnote continued on next page*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been forwarded by

U.S. Mail this 25 day of May, 2004, to C. Todd Alley, Esq., Alley & Ingram, 701 East Washington

Street, P.O. Box 3127, Tampa, FL 33601-3127; and Richard M. Zabak, 201 North Franklin Street,

Suite 2200, Tampa, FL 33602.

**Matthew J. Moore**
Florida Bar No. 0476587
**James B. Murphy, Jr.**
Florida Bar No. 287598
**SHOOK, HARDY & BACON L.L.P.**
100 North Tampa Street, Suite 2900
Tampa, FL 33602-5810
Ph: 813-202-7100/Fax: 813-221-8888

Attorneys for Wyeth, Matthew Sullivan
and Veronica Cazin

---

*Footnote continued from previous page*
589, 591-92 (M.D. Fla. 1997).

# EXHIBIT 1

AUG-26-2003  18:55       US DISTRICT COURT EDPA                              P.18/18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS                    :     MDL DOCKET NO. 1203
(PHENTERMINE, FENFLURAMINE,          :
DEXFENFLURAMINE) PRODUCTS            :
LIABILITY LITIGATION                 :
                                     :            FILED    AUG 25 2003
THIS DOCUMENT RELATES TO:            :
_____     :
SHEILA BROWN, et al.                 :
                                     :
            v.                       :
                                     :
AMERICAN HOME PRODUCTS               :
CORPORATION                          :     CIVIL ACTION NO. 99-20593

### PRETRIAL ORDER NO. 2984

AND NOW, this 25th day of August, 2003, for the
reasons set forth in the accompanying Memorandum, it is hereby
ORDERED that:

(1) the suggestions for the dissolution of MDL 1203 and
for remand of all pending cases to the various transferor courts
(incorrectly denominated by some Movants as a motion for
dissolution and remand) are DENIED; and

(2)  the parties shall file a copy of this Pretrial
Order, together with the accompanying Memorandum, with the
Judicial Panel on Multidistrict Litigation.

BY THE COURT:

ENTERED

AUG 2 6 2003

CLERK OF COURT

_____ J.

TOTAL P.18

FILED   AUG 25 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS          :
(PHENTERMINE, FENFLURAMINE, :     MDL DOCKET NO. 1203
DEXFENFLURAMINE) PRODUCTS   :
LIABILITY LITIGATION        :

MEMORANDUM AND PRETRIAL ORDER NO. 2984

Bartle, J.                                    August 25, 2003

    Pending before this, the transferee court, are
"motions" of certain class members to dissolve MDL 1203 involving
the diet drug (fen-phen) litigation and to remand all pending
cases to the various transferor courts.[1]  We have been advised
that similar motions have been filed with the Judicial Panel on
Multidistrict Litigation ("MDL Panel").

    Under 28 U.S.C. § 1407(a), only the MDL Panel has the
authority to grant the relief requested.  However, Rule 7.6(d) of
the Rules of Procedure of the Judicial Panel on Multidistrict
Litigation states, "[t]he Panel is reluctant to order remand
absent a suggestion of remand from the transferee district
court."  Thus, we will treat the pending motions to dissolve as
motions seeking a suggestion of remand.[2]

---

1.  These motions have been filed by MDL 1203 plaintiffs
represented by Fleming & Associates of Houston, Texas, the Law
Offices of Daniel E. Becnel, Jr., and O'Quinn, Laminack & Pirtle
of Houston, Texas.  O'Quinn Laminack & Pirtle filed a second
motion that was joined by its local counsel in Louisiana.

2.  One group of class members did correctly entitle its paper as
a suggestion of remand.

Title 28 U.S.C. § 1407(a) provides in relevant part:

When civil actions involving one or more
common questions of fact are pending in
different districts, such actions may be
transferred to any district for coordinated
or consolidated pretrial proceedings.  Such
transfers shall be made by the judicial panel
on multidistrict litigation authorized by
this section upon its determination that
transfers for such proceedings will be for
the convenience of parties and witnesses and
will promote the just and efficient conduct
of such actions.  Each action so transferred
shall be remanded by the panel at or before
the conclusion of such pretrial proceedings
to the district from which it was transferred
unless it shall have been previously
terminated ....

In an Amended Transfer Order dated January 6, 1998, the

MDL Panel selected the Eastern District of Pennsylvania as the

transferee court for MDL 1203 and assigned the matter to my able

former colleague Judge Louis C. Bechtle for "coordinated or

consolidated pretrial proceedings."  It recognized that "the

actions in this litigation involve common questions of fact and

that centralization under section 1407 in [this district] will

serve the convenience of the parties and witnesses and promote

the just and efficient conduct of this litigation."  In re Diet

Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab.

Litig., 990 F. Supp. 834, 835-36 (J.P.M.L. 1998).  Upon the

retirement of Judge Bechtle, the MDL Panel reassigned the

litigation to the undersigned on July 2, 2001.  In re Diet Drugs

(Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.,

Docket No. 1203 (J.P.M.L. July 2, 2001) (order reassigning

litigation).

-2-

Movants seek the remand of all pending cases in MDL 1203 on the basis that the MDL has fulfilled the objectives set forth by the MDL Panel. They argue that generic discovery has long been completed and only case-specific issues and discovery remain. In addition, they point to the estimated 90,000 class members who recently have exercised downstream opt-out rights under the class action Settlement Agreement with Wyeth and the likelihood that thousands of these individuals ultimately will file lawsuits which will end up as part of MDL 1203.[3] Since in Movants' view only case-specific issues are left, they assert that continuation of proceedings in the MDL will inconvenience the parties and witnesses and unnecessarily delay the resolution of their cases. We note that Movants do not contend that all pending cases have reached the "conclusion of pretrial proceedings."

It is true that generic liability discovery is currently completed. It remains to be seen whether the generic liability discovery can be used as is in downstream opt-out lawsuits. Settlement Agreement §§ IV.D.3, IV.D.4. In any event, the Supreme Court has indicated that the phrase "consolidated or coordinated" pretrial proceedings "is to be interpreted broadly." In re Patenaude, 210 F.3d 135, 142 (3d Cir. 2000) (discussing

---

3. Under the class action Settlement Agreement, class members may exercise what are described as intermediate or back-end opt-out rights under certain conditions. Settlement Agreement §§ IV.D.3, IV.D.4. A class member who opts out may pursue a limited recovery against Wyeth in a lawsuit in state or federal court.

-3-

Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 33-34 (1998)). Although the MDL Panel certainly has the power to dissolve the MDL once only case-specific issues remain, it is clear that consolidated or coordinated pretrial proceedings involving common facts have not yet run their course. See id. at 145.

Pretrial proceedings are ongoing in most if not all cases currently pending in MDL 1203.[4] Judge Bechtle determined that pretrial proceedings would include case-specific fact and expert discovery. See, e.g., Pretrial Order ("PTO") No. 1962 (May 9, 2001) at 8-12; PTO No. 417 (Jan. 6, 1999); PTO No. 292 (Sept. 24, 1998). Such discovery continues in accordance with the framework and specific deadlines implemented by this court. In addition, we recently updated the fact sheet and medical authorization forms that plaintiffs are required to submit to Wyeth and other named defendants in an effort further to streamline and expedite the discovery process. PTO No. 2930 (July 23, 2003). The nature of that discovery and the type of evidence sought by plaintiffs is generally similar from case to case. Under such circumstances, we believe that the continued administration of discovery and other pretrial matters through the MDL process will provide much needed consistency and reduce duplication of effort and expense.

---

4. Hundreds of cases, involving thousands of plaintiffs, currently are pending in MDL 1203. In addition, the MDL Panel continues to transfer cases here for the purpose of completing coordinated or consolidated pretrial proceedings.

-4-

Remand of all cases and dissolution of MDL 1203 is also, in our view, premature because issues common to all MDL cases continue to arise as diet drug cases are litigated.  As Movants are well aware, the litigation of intermediate opt-out lawsuits already has spawned issues of general applicability which not only implicate the class action Settlement Agreement approved by this court but also impact on federal lawsuits which are a part of the MDL.[5]  See Memorandum and PTO No. 2828 (Apr. 8, 2003); Memorandum and PTO No. 2717 (Jan. 29, 2003); Memorandum and PTO No. 2680 (Dec. 11, 2002); Memorandum and PTO No. 2625 (Oct. 17, 2002).

Under the Settlement Agreement, the relief available to downstream opt-out class members is strictly circumscribed.  In exchange for Wyeth's agreement to waive any defense based on the statute of limitations, opt-out class members may not seek punitive, exemplary or multiple damages in the tort system.  Settlement Agreement §§ IV.D.3.c, IV.D.4.c.  This prohibition against non-compensatory damages overrides any contrary or inconsistent state evidentiary, procedural, or substantive rule of law.  Memorandum and PTO 2867 (May 22, 2003) at 3; Memorandum and PTO No. 2828 at 39.  On two occasions so far, we have been forced to enjoin certain opt-out class members and their counsel from pursuing punitive damages in state courts in violation of

---

5.  Opt-out plaintiffs, we must emphasize, still remain as class members and continue to be subject to various terms of the Settlement Agreement.  See Memorandum and PTO No. 2828; Memorandum and PTO No. 2717; Memorandum and PTO No. 2680; Memorandum and PTO No. 2625.

the clear terms of § IV.D.3.  See Memorandum and PTO No. 2828 at
¶¶ 2-4; Memorandum and PTO No. 3680 at ¶ 3.  Had we not granted
this relief, it is not unlikely that this type of improper
activity would have become rampant.  Moreover, it would not be
surprising if there is the need for similar injunctive relief in
MDL 1203 cases.  Suffice it to say, if punitive awards, either in
name or substance, are allowed against Wyeth in downstream opt-
out cases, its financial viability could be placed in doubt, and
many deserving class members in this MDL 1203 may never be
compensated for their injuries.  To ensure a unified
interpretation of the Settlement Agreement and to prevent it from
being eviscerated, it is critical that we continue in our role as
supervisor of active MDL cases.

In addition, we anticipate that issues related to the
eligibility of individual class members to exercise an opt-out
under the terms of the Settlement Agreement will arise.
Eligibility to opt-out depends on the application of detailed
medical criteria set forth in the Settlement Agreement.
Settlement Agreement §§ IV.D.3.a, IV.D.4.a.  Again, coordinated
proceedings within MDL 1203 will best ensure that these criteria
are applied consistently.

Finally, recurrent issues have continued to emerge in
connection with motions to remand to state courts cases removed
by Wyeth on the basis of diversity of citizenship.  We have now
developed a broader perspective than is usually available to
individual transferor courts in dealing with widespread efforts

-6-

fraudulently to join Phentermine manufacturers as a tactic to thwart removal of cases to the federal courts.[6] Likewise, we are continuing to address the fraudulent joinder of individual physicians and pharmacies as defendants as a means to prevent removal. Many of these issues have common patterns as well as ramifications far beyond any specific case. Again, we believe these issues are best resolved in a uniform manner through the coordinated proceedings of MDL 1203.

Parties, of course, may seek a suggestion of remand from this court once the pretrial process in their individual cases, including case-specific fact and expert discovery, has been completed. See PTO No. 1962. In PTO No. 1962, this court implemented an ongoing remand program "to foster prompt adjudication of cases transferred here by the Panel that have completed the pretrial process." Id. at 3. Although some of Movants' individual cases may have reached the stage where a suggestion of remand is appropriate, their motions do not make this clear. Instead, they seek a suggestion for the blanket remand of all pending cases, including those involving class members they do not represent.

---

6.  Phentermine defendants manufactured a drug called phentermine which often was prescribed with Wyeth's diet drugs to counteract certain adverse side effects. This court has on numerous occasions noted the lack of evidence linking phentermine to the injuries associated with the use of Pondimin and Redux. Memorandum and PTO No. 2946 (July 30, 2003) at 11-13; Memorandum and PTO No. 2876 (May 29, 2003) at 6-9; Memorandum and PTO No. 2567 (Aug. 13, 2002) at 8-10; Memorandum and PTO No. 1351 (June 28, 2000) at 15.

If history is any guide, issues of general impact will continue to materialize into the foreseeable future.  We respectfully suggest that centralization under § 1407 in the Eastern District of Pennsylvania is still needed to serve the convenience of the parties and witnesses and to promote the just and efficient conduct of this litigation.  *See Diet Drugs Prods. Liab. Litig.*, 990 F. Supp. at 835-36.  The day will come when MDL 1203 will no longer be needed, but that day is not yet upon us.

We will deny the suggestions for the dissolution of MDL 1203 and for the remand of all pending cases to the various transferor courts.

-8-

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

EARLIE J. FOWLER, and SOLOMON
FOWLER, JR.,

     Plaintiffs,

v.                               Case No. 3:04-cv-83/MCR

WYETH, f/k/a American Home Products
Corporation; WYETH PHARMACEUTICALS,
f/k/a Wyeth-Ayerst Labs, Inc.; RICHARD COE;
and DEBRA BERRY,

     Defendants.
_____/

## ORDER DENYING PLAINTIFFS' MOTION TO REMAND AND TEMPORARILY STAYING THE CASE

On February 5, 2004, Plaintiffs EARLIE J. FOWLER and SOLOMON FOWLER, JR. ("Plaintiffs") filed a tort action in the Circuit Court in and for Escambia County, Florida seeking damages that allegedly resulted from Earlie Fowler's ingestion of the prescription diet drug Pondimin. (Doc. 1, Exh. 1). Plaintiffs' Complaint for Damages asserts the following six causes of action against all Defendants: (1) Count I - strict products liability, defective design; (2) Count II - strict products liability, failure to warn; (3) Count III - negligence; (4) Count IV - fraudulent misrepresentation and fraudulent concealment; (5) Count V - civil conspiracy; and (6) Count VI - loss of consortium. (Id.). On March 8, 2004, Defendants WYETH and WYETH PHARMACEUTICALS (collectively referred to as "Wyeth") filed a Notice of Removal in this Court based on diversity jurisdiction, see 28 U.S.C. § 1332. (Doc. 1). Although Plaintiffs and Defendants RICHARD COE ("Coe") and DEBRA BERRY

("Berry") are Florida residents, Wyeth's Notice asserts that Plaintiffs fraudulently joined Coe and Berry in this case so as to prevent federal diversity jurisdiction. (Id.).

On the day of removal, Wyeth also filed a Motion to Stay All Proceedings (see doc. 5) pending a final ruling from the Judicial Panel on Multi-District Litigation regarding transfer of this case to MDL-1203, and Defendants Coe and Berry each filed an Answer and Affirmative Defenses (see docs. 3 and 4). On March 17, 2004, Plaintiffs filed a Motion to Remand (see doc. 16) along with supporting documents (see doc. 17); however, due to a clerical error, the motion to remand and supporting documents were not reflected on the docket until April 5, 2004. Also on March 17, 2004, Plaintiffs filed a response in opposition to the motion to stay requesting that the Court consider their motion to remand before ruling on the motion to stay. (Doc. 5). Because of the clerical error, the Court was unaware that the motion to remand had been misfiled and granted the motion to stay. (Doc. 14). The clerical error was discovered shortly thereafter, and the Court lifted the stay. (Doc. 19). Defendants failed to timely respond in opposition to Plaintiffs' motion to remand.[1]

## A. Facts

Plaintiffs allege, in their complaint, that Earlie J. Fowler sustained serious and permanent injuries as a result of her ingestion of the prescription diet drug Pondimin. Wyeth distributed and sold Pondimin, as well as another diet drug, Redux, which is not at issue in this case. Wyeth promoted and distributed both drugs to physicians. When Pondimin or Redux is combined with another diet drug called phentermine, the resulting combination is popularly known as "fen-phen." In September 1997, both Pondimin and Redux were voluntarily withdrawn from the market due to concerns about heart valve damage associated with their usage.

---

[1] Defendant Wyeth did file a Consent Motion for Leave to Respond to Plaintiffs' Motion to Remand Out of Time (doc. 20) which is rendered moot by this order.

The following facts are derived from the declarations of Defendants Coe and Berry. (Doc. 1, Exhs. 14 and 15). In the 1990s, Coe and Berry worked as sales representatives for A.H. Robins Co. and American Home Products Corp. (which are now known as Wyeth). As sales representatives, they visited physicians' offices educating them about Redux so that the physicians could consider whether to prescribe Redux to their patients.[2]   On these visits, Coe and Berry gave the physicians FDA-approved package inserts about Wyeth's products. Typically, these visits lasted less than five minutes. Neither Coe nor Berry had any specialized medical or pharmacological training, except that which was provided by Wyeth. Their knowledge of Redux was derived exclusively from the training provided by Wyeth. Furthermore, neither Coe nor Berry had involvement in the preparation or development of package inserts for any drugs, and had no control over content or other written warnings. In fact, they had no knowledge concerning the association of Redux to valvular heart disease prior to that relationship being first acknowledged and publicized.

## B. Motion to Remand

In the motion to remand, Plaintiffs assert that Wyeth has not demonstrated that Coe and Berry were fraudulently joined in the current lawsuit. Plaintiffs claim that there is a possibility that they have a cause of action against Coe and Berry under Florida law, and because of that possibility, Plaintiffs argue that Coe and Berry are not fraudulently joined. If Plaintiffs are correct, then complete diversity will not exist, and the this case should be remanded to the Circuit Court in and for Escambia County, Florida. In opposition to Plaintiffs' motion to remand, Wyeth asserts that Plaintiffs have no reasonable basis for the claims asserted against Coe and Berry, thereby making them fraudulently joined.

---

[2] As sales representatives, neither Coe nor Berry "dispensed, supplied, designed, detailed, promoted, marketed, advertised, distributed, or sold Pondimin." (Doc. 1, Exhs. 14, ¶ 3, and 15, ¶ 3).

Case No. 3:04-cv-83/MCR

## 1. Removal Jurisdiction

A party may remove any case from a state court which could have been brought in federal court, see 28 U.S.C. § 1441(a), but the removing party bears the burden of establishing jurisdiction, see University of S. Ala. v. The Amer. Tobacco Co., 139 F. 3d 1368, 1373 (11th Cir. 1998) (citing Diaz v. Sheppard, 85 F. 3d 1502, 1505 (11th Cir. 1996)). To satisfy its burden as the removing party, Wyeth argues that the Court has removal jurisdiction over this case because Plaintiffs' complaint could have been originally filed in federal court pursuant to diversity jurisdiction. See 28 U.S.C. § 1332 (West 2004). Diversity jurisdiction is an adequate ground for removal, see Pancho de Perez, 139 F. 3d at 1373, but diversity jurisdiction only exists when there is complete diversity amongst the parties, see Triggs v. John Crump Toyota, Inc., 154 F. 3d 1284, 1287 (11th Cir. 1998). Complete diversity requires that all defendants have diverse citizenship from all plaintiffs. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806), overruled on other grounds, Louisville C. & C.R. Co. v. Letson, 43 U.S. (2 How.) 497, 11 L. Ed. 353 (1844); Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1542 (11th Cir. 1993).

The procedure to remove a case to federal court is relatively simple, requiring only that a defendant file a notice of removal containing "a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant." 28 U.S.C.A. § 1446(a) (West 2004). However, a court must continue to scrutinize its jurisdiction subsequent to removal. "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C.A. § 1447(c) (West 2004); see also FED. R. CIV. P. 12(h)(3) (2004). Once a court's jurisdiction is questioned—either by the court sua sponte or the plaintiff—the defendant, as the party invoking jurisdiction, has the burden of proving that federal jurisdiction is appropriate. See McNutt v. Gen. Motors Acceptance Corp. of Ind., Inc., 298 U.S. 178, 184–90, 56 S. Ct.

780, 782–85, 80 L. Ed. 1135 (1936); <u>Village Fair Shopping Ctr., Co. v. Sam Broadhead Trust</u>, 588 F.2d 431, 433 (5th Cir. 1979).[3]

As noted, Wyeth's notice of removal bases this Court's jurisdiction solely on diversity grounds.  Plaintiffs are Florida residents, and Defendant Wyeth is a Delaware corporation with its principal place of business in New Jersey.  However, Defendants Coe and Berry, like Plaintiffs, are Florida residents, which would normally destroy complete diversity under 28 U.S.C. § 1332, unless Coe and Berry were fraudulently joined in the lawsuit.

### 2. Fraudulent Joinder

Courts recognize an exception to the complete diversity requirement for cases in which a nondiverse party has been fraudulently joined.  See <u>Crowe v. Coleman</u>, 113 F. 3d 1536, 1538 (11th Cir. 1997).  The Eleventh Circuit has acknowledged three situations in which joinder is deemed fraudulent.  The first situation is when there is no possibility that the plaintiff can prove a cause of action against the non-diverse defendant.  See <u>Triggs v. John Crump Toyota, Inc.</u>, 154 F.3d 1284, 1287 (11th Cir. 1998)(<u>citing Coker v. Amoco Oil Co.</u>, 709 F.2d 1433, 1440 (11th Cir. 1983), <u>superceded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc.</u>, 991 F.2d 1533 (11th Cir. 1993)).  The second is where there is outright fraud in the plaintiff's pleading of jurisdictional facts.  See <u>Triggs</u>, 154 F.3d at 1287; <u>Coker</u>, 709 F.2d at 1440.  The third is where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several, or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant.  See <u>Triggs</u>, 154 F.3d at 1287; <u>Tapscott v. MS Dealer Serv. Corp.</u>, 77 F.3d 1353, 1355 (11th Cir. 1996), <u>abrogated on other grounds by Cohen v. Office Depot, Inc.</u>, 204 F.3d 1069 (11th Cir.

---

[3] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

Case No. 3:04-cv-83/MCR

2000).  The type of fraudulent joinder pertinent to the matter *sub judice* is the first type.

Wyeth, as the removing party, bears the burden of establishing fraudulent joinder.  See Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989). The burden is a "heavy one," because Plaintiffs need not have a winning case against the nondiverse Defendants. See Triggs, 154 F. 3d at 1287.  Rather, "[i]f there is even a possibility that a state court would find that the complaint states a cause of action against any one of the [nondiverse Defendants, the Court] must find that the joinder was proper and remand the case to the state court." Coker v. Amoco Oil Co., 709 F.2d 1433, 1440-41 (11th Cir. 1983), superceded by statute on other grounds by Wilson v. Gen. Motors Corp., 888 F.2d 779, 782 n. 3 (11th Cir. 1989).[4] A district court  "must evaluate the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff." Crowe, 113 F.3d at 1538. This determination is based on the plaintiff's pleadings at the time of removal. See Id.  However, a district court "may consider affidavits and deposition transcripts submitted by the parties." Id.[5]

---

[4] Plaintiffs argue that Wyeth must demonstrate fraudulent joinder with clear and convincing evidence. The former Fifth Circuit appears to have required that a defendant's evidence in support of a fraudulent joinder claim be clear and convincing.  See Parks v. New York Times Co., 308 F. 2d 474, 478 (5th Cir. 1962). Because former Fifth Circuit opinions are binding precedent for Eleventh Circuit courts, some district courts in the Eleventh Circuit have adopted the clear and convincing standard.  See e.g., Lane v. Champion Int'l Corp., 827 F. Supp. 701, 710 (S.D. Ala. 1993); Katz v. Costa Armatori, S.P.A., 718 F. Supp. 1508, 1510 (S.D. Fla. 1989). On the other hand, some district courts have questioned whether Parks remains good law in light of numerous Eleventh Circuit opinions which have failed to enunciate a clear and convincing requirement. See e.g., Campana v. American Home Products Corp., Case No. 1:99-cv-250/MMP, p. 7 n. 5 (N.D. Fla. March 7, 2000).  However, this Court need not determine whether the clear and convincing standard is applicable, because assuming *arguendo* that it is, the evidence presented by Wyeth is clear and convincing.

[5] The evidence in question in this case are declarations as opposed to affidavits; however, declarations have the same legal effect as affidavits.  See 28 U.S.C. § 1746 (West 2004). A "declaration" is "[a] formal, written statement–resembling an affidavit but not notarized or sworn to–that attests under penalty of perjury, to facts known by the declarant. Such a declaration, if properly prepared, is admissible in federal court with the same effect as an affidavit." BLACK'S LAW DICTIONARY 415 (7th ed. 1999) (citing 28 U.S.C. § 1746).

"While the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed.R.Civ.P. 56(b), the jurisdictional inquiry must not subsume substantive determination." Id. (citation and internal quotations omitted). "When considering a motion to remand, [the district court should] not weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." Id. Regarding a district court's determination of an arguable claim, the Eleventh Circuit has stated:

> For a [p]laintiff to present an arguable claim against an in-state [i.e., nondiverse] defendant and, therefore, to require a case removed to federal court to be remanded to state court, the plaintiff need not show that he could survive in the district court a motion for summary judgment filed by that in-state defendant. For a remand, the plaintiff's burden is much lighter than that: after drawing all reasonable inferences from the record in the plaintiff's favor and then resolving all contested issues of fact in favor of the plaintiff, there need only be "a reasonable basis for predicting that the state law *might* impose liability on the facts involved."

Id., at 1541-42 (quoting B. Inc. v. Miller Brewing Co., 663 F.. 2d 545, 549 (5th Cir. Unit A 1981)) (emphasis in original).[6]  Furthermore, because "[f]ederal courts are courts of limited jurisdiction,...there is a presumption against the exercise of federal jurisdiction, such that all uncertainties as to removal are to be resolved in favor of remand." Russell Corp. v. American Home Assurance Co., 264 F. 3d 1040, 1050 (11th Cir. 2001) (citing Burns v. Windsor Ins. Co., 31 F. 3d 1092, 1095 (11th Cir. 1994)).

In the instant case, Wyeth, the removing party, has affirmatively presented evidence to demonstrate that Defendants Coe and Berry were fraudulently joined by Plaintiffs.  The declarations of Coe and Berry show that they did not market,

---

[6] The Eleventh Circuit has cautioned that "district courts must exercise extraordinary care to avoid jumbling up motions for remand and motions for summary judgment that come before them. In the remand context, the district court's authority to look into the ultimate merit of the plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims." Crowe, 113 F. 3d at 1542.

**advertise, sell, distribute, promote, dispense, supply, detail, or design Pondimin,**
**which was the diet drug allegedly ingested by Earlie J. Fowler.   Moreover,**
**Defendants Coe and Berry had no independent knowledge or control over the**
**messages that Wyeth provided to physicians about Pondimin.   Based on the**
**declarations, Plaintiffs cannot maintain any of their asserted causes of action**
**against Coe and Berry.[7]   Once Wyeth presented the declarations to the Court,**

---

[7] Regarding the causes of action in Plaintiffs' complaint, Florida law requires:

(1) Counts I & II - strict liability - "In order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonable dangerous condition of the product, and the existence of a proximate causal connection between such condition and the user's injuries or damage." Siemens Energy & Automation, Inc. v. Medina, 719 So. 2d 312, 315 (citations omitted). "Florida courts have expanded the doctrine of strict liability to others in the distributive chain including retailers, wholesalers, and distributors." Id. (citations omitted). In the case at hand, it is clear that Coe and Berry were neither manufacturers of Pondimin nor within the drug's distributive chain. Furthermore, unlike the defendant in Medina, neither Coe nor Berry were brokers of Pondimin who served as the conduit of information between Wyeth and physicians. Thus, there is no possibility that a Florida court could determine that Plaintiff Earlie J. Fowler states a claim for strict liability against Coe and Berry.

(2) Count III - negligence (based on a failure to warn and misrepresentation) - Because Defendants Coe and Berry had no knowledge about Pondimin and did not distribute, sell, market, etc. it to physicians, Plaintiff Earlie J. Fowler fails to state a claim for negligence. See Cooper Hotel Servs., Inc. v. MacFarland, 662 So. 2d 710, 712 (Fla. 2nd DCA 1995) (Under Florida law, the elements for negligence are: "(1) the defendant had a duty to protect the plaintiff; (2) the defendant breached that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injuries and resulting damages.") (citation omitted). Coe and Berry owed no duty to Earlie J. Fowler, and they could not be the legal or proximate cause of her alleged injuries. Thus, there is no possibility that a Florida court could determine that Plaintiff Earlie J. Fowler states a claim for negligence against Coe and Berry.

(3) Count IV - fraudulent misrepresentation and fraudulent concealment - Under Florida law, a fraudulent misrepresentation claim has four elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." Johnson v. Davis, 480 So. 2d 625, 627 (Fla. 1985) (citing Huffstetter v. Our Home Life Ins. Co., 65 So. 1 (Fla. 1914)). "As for fraudulent concealment, "[a] defendant's knowing concealment or non-disclosure of a material fact may only support an action for fraud where there is a duty to disclose. Such duty arises when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them." TransPetrol, Ltd. v. Radulovic, 764 So. 2d 878, 879-80 (Fla. 4th DCA 2000) (citations omitted). Because Coe and Berry did not sell, distribute, etc. Pondimin, Plaintiff Earlie J. Fowler cannot state a claim for fraudulent misrepresentation or fraudulent concealment against them. Thus, there is no possibility that a Florida court could determine that Plaintiff Earlie J. Fowler states a claim for fraudulent misrepresentation against Coe and Berry.

(4) Count V - civil conspiracy - "Ordinarily, [under Florida law], a corporation cannot conspire with its own directors, officers, or employees since the corporation acts through these individuals. However, an exception exists when the individual has an independent personal stake, apart from that of the corporation, in achieving

**Plaintiffs could not continue to rely upon their unsupported allegations in the complaint.  Plaintiffs had to put forth specific evidence to refute the statements in the declarations.  See Campana v. American Home Products, 1:99-cv-250/MMP, pp. 7-8 (N.D. Fla. March 7, 2000).**

**Plaintiffs' evidence in support of the motion to remand does not refute the evidence in the Coe and Berry declarations concerning their non-involvement with the drug Pondimin.  None of Plaintiffs' evidence shows that Coe and Berry promoted Pondimin to Earlie J. Fowler's prescribing physician.  Thus, the uncontroverted declarations of Coe and Berry are sufficient to demonstrate that they were fraudulently joined in this lawsuit.[8]  See e.g., Kearney v. Wyeth, Case No. 6:03-cv-288-Orl-31KRS (M.D. Fla. May 13, 2003) (An uncontroverted affidavit of a sales representative that she did not promote, sell, etc. Pondimin, the drug that allegedly injured the plaintiff, was enough to establish fraudulent joinder as the court**

---

the object of the conspiracy."  Greenberg v. Mount Sinai Med. Ctr., 629 So. 2d 252, 256 (Fla. 3[rd] DCA 1993) (citations omitted).  Plaintiff Earlie J. Fowler cannot state a claim for civil conspiracy against Coe and Berry because they did not have a personal stake in misrepresenting Pondimin to physicians, a drug with which they were not involved, and without an independent personal stake in the misrepresentation, they could not have conspired with Wyeth.  Thus, there is no possibility that a Florida court could determine that Plaintiff Earlie J. Fowler states a claim for civil conspiracy against Coe and Berry

(5) Count V - loss of consortium - A spouse's claim for loss of consortium is a derivative claim.  See ACandS, Inc. v. Redd, 703 So. 2d 492, 493-94 (Fla. 3rd DCA 1997) (citation omitted).  For example, a husband may only recover on such a claim only if his wife has a cause of action against the same defendant.  See id.  Because the Court has determined that Plaintiff Earlie J. Fowler did not state a claim against Coe and Berry, Plaintiff Solomon Fowler likewise cannot state a derivative claim for loss of consortium against them.  Thus, there is no possibility that a Florida court could determine that Plaintiff Solomon Fowler could state a claim for loss of consortium against Coe and Berry.

[8]  In their motion to remand, Plaintiffs also argue that Coe and Berry admit in their answers to having provided adequate and complete warnings to physicians regarding Pondimin.  According to Plaintiffs, such admissions "are evidence that Defendants Coe and Berry detailed Pondimin."  Contrary to Plaintiffs' position, in Florida, a statement in a pleading that is meant as an alternative allegation in the event that a plaintiff successfully pleads a prima facie case does not constitute an admission.  See Booker v. Sarasota, Inc., 707 So. 2d 886, 888-89 (Fla. 1st DCA 1998) (citations omitted).  Thus, the statement that "Defendant provided adequate warnings and complete warnings to Plaintiff's prescribing physicians" does not constitute an admission by either Coe or Berry, because they were pleading in the alternative in the event that Plaintiffs pleaded a prima facie case against them.  Furthermore, in their answers, Coe and Berry denied specific allegations, in the complaint, such as: (1) "Pondimin was widely advertised and/or promoted by Defendants[;]" and (2) they had control over the "design, assembly, packaging, marketing, advertising, manufacturing, labeling, testing, promoting, distribution, and/or sale of...Pondimin."

Case No. 3:04-cv-83/MCR

determined that plaintiff could not state a claim against her.); <u>Long v. Wyeth</u>, Case No. 6:03-cv-421-OrlJGG (M.D. Fla. May 15, 2003) (same); <u>Campana v. American Home Products</u>, 1:99-cv-250/MMP (N.D. Fla. March 7, 2000) (same). As a result, after drawing all reasonable inferences from the record in Plaintiffs' favor, there is no reasonable basis for predicting that Florida law might impose liability on Coe and Berry based upon the facts involved in this case. Therefore, Wyeth's removal of this case was proper, and Plaintiffs' motion to remand (<u>see</u> doc. 16) is DENIED. Because Coe and Berry were fraudulently joined in the instant action, all claims against them are DISMISSED WITH PREJUDICE, and the Clerk shall enter judgment for Defendants Coe and Berry. The dismissal of the nondiverse Defendants results in achieving complete diversity in this case, and as such, the Court has subject matter jurisdiction. In addition, the Court's previous Order temporarily staying the case (<u>see</u> doc. 14) is hereby reinstated, and all proceedings in this case are temporarily STAYED for four (4) months from the date that this Order is signed, pending a decision by the Judicial Panel on Multi-District Litigation on whether to transfer this action to MDL-1203.

Accordingly, it is hereby ordered:

1.     Plaintiffs EARLIE J. FOWLER and SOLOMON FOWLER's motion to remand (<u>see</u> doc. 16) is DENIED.

2.     Defendants RICHARD COE and DEBRA BERRY have been fraudulently joined in this lawsuit; therefore, all claims against Defendants Coe and Berry are DISMISSED WITH PREJUDICE. The Clerk shall enter judgment for Defendants Coe and Berry.

3.     The Court's previous Order temporarily staying the case (<u>see</u> doc. 14) is hereby reinstated, and all proceedings in this case are temporarily

Case No. 3:04-cv-83/MCR

STAYED for four (4) months from the date that this Order is signed,
pending a decision by the Judicial Panel on Multi-District Litigation on
whether to transfer this action to MDL-1203.

ORDERED on this 14th day of May, 2004.

*s/ M. Casey Rodgers*

M. CASEY RODGERS
United States District Judge

Case No. 3:04-cv-83/MCR

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

BARBARA PETTY,

     Plaintiff,

v.                          Case No. 3:04-cv-82/MCR

WYETH, f/k/a American Home Products
Corporation; WYETH PHARMACEUTICALS,
f/k/a Wyeth-Ayerst Labs, Inc.; RICHARD COE;
and DEBRA BERRY,

     Defendants.

_____/

## ORDER DENYING PLAINTIFF'S MOTION TO REMAND

On February 5, 2004, Plaintiff BARBARA PETTY ("Petty") filed a tort action in the Circuit Court in and for Escambia County, Florida seeking damages that allegedly resulted from her ingestion of the prescription diet drug Pondimin. (Doc. 1, Exh. 1). Petty's Complaint for Damages asserts the following five causes of action against all Defendants: (1) Count I - strict products liability, defective design; (2) Count II - strict products liability, failure to warn; (3) Count III - negligence; (4) Count IV - fraudulent misrepresentation and fraudulent concealment; and (5) Count V - civil conspiracy. (Id.). On March 8, 2004, Defendants WYETH and WYETH PHARMACEUTICALS (collectively referred to as "Wyeth") filed a Notice of Removal in this Court based on diversity jurisdiction, see 28 U.S.C. § 1332. (Doc. 1). Although Petty and Defendants RICHARD COE ("Coe") and DEBRA BERRY ("Berry") are Florida residents, Wyeth's Notice asserts that Petty fraudulently joined Coe and Berry in this case so as to prevent federal diversity jurisdiction. (Id.).

On the day of removal, Wyeth also filed a Motion to Stay All Proceedings (see doc. 5) pending a final ruling from the Judicial Panel on Multi-District Litigation regarding transfer of this case to MDL-1203, and Defendants Coe and Berry each filed an Answer and Affirmative Defenses (see docs. 3 and 4). On April 7, 2004, Petty filed a Motion to Remand (see doc. 18) along with supporting documents (see doc. 19). The next day, Petty filed a response, along with supporting documents, in opposition to the motion to stay. (Docs. 20 and 21). On April 21, 2004, Wyeth filed a response, along with supporting documents, in opposition to Petty's motion to remand. (Doc. 24).

## A. Facts

Petty alleges, in her complaint, that she sustained serious and permanent injuries as a result of her ingestion of the prescription diet drug Pondimin. Wyeth distributed and sold Pondimin, as well as another diet drug, Redux, which is not at issue in this case. Wyeth promoted and distributed both drugs to physicians. When Pondimin or Redux is combined with another diet drug called phentermine, the resulting combination is popularly known as "fen-phen." In September 1997, both Pondimin and Redux were voluntarily withdrawn from the market due to concerns about heart valve damage associated with their usage.

The following facts are derived from the declarations of Defendants Coe and Berry. (Doc. 1, Exhs. 14 and 15). In the 1990s, Coe and Berry worked as sales representatives for A.H. Robins Co. and American Home Products Corp. (which are now known as Wyeth). As sales representatives, they visited physicians' offices educating them about Redux so that the physicians could consider whether to prescribe Redux to their patients.[1] On these visits, Coe and Berry gave the physicians FDA-approved package inserts about Wyeth's products. Typically, these

---

[1] As sales representatives, neither Coe nor Berry "dispensed, supplied, designed, detailed, promoted, marketed, advertised, distributed, or sold Pondimin." (Doc. 1, Exhs. 14, ¶ 3, and 15, ¶ 3).

visits lasted less than five minutes.  Neither Coe nor Berry had any specialized medical or pharmacological training, except that which was provided by Wyeth. Their knowledge of Redux was derived exclusively from the training provided by Wyeth.  Furthermore, neither Coe nor Berry had involvement in the preparation or development of package inserts for any drugs, and had no control over content or other written warnings.  In fact, they had no knowledge concerning the association of Redux to valvular heart disease prior to that relationship being first acknowledged and publicized.

## B. Motion to Remand

In the motion to remand, Petty asserts that Wyeth has not demonstrated that Coe and Berry were fraudulently joined in the current lawsuit. Petty claims that there is a possibility that she has a cause of action against Coe and Berry under Florida law, and because of that possibility, Petty argues that Coe and Berry are not fraudulently joined. If Petty is correct, then complete diversity will not exist, and the this case should be remanded to the Circuit Court in and for Escambia County, Florida. In opposition to Petty's motion to remand, Wyeth asserts that Petty has no reasonable basis for the claims asserted against Coe and Berry, thereby making them fraudulently joined.

### 1. Removal Jurisdiction

A party may remove any case from a state court which could have been brought in federal court, see 28 U.S.C. § 1441(a), but the removing party bears the burden of establishing jurisdiction, see University of S. Ala. v. The Amer. Tobacco Co., 139 F. 3d 1368, 1373 (11th Cir. 1998) (citing Diaz v. Sheppard, 85 F. 3d 1502, 1505 (11th Cir. 1996)).  To satisfy its burden as the removing party, Wyeth argues that the Court has removal jurisdiction over this case because Petty's complaint could have been originally filed in federal court pursuant to diversity jurisdiction.  See 28 U.S.C.

§ 1332 (West 2004). Diversity jurisdiction is an adequate ground for removal, see Pancho de Perez, 139 F. 3d at 1373, but diversity jurisdiction only exists when there is complete diversity amongst the parties, see Triggs v. John Crump Toyota, Inc., 154 F. 3d 1284, 1287 (11th Cir. 1998). Complete diversity requires that all defendants have diverse citizenship from all plaintiffs. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806), overruled on other grounds, Louisville C. & C.R. Co. v. Letson, 43 U.S. (2 How.) 497, 11 L. Ed. 353 (1844); Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1542 (11th Cir. 1993).

The procedure to remove a case to federal court is relatively simple, requiring only that a defendant file a notice of removal containing "a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant." 28 U.S.C.A. § 1446(a) (West 2004). However, a court must continue to scrutinize its jurisdiction subsequent to removal. "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C.A. § 1447(c) (West 2004); see also FED. R. CIV. P. 12(h)(3) (2004). Once a court's jurisdiction is questioned—either by the court *sua sponte* or the plaintiff—the defendant, as the party invoking jurisdiction, has the burden of proving that federal jurisdiction is appropriate. See McNutt v. Gen. Motors Acceptance Corp. of Ind., Inc., 298 U.S. 178, 184–90, 56 S. Ct. 780, 782–85, 80 L. Ed. 1135 (1936); Village Fair Shopping Ctr., Co. v. Sam Broadhead Trust, 588 F.2d 431, 433 (5th Cir. 1979).[2]

As noted, Wyeth's notice of removal bases this Court's jurisdiction solely on diversity grounds. Plaintiff Petty is a Florida resident, and Defendant Wyeth is a Delaware corporation with its principal place of business in New Jersey. However, Defendants Coe and Berry, like Petty, are Florida residents, which would normally

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

destroy complete diversity under 28 U.S.C. § 1332, unless Coe and Berry were fraudulently joined in the lawsuit.

### 2. Fraudulent Joinder

Courts recognize an exception to the complete diversity requirement for cases in which a nondiverse party has been fraudulently joined. See Crowe v. Coleman, 113 F. 3d 1536, 1538 (11th Cir. 1997). The Eleventh Circuit has acknowledged three situations in which joinder is deemed fraudulent. The first situation is when there is no possibility that the plaintiff can prove a cause of action against the non-diverse defendant. See Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998)(citing Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983), superceded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533 (11th Cir. 1993)). The second is where there is outright fraud in the plaintiff's pleading of jurisdictional facts. See Triggs, 154 F.3d at 1287; Coker, 709 F.2d at 1440. The third is where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several, or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant. See Triggs, 154 F.3d at 1287; Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1355 (11th Cir. 1996), abrogated on other grounds by Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir. 2000). The type of fraudulent joinder pertinent to the matter sub judice is the first type.

Wyeth, as the removing party, bears the burden of establishing fraudulent joinder. See Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989). The burden is a "heavy one," because Petty need not have a winning case against the nondiverse Defendants. See Triggs, 154 F. 3d at 1287. Rather, "[i]f there is even a possibility that a state court would find that the complaint states a cause of action against any one of the [nondiverse Defendants, the Court] must find that the joinder

23a3

removed to federal court to be remanded to state court, the
plaintiff need not show that he could survive in the district court
a motion for summary judgment filed by that in-state defendant.
For a remand, the plaintiff's burden is much lighter than that:
after drawing all reasonable inferences from the record in the
plaintiff's favor and then resolving all contested issues of fact in
favor of the plaintiff, there need only be "a reasonable basis for
predicting that the state law *might* impose liability on the facts
involved."

Id., at 1541-42 (quoting B. Inc. v. Miller Brewing Co., 663 F.. 2d 545, 549 (5th Cir. Unit
A 1981)) (emphasis in original).[5]  Furthermore, because "[f]ederal courts are courts
of limited jurisdiction,...there is a presumption against the exercise of federal
jurisdiction, such that all uncertainties as to removal are to be resolved in favor of
remand." Russell Corp. v. American Home Assurance Co., 264 F. 3d 1040, 1050 (11th
Cir. 2001) (citing Burns v. Windsor Ins. Co., 31 F. 3d 1092, 1095 (11th Cir. 1994)).

    In the instant case, Wyeth, the removing party, has affirmatively presented
evidence to demonstrate that Defendants Coe and Berry were fraudulently joined by
Petty.  The declarations of Coe and Berry show that they did not market, advertise,
sell, distribute, promote, dispense, supply, detail, or design Pondimin, which was
the diet drug allegedly ingested by Petty.  Moreover, Defendants Coe and Berry had
no independent knowledge or control over the messages that Wyeth provided to
physicians about Pondimin.  Based on the declarations, Petty cannot maintain any
of her asserted causes of action against Coe and Berry.[6]  Once Wyeth presented the

---

    [5] The Eleventh Circuit has cautioned that "district courts must exercise extraordinary care to avoid
jumbling up motions for remand and motions for summary judgment that come before them.  In the remand
context, the district court's authority to look into the ultimate merit of the plaintiff's claims must be limited to
checking for obviously fraudulent or frivolous claims." Crowe, 113 F. 3d at 1542.

    [6] Regarding the causes of action in Petty's complaint, Florida law requires:

(1) Counts I & II - strict liability - "in order to hold a manufacturer liable on the theory of strict liability in tort, the
user must establish the manufacturer's relationship to the product in question, the defect and unreasonable
dangerous condition of the product, and the existence of a proximate causal connection between such
condition and the user's injuries or damage." Siemens Energy & Automation, Inc. v. Medina, 719 So. 2d 312,
315 (citations omitted).  "Florida courts have expanded the doctrine of strict liability to others in the distributive

declarations to the Court, Petty could not continue to rely upon her unsupported allegations in the complaint.  Petty had to put forth evidence to refute the statements in the declarations.  See Campana v. American Home Products, 1:99-cv-250/MMP, pp. 7-8 (N.D. Fla. March 7, 2000).

Petty's evidence in support of the motion to remand does not refute the evidence in the Coe and Berry declarations concerning their non-involvement with the drug Pondimin.  None of Petty's evidence shows that Coe and Berry promoted Pondimin to Petty's prescribing physician.  Thus, the uncontroverted declarations

---

chain including retailers, wholesalers, and distributors." Id. (citations omitted). In the case at hand, it is clear that Coe and Berry were neither manufacturers of Pondimin nor within the drug's distributive chain. Furthermore, unlike the defendant in Medina, neither Coe nor Berry were brokers of Pondimin who served as the conduit of information between Wyeth and physicians. Thus, there is no possibility that a Florida court could determine that Petty states a claim for strict liability against Coe and Berry.

(2) Count III - negligence (based on a failure to warn and misrepresentation) - Because Defendants Coe and Berry had no knowledge about Pondimin and did not distribute, sell, market, etc. it to physicians, Petty fails to state a claim for negligence. See Cooper Hotel Servs., Inc. v. MacFarland, 662 So. 2d 710, 712 (Fla. 2nd DCA 1995) (Under Florida law, the elements for negligence are: "(1) the defendant had a duty to protect the plaintiff; (2) the defendant breached that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injuries and resulting damages.") (citation omitted). Coe and Berry owed no duty to Petty, and they could not be the legal or proximate cause of Petty's alleged injuries. Thus, there is no possibility that a Florida court could determine that Petty states a claim for negligence against Coe and Berry.

(3) Count IV - fraudulent misrepresentation and fraudulent concealment - Under Florida law, a fraudulent misrepresentation claim has four elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." Johnson v. Davis, 480 So. 2d 625, 627 (Fla. 1985) (citing Huffstetler v. Our Home Life Ins. Co., 65 So. 1 (Fla. 1914)). "As for fraudulent concealment, "[a] defendant's knowing concealment or non-disclosure of a material fact may only support an action for fraud where there is a duty to disclose. Such duty arises when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them." TransPetrol, Ltd. v. Radulovic, 764 So. 2d 878, 879-80 (Fla. 4th DCA 2000) (citations omitted). Because Coe and Berry did not sell, distribute, etc. Pondimin, Petty cannot state a claim for fraudulent misrepresentation or fraudulent concealment against them.

(4) Count V - civil conspiracy - "Ordinarily, [under Florida law], a corporation cannot conspire with its own directors, officers, or employees since the corporation acts through these individuals. However, an exception exists when the individual has an independent personal stake, apart from that of the corporation, in achieving the object of the conspiracy." Greenberg v. Mount Sinai Med. Ctr., 629 So. 2d 252, 256 (Fla. 3rd DCA 1993) (citations omitted). Petty cannot state a claim for civil conspiracy against Coe and Berry because they did not have a personal stake in misrepresenting Pondimin to physicians, a drug with which they were not involved, and without an independent personal stake in the misrepresentation, they could not have conspired with Wyeth.

Case No. 3:04-cv-82/MCR

of Coe and Berry are sufficient to demonstrate that they were fraudulently joined in this lawsuit.[7]  See e.g., Kearney v. Wyeth, Case No. 6:03-cv-288-Orl-31KRS (M.D. Fla. May 13, 2003) (An uncontroverted affidavit of a sales representative that she did not promote, sell, etc. Pondimin, the drug that allegedly injured the plaintiff, was enough to establish fraudulent joinder as the court determined that plaintiff could not state a claim against her.); Long v. Wyeth, Case No. 6:03-cv-421-OrlJGG (M.D. Fla. May 15, 2003) (same); Campana v. American Home Products, 1:99-cv-250/MMP (N.D. Fla. March 7, 2000) (same).  As a result, after drawing all reasonable inferences from the record in Petty's favor, there is no reasonable basis for predicting that Florida law might impose liability on Coe and Berry based upon the facts involved in this case. Therefore, Wyeth's removal of this case was proper, and Petty's motion to remand (see doc. 18) is DENIED.  Because Coe and Berry were fraudulently joined in the instant action, all claims against them are DISMISSED WITH PREJUDICE, and the Clerk shall enter judgment for Defendants Coe and Berry.  The dismissal of the nondiverse Defendants results in achieving complete diversity in this case, and as such, the Court has subject matter jurisdiction.

---

[7] In her motion to remand, Petty also argues that Coe and Berry admit in their answers to having provided adequate and complete warnings to physicians regarding Pondimin.  According to Petty, such admissions "are evidence that Defendants Coe and Berry detailed Pondimin."  Contrary to Petty's position, in Florida, a statement in a pleading that is meant as an alternative allegation in the event that a plaintiff successfully pleads a prima facie case does not constitute an admission. See Booker v. Sarasota, Inc., 707 So. 2d 886, 888-89 (Fla. 1st DCA 1998) (citations omitted).  Thus, the statement that "Defendant provided adequate warnings and complete warnings to Plaintiff's prescribing physicians" does not constitute an admission by either Coe or Berry, because they were pleading in the alternative in the event that Petty pleaded a prima facie case against them.  Furthermore, in their answers, Coe and Berry denied specific allegations, in the complaint, such as: (1) "Pondimin was widely advertised and/or promoted by Defendants[;]" and (2) they had control over the "design, assembly, packaging, marketing, advertising, manufacturing, labeling, testing, promoting, distribution, and/or sale of...Pondimin."

Case No. 3:04-cv-82/MCR

**Accordingly, it is hereby ordered:**

1.     Plaintiff BARBARA PETTY's motion to remand (see doc. 18) is DENIED.

2.     Defendants RICHARD COE and DEBRA BERRY have been fraudulently joined in this lawsuit; therefore, all claim against Defendants Coe and Berry are **DISMISSED WITH PREJUDICE.**  The Clerk shall enter judgment for Defendants Coe and Berry.

**ORDERED on this 28th day of April, 2004.**

s/ *M. Casey Rodgers*

**M. CASEY RODGERS**
**United States District Judge**

Case No. 3:04-cv-82/MCR

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

SHERRILEE H. LEWIS,

     Plaintiff,

v.                                                     Case No. 3:04-cv-81/MCR

WYETH, f/k/a American Home Products
Corporation; WYETH PHARMACEUTICALS,
f/k/a Wyeth-Ayerst Labs, Inc.; and LEROY R.
PEACOCK,

     Defendants.

_____/

## ORDER DENYING PLAINTIFF'S MOTION TO REMAND

On February 5, 2004, Plaintiff SHERRILEE H. LEWIS ("Lewis") filed a tort action in the Circuit Court in and for Escambia County, Florida seeking damages that allegedly resulted from her ingestion of the prescription diet drug Pondimin. (Doc. 1, Exh. 1). Lewis's Complaint for Damages asserts the following five causes of action against all Defendants: (1) Count I - strict products liability, defective design; (2) Count II - strict products liability, failure to warn; (3) Count III - negligence; (4) Count IV - fraudulent misrepresentation and fraudulent concealment; and (5) Count V - civil conspiracy. (Id.). On March 8, 2004, Defendants WYETH and WYETH PHARMACEUTICALS (collectively referred to as "Wyeth") filed a Notice of Removal in this Court based on diversity jurisdiction, see 28 U.S.C. § 1332. (Doc. 1). Although Lewis and Defendant LEROY PEACOCK ("Peacock") are Florida residents, Wyeth's Notice asserts that Lewis fraudulently joined Peacock in this case so as to prevent federal diversity jurisdiction. (Id.).

On the day of removal, Wyeth also filed a Motion to Stay All Proceedings (see doc. 4) pending a final ruling from the Judicial Panel on Multi-District Litigation regarding transfer of this case to MDL-1203, and Defendant Peacock filed an Answer

and Affirmative Defenses (see doc. 3).  On April 7, 2004, Lewis filed a Motion to Remand (see doc. 16) along with supporting documents (see doc. 17). The next day, Lewis filed a response, along with supporting documents, in opposition to the motion to stay. (Doc. 19).  On April 21, 2004, Wyeth filed  a response, along with supporting documents, in opposition to Lewis's motion to remand.  (Doc. 21).

## A. Facts

Lewis alleges, in her complaint, that she sustained serious and permanent injuries as a result of her ingestion of the prescription diet drug Pondimin.  Wyeth distributed and sold Pondimin, as well as another diet drug, Redux, which is not at issue in this case. Wyeth promoted and distributed both drugs to physicians. When Pondimin or Redux is combined with another diet drug called phentermine, the resulting combination is popularly known as "fen-phen." In September 1997, both Pondimin and Redux were voluntarily withdrawn from the market due to concerns about heart valve damage associated with their usage.

The following facts are derived from the declaration of Defendant Peacock. (Doc. 1, Exh. 14).  Peacock worked as a sales representative Wyeth from 1977 until 2003. As a sales representative, he visited physicians' offices educating them about Redux so that the physicians could consider whether to prescribe Redux to their patients.[1]  On these visits, Peacock gave the physicians FDA-approved package inserts about Wyeth's products. Typically, these visits lasted less than five minutes. Peacock did not have any specialized medical or pharmacological training, except that which was provided by Wyeth. His knowledge of Redux was derived exclusively from the training provided by Wyeth. Furthermore, Peacock had no involvement in the preparation or development of package inserts for any drugs, and had no control over content or other written warnings. In fact, he had no knowledge concerning the

---

[1] As a sales representative, Peacock had not "dispensed, supplied, designed, detailed, promoted, marketed, advertised, distributed, or sold Pondimin." (Doc. 1, Exhs. 14, ¶ 3, and 15, ¶ 3).

association of Redux to valvular heart disease prior to that relationship being first acknowledged and publicized.

### B. Motion to Remand

In the motion to remand, Lewis asserts that Wyeth has not demonstrated that Peacock was fraudulently joined in the current lawsuit. Lewis claims that there is a possibility that she has a cause of action against Peacock under Florida law, and because of that possibility, Lewis argues that Peacock is not fraudulently joined. If Lewis is correct, then complete diversity will not exist, and the this case should be remanded to the Circuit Court in and for Escambia County, Florida. In opposition to Lewis's motion to remand, Wyeth asserts that Lewis has no reasonable basis for the claims asserted against Peacock, thereby making him fraudulently joined.

#### 1. Removal Jurisdiction

A party may remove any case from a state court which could have been brought in federal court, see 28 U.S.C. § 1441(a), but the removing party bears the burden of establishing jurisdiction, see University of S. Ala. v. The Amer. Tobacco Co., 139 F. 3d 1368, 1373 (11th Cir. 1998) (citing Diaz v. Sheppard, 85 F. 3d 1502, 1505 (11th Cir. 1996)). To satisfy its burden as the removing party, Wyeth argues that the Court has removal jurisdiction over this case because Lewis's complaint could have been originally filed in federal court pursuant to diversity jurisdiction. See 28 U.S.C. § 1332 (West 2004). Diversity jurisdiction is an adequate ground for removal, see Pancho de Perez, 139 F. 3d at 1373, but diversity jurisdiction only exists when there is complete diversity amongst the parties, see Triggs v. John Crump Toyota, Inc., 154 F. 3d 1284, 1287 (11th Cir. 1998). Complete diversity requires that all defendants have diverse citizenship from all plaintiffs. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806), overruled on other grounds, Louisville C. & C.R. Co.

v. Letson, 43 U.S. (2 How.) 497, 11 L. Ed. 353 (1844); Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1542 (11th Cir. 1993).

The procedure to remove a case to federal court is relatively simple, requiring only that a defendant file a notice of removal containing "a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant." 28 U.S.C.A. § 1446(a) (West 2004). However, a court must continue to scrutinize its jurisdiction subsequent to removal. "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C.A. § 1447(c) (West 2004); see also FED. R. CIV. P. 12(h)(3) (2004). Once a court's jurisdiction is questioned—either by the court *sua sponte* or the plaintiff—the defendant, as the party invoking jurisdiction, has the burden of proving that federal jurisdiction is appropriate. See McNutt v. Gen. Motors Acceptance Corp. of Ind., Inc., 298 U.S. 178, 184–90, 56 S. Ct. 780, 782–85, 80 L. Ed. 1135 (1936); Village Fair Shopping Ctr., Co. v. Sam Broadhead Trust, 588 F.2d 431, 433 (5th Cir. 1979).[2]

As noted, Wyeth's notice of removal bases this Court's jurisdiction solely on diversity grounds.  Plaintiff Lewis is a Florida resident, and Defendant Wyeth is a Delaware corporation with its principal place of business in New Jersey.  However, Defendant Peacock, like Lewis, is a Florida resident, which would normally destroy complete diversity under 28 U.S.C. § 1332, unless Peacock was fraudulently joined in the lawsuit.

### 2. Fraudulent Joinder

Courts recognize an exception to the complete diversity requirement for cases in which a nondiverse party has been fraudulently joined. See Crowe v. Coleman, 113 F. 3d 1536, 1538 (11th Cir. 1997).  The Eleventh Circuit has

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

acknowledged three situations in which joinder is deemed fraudulent. The first situation is when there is no possibility that the plaintiff can prove a cause of action against the non-diverse defendant. See Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998)(citing Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983), superceded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533 (11th Cir. 1993)). The second is where there is outright fraud in the plaintiff's pleading of jurisdictional facts. See Triggs, 154 F.3d at 1287; Coker, 709 F.2d at 1440. The third is where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several, or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant. See Triggs, 154 F.3d at 1287; Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1355 (11th Cir. 1996), abrogated on other grounds by Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir. 2000). The type of fraudulent joinder pertinent to the matter *sub judice* is the first type.

Wyeth, as the removing party, bears the burden of establishing fraudulent joinder. See Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989). The burden is a "heavy one," because Lewis need not have a winning case against the nondiverse Defendant. See Triggs, 154 F.3d at 1287. Rather, "[i]f there is even a possibility that a state court would find that the complaint states a cause of action against [ the nondiverse Defendant, the Court] must find that the joinder was proper and remand the case to the state court." Coker v. Amoco Oil Co., 709 F.2d 1433, 1440-41 (11th Cir. 1983), superceded by statute on other grounds by Wilson v. Gen. Motors Corp., 888 F.2d 779, 782 n. 3 (11th Cir. 1989).[3] A district court "must evaluate

---

[3] Plaintiff Lewis argues that Wyeth must demonstrate fraudulent joinder with clear and convincing evidence. The former Fifth Circuit appears to have required that a defendant's evidence in support of a fraudulent joinder claim be clear and convincing. See Parks v. New York Times Co., 308 F. 2d 474, 478 (5th Cir. 1962). Because former Fifth Circuit opinions are binding precedent for Eleventh Circuit courts, some district courts in the Eleventh Circuit have adopted the clear and convincing standard. See e.g., Lane v. Champion Int'l Corp., 827 F. Supp. 701, 710 (S.D. Ala. 1993); Katz v. Costa Armatori, S.P.A., 718 F. Supp.

Case No. 3:04-cv-81/MCR

the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff." Crowe, 113 F.3d at 1538. This determination is based on the plaintiff's pleadings at the time of removal. See id. However, a district court "may consider affidavits and deposition transcripts submitted by the parties." Id.[4]

"While the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed.R.Civ.P. 56(b), the jurisdictional inquiry must not subsume substantive determination." Id. (citation and internal quotations omitted). "When considering a motion to remand, [the district court should] not weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." Id. Regarding a district court's determination of an arguable claim, the Eleventh Circuit has stated:

> For a [p]laintiff to present an arguable claim against an in-state [*i.e.*, nondiverse] defendant and, therefore, to require a case removed to federal court to be remanded to state court, the plaintiff need not show that he could survive in the district court a motion for summary judgment filed by that in-state defendant. For a remand, the plaintiff's burden is much lighter than that: after drawing all reasonable inferences from the record in the plaintiff's favor and then resolving all contested issues of fact in favor of the plaintiff, there need only be "a reasonable basis for predicting that the state law *might* impose liability on the facts involved."

---

1508, 1510 (S.D. Fla. 1989). On the other hand, some district courts have questioned whether Parks remains good law in light of numerous Eleventh Circuit opinions which have failed to enunciate a clear and convincing requirement. See e.g., Campana v. American Home Products Corp., Case No. 1:99-cv-250/MMP, p. 7 n. 5 (N.D. Fla. March 7, 2000). However, this Court need not determine whether the clear and convincing standard is applicable, because assuming *arguendo* that it is, the evidence presented by Wyeth is clear and convincing.

[4] The evidence in question in this case are declarations as opposed to affidavits; however, declarations have the same legal effect as affidavits. See 28 U.S.C. § 1746 (West 2004). A "declaration" is "[a] formal, written statement–resembling an affidavit but not notarized or sworn to–that attests under penalty of perjury, to facts known by the declarant. Such a declaration, if properly prepared, is admissible in federal court with the same effect as an affidavit." BLACK'S LAW DICTIONARY 415 (7th ed. 1999) (citing 28 U.S.C. § 1746).

Case No. 3:04-cv-81/MCR

Id., at 1541-42 (quoting B. Inc. v. Miller Brewing Co., 663 F.. 2d 545, 549 (5th Cir. Unit A 1981)) (emphasis in original).[5] Furthermore, because "[f]ederal courts are courts of limited jurisdiction,...there is a presumption against the exercise of federal jurisdiction, such that all uncertainties as to removal are to be resolved in favor of remand." Russell Corp. v. American Home Assurance Co., 264 F. 3d 1040, 1050 (11th Cir. 2001) (citing Burns v. Windsor Ins. Co., 31 F. 3d 1092, 1095 (11th Cir. 1994)).

In the instant case, Wyeth, the removing party, has affirmatively presented evidence to demonstrate that Defendant Peacock was fraudulently joined by Lewis. Peacock's declaration shows that he did not market, advertise, sell, distribute, promote, dispense, supply, detail, or design Pondimin, which was the diet drug allegedly ingested by Lewis. Moreover, Peacock had no independent knowledge or control over the messages that Wyeth provided to physicians about Pondimin. Based on the declaration, Lewis cannot maintain any of her asserted causes of action against Peacock.[6] Once Wyeth presented the declaration to the Court, Lewis

---

[5] The Eleventh Circuit has cautioned that "district courts must exercise extraordinary care to avoid jumbling up motions for remand and motions for summary judgment that come before them. In the remand context, the district court's authority to look into the ultimate merit of the plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims." Crowe, 113 F. 3d at 1542.

[6] Regarding the causes of action in Lewis's complaint, Florida law requires:

(1) Counts I & II - strict liability - "In order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonable dangerous condition of the product, and the existence of a proximate causal connection between such condition and the user's injuries or damage." Siemens Energy & Automation, Inc. v. Medina, 719 So. 2d 312, 315 (citations omitted). "Florida courts have expanded the doctrine of strict liability to others in the distributive chain including retailers, wholesalers, and distributors." Id. (citations omitted). In the case at hand, it is clear that Peacock was neither a manufacturer of Pondimin nor within the drug's distributive chain. Furthermore, unlike the defendant in Medina, Peacock was not even a broker of Pondimin who served as the conduit of information between Wyeth and physicians. Thus, there is no possibility that a Florida court could determine that Lewis states a claim for strict liability against Peacock.

(2) Count III - negligence (based on a failure to warn and misrepresentation) - Because Defendant Peacock had no knowledge about Pondimin and did not distribute, sell, market, etc. it to physician Lewis fails to state a claim for negligence. See Cooper Hotel Servs., Inc. v. MacFarland, 662 So. 2d 710, 712 (Fla. 2nd DCA 1995) (Under Florida law, the elements for negligence are: "(1) the defendant had a duty to protect the plaintiff; (2) the defendant breached that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injuries and resulting damages.") (citation omitted). Peacock owed no duty to Lewis, and he could not be the legal or proximate cause of Lewis's alleged injuries. Thus, there is no possibility that a Florida court could

could not continue to rely upon her unsupported allegations in the complaint. **Lewis had to put forth evidence to refute the statements in the declaration.** See Campana v. American Home Products, 1:99-cv-250/MMP, pp. 7-8 (N.D. Fla. March 7, 2000).

Lewis's evidence in support of the motion to remand does not refute the evidence in Peacock's declaration concerning his non-involvement with the drug Pondimin. None of Lewis's evidence shows that Peacock promoted Pondimin to Lewis's prescribing physician. Thus, Peacock's uncontroverted declaration is sufficient to demonstrate that he was fraudulently joined in this lawsuit.[7] See e.g., Kearney v. Wyeth, Case No. 6:03-cv-288-Orl-31KRS (M.D. Fla. May 13, 2003) (An

---

determine that Lewis states a claim for negligence against Peacock.

(3) Count IV - fraudulent misrepresentation and fraudulent concealment - Under Florida law, a fraudulent misrepresentation claim has four elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." Johnson v. Davis, 480 So. 2d 625, 627 (Fla. 1985) (citing Huffstetler v. Our Home Life Ins. Co., 65 So. 1 (Fla. 1914)). "As for fraudulent concealment, "[a] defendant's knowing concealment or non-disclosure of a material fact may only support an action for fraud where there is a duty to disclose. Such duty arises when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them." TransPetrol, Ltd. v. Radulovic, 764 So. 2d 878, 879-80 (Fla. 4th DCA 2000) (citations omitted). Because Peacock did not sell, distribute, etc. Pondimin, Lewis cannot state a claim for fraudulent misrepresentation or fraudulent concealment against him.

(4) Count V - civil conspiracy - "Ordinarily, [under Florida law], a corporation cannot conspire with its own directors, officers, or employees since the corporation acts through these individuals. However, an exception exists when the individual has an independent personal stake, apart from that of the corporation, in achieving the object of the conspiracy." Greenberg v. Mount Sinai Med. Ctr., 629 So. 2d 252, 256 (Fla. 3rd DCA 1993) (citations omitted). Lewis cannot state a claim for civil conspiracy against Peacock because he did not have a personal stake in misrepresenting Pondimin to physicians, a drug with which they were not involved, and without an independent personal stake in the misrepresentation, he could not have conspired with Wyeth.

[7] In her motion to remand, Lewis also argues that Peacock admits in his answer to having provided adequate and complete warnings to physicians regarding Pondimin. According to Lewis, such admissions "are evidence that Defendant Peacock detailed Pondimin." Contrary to Lewis's position, in Florida, a statement in a pleading that is meant as an alternative allegation in the event that a plaintiff successfully pleads a prima facie case does not constitute an admission. See Booker v. Sarasota, Inc., 707 So. 2d 886, 888-89 (Fla. 1st DCA 1998) (citations omitted). Thus, the statement that "Defendant provided adequate warnings and complete warnings to Plaintiff's prescribing physicians" does not constitute an admission by Peacock, because he was pleading in the alternative in the event that Lewis pleaded a prima facie case against him. Furthermore, in his answer, Peacock denied specific allegations in the complaint, such as: (1) "Pondimin was widely advertised and/or promoted by Defendants[;]" and (2) he had control over the "design, assembly, packaging, marketing, advertising, manufacturing, labeling, testing, promoting, distribution, and/or sale of...Pondimin."

Case No. 3:04-cv-81/MCR

uncontroverted affidavit of a sales representative that she did not promote, sell, etc. Pondimin, the drug that allegedly injured the plaintiff, was enough to establish fraudulent joinder as the court determined that plaintiff could not state a claim against her.); <u>Long v. Wyeth</u>, Case No. 6:03-cv-421-OrlJGG (M.D. Fla. May 15, 2003) (same); <u>Campana v. American Home Products</u>, 1:99-cv-250/MMP (N.D. Fla. March 7, 2000) (same). As a result, after drawing all reasonable inferences from the record in Lewis's favor, there is no reasonable basis for predicting that Florida law might impose liability on Peacock based upon the facts involved in this case. Therefore, Wyeth's removal of this case was proper, and Lewis's motion to remand (<u>see</u> doc. 16) is DENIED. Because Peacock was fraudulently joined in the instant action, all claims against him are DISMISSED WITH PREJUDICE, and the Clerk shall enter judgment for Defendant Peacock. The dismissal of the nondiverse Defendant results in achieving complete diversity in this case, and as such, the Court has subject matter jurisdiction.

Accordingly, it is hereby ordered:

1.    Plaintiff SHERRILEE H. LEWIS's motion to remand (<u>see</u> doc. 16) is DENIED.

2.    Defendant LEROY PEACOCK has been fraudulently joined in this lawsuit; therefore, all claim against Defendant Peacock are DISMISSED WITH PREJUDICE. The Clerk shall enter judgment for Defendant Peacock.

ORDERED on this 28th day of April, 2004.

s/ *M. Casey Rodgers*

M. CASEY RODGERS
United States District Judge

# <u>**EXHIBIT 5**</u>

FILED 

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

·· ·· 17  FIl 5· 21

CL·· ··  · ·· ··COURT
·· ···A···· ·

LORI SOBKOWSKI,

Plaintiff,

v.                                                Case No.  5:04-cv-96-Oc-10GRJ

WYETH, INC. f/k/a American Home Products
Corporation, WYETH-AYERST
LABORATORIES, INC., WYETH
PHARMACEUTICALS, INC., INDEVUS
PHARMACEUTICALS, INC. f/k/a Interneuron
Pharmaceuticals, Inc., PAUL W. PORTIER,
ANGELA KIRBY, M. ALYSEN TROY,

Defendants.

_____

## REPORT AND RECOMMENDATION[1]

Pending before the Court is Plaintiff's Motion to Remand (Doc. 9) in which

Plaintiff requests the Court to remand this action to the Circuit Court for the Fifth

Judicial Circuit in and for Lake County, Florida. Defendants Wyeth, Potier, Kirby,

and Troy have filed a memorandum in opposition to Plaintiff's Motion (Doc. 20),

and the matter is now ripe for the Court's consideration. For the reasons discussed

below, the Court finds that Plaintiff's Motion to Remand (Doc. 9) is due to be

**DENIED.**

_____

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule
6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.
Failure to file timely objections shall bar the party from a *de novo* determination by a district judge
and from attacking factual findings on appeal.



## I. BACKGROUND & FACTS

On October 30, 2003, Plaintiff, a resident of Florida, filed this action in Florida state court against four companies,[2] each of which is considered a foreign entity for the purposes of diversity. Plaintiff also named as defendants Wyeth sales representatives Paul Potier, Angela Kirby (now known as Angela Richards), and Alysen Troy ("sales representatives").[3] While Potier and Kirby are Florida residents,[4] Ms. Troy avers in a sworn affidavit that she has been a resident of Illinois at all times since May 1998 - well before Plaintiff filed her Complaint in October 2003.[5] Plaintiff has provided nothing to rebut such evidence. Because "diversity is determined when the suit is instituted and not when a cause of action arose,"[6] Troy is deemed a diverse party for the purposes of the Court's resolution of Plaintiff's motion to remand.

According to the allegations contained in Plaintiff's First Amended Complaint[7] ("Complaint"), Plaintiff developed Primary Pulmonary Hypertension

_____

[2] Hereinafter, "Wyeth."

[3] According to Wyeth, "The job of sales representatives, also known as 'detailers,' is to ensure that physicians are aware of Wyeth's products so they can consider whether to prescribe them. Among other things, detailers deliver FDA-approved package inserts and other FDA-approved information [...] The FDA-approved inserts that the detailers provide disclose the drug's pharmacological properties, indications and contraindications, and known side effects." *See* Wyeth's Notice of Removal, Doc. 1, ¶24.

[4] *See* Wyeth's Memorandum in Opposition to Plaintiff's Motion to Remand, Doc. 20 at 8.

[5] *Id.* at Ex. 12.

[6] Jones v. Law Firm of Hill and Ponton, 141 F. Supp. 2d 1349, 1354-55 (M.D. Fla. 2001).

[7] Doc. 2.

2

("PPH")[8] as a result of ingesting Redux[9] diet pills which were prescribed by her physician in 1996.[10] In brief summary, Plaintiff claims that the sales representatives promoted Redux and encouraged Plaintiff's physician to prescribe the drug to his patients even though the sales representatives were aware that the drug caused PPH and other life-threatening conditions and was otherwise ineffective.[11]

Counts six through eleven of the Amended Complaint purport to allege claims against the sales representatives for civil conspiracy, misrepresentation by seller of chattel, negligence, fraud, breach of express warranty, and breach of implied warranty.[12]

Wyeth removed the case to this Court on March 15, 2004, pursuant to 28 U.S.C. §1441.[13] In its Notice of Removal, Wyeth claimed that the sales representatives have been fraudulently joined and that their presence in this action,

---

[8] Primary pulmonary hypertension is a condition where pulmonary capillaries in the lungs constrict, thereby elevating blood pressure. The signs and symptoms include fatigue, dizziness, syncope (fainting), dyspnea (labored breathing), swelling of ankles or legs, chest pain, and palpitations. It may be treated with drug therapy involving calcium-channel blockers or vasodilators, but a lung transplant is required for patients with severe PPH. *See* J.E. Schmidt, Attorneys' Dictionary of Medicine Vol. 4 (2003).

[9] Redux is the popular/brand name for dexfenfluramine. *See* Complaint, Doc. 2 at p.2. According to Plaintiff, Redux is designed to suppress one's appetite by increasing blood levels of the neurotransmitter, serotonin. Serotonin is a chemical that makes a person feel full after eating. (*Id.* at p. 7.)

[10] Plaintiff's Amended Complaint, Doc. 2. at p. 2.

[11] *Id.* at 1-61.

[12] *Id.*

[13] Notice of Removal, Doc. 1.

3

therefore, does not destroy diversity of citizenship.[14] Wyeth claims that the sales representatives were fraudulently joined because "[p]laintiff has no reasonable possibility of prevailing on any of the claims pled against them, and no good faith intent to pursue them to judgment."[15]

Plaintiff filed her motion to remand on March 22, 2004, claiming that the case should be remanded because she has stated several viable causes of action against Wyeth and its sales representatives under Florida state law and thus joinder of the sales representatives was not fraudulent joinder.[16]

## II. LEGAL STANDARD

A party may remove any case from a state court which originally could have been brought in federal court,[17] but the removing party bears the burden of establishing subject matter jurisdiction.[18] Any doubts regarding the existence of removal jurisdiction should be resolved in favor of the non-removing party.[19]

To satisfy its burden, Wyeth claims that, pursuant to 28 U.S.C. §1332, the Court has diversity jurisdiction over this case because the sales representatives, the only non-diverse defendants, have been fraudulently joined by Plaintiff.

---

[14] *Id.* at ¶10.

[15] *Id.* at ¶3.

[16] Plaintiff's Emergency Motion to Remand, Doc. 9.

[17] *See* 28 U.S.C. §1441(a)

[18] University of Alabama v. The American Tobacco Co., 168 F. 3d 405, 410 (11th Cir. 1999).

[19] Pacheco de Perez v. AT&T Co., 139 F. 3d 1368, 1373 (11th Cir. 1998).

Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity.[20] The Eleventh Circuit has recognized three situations in which fraudulent joinder arises.[21] The first is when there is no possibility that the plaintiff can prove a cause of action against the resident defendant.[22] The second is when there is outright fraud in the plaintiff's pleading of jurisdictional facts.[23] Finally, fraudulent joinder arises where a diverse defendant is joined with a non-diverse defendant as to whom there is no joint, several or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the non-diverse defendant.[24]

As to the first type of fraudulent joinder, which is the only type relevant to the Court's resolution of the instant motion to remand, "if there is even a possibility that a state court would find the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper

_____

[20] *Triggs v. John Crump Toyota, Inc.*, 154 F. 3d 1284, 1287 (11th Cir. 1998).

[21] *Id.* at 1287.

[22] *Id. Citing* Coker v. Amoco Oil Co., 709 F. 2d 1433, 1440 (11th Cir. 1983), *superceded by statute on other grounds, see* Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F. 2d 1533 (11th Cir. 1993).

[23] *Triggs* at 1287 *citing* Coker at 1440.

[24] *Id. Citing* Tapscott v. MS Dealer Service Corp., 77 F. 3d 1353, 1355 (11th Cir. 1996). Defendant also claims that joinder of the detailer defendants was fraudulent because Plaintiff lacks the intent to obtain judgment against them. This basis for fraudulent joinder has been mentioned by the other district courts. *See* Samples v. Conoco, Inc., 165 F. Supp 2d 1303, 1319-1320 (N.D. Fla. 2001)(Plaintiff must have a real intention to obtain judgment against the non-diverse defendant as long as the potential for joint liability exists.) *Citing* Triggs at 1291. *See Also* Chicago Rock Island & Pac. Ry. Co. v. Schwyhart, 227 U.S. 184, 193-194 (1913).

and remand the case to state court."[25] The plaintiff need not have a "winning case" against the allegedly fraudulent defendant.[26] Rather, the Plaintiff need only have "a possibility of stating a valid cause of action in order for the joinder to be legitimate."[27] Conversely, the burden on Wyeth to establish fraudulent joinder is a heavy one to bear.[28]

"While the proceeding [...] for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under F. R. Civ. P. 56(b), the jurisdictional inquiry must not subsume substantive determination."[29] Accordingly, to determine whether a case should be remanded, the court "must evaluate the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff."[30] These determinations are based on the plaintiff's pleadings at the time of removal, and on the affidavits and deposition transcripts submitted by the parties.[31] However, in considering a motion to remand, a federal court must not "weigh the

---

[25] *Id. See Also* Tillman v. R.J. Reynolds Tobacco, 340 F. 3d 1277, 1279 (11th Cir. 2003).

[26] Triggs at 1287.

[27] *Id.*

[28] Crowe v. Coleman, 113 F. 3d 1536, 1538 (11th Cir. 1997) *Citing* B, Inc. v. Miller Brewing Co., 663 F. 2d 545, 549 (5th Cir. Unit A 1981).

[29] *Id.*

[30] *Id.*

[31] Crowe at 1538. *See also* Coker at 1440 (Both parties may submit affidavits and deposition transcripts to support their positions with respect to a motion to remand.)

merits of a plaintiff's claim beyond determining whether it is an arguable one under state law."[32]

## III. DISCUSSION

### A. Fraud

Relying upon *Albertson v. Richardson-Merrell, Inc.*[33] Plaintiff argues that Florida law recognizes a cause of action in fraud against pharmaceutical sales representatives. In *Albertson*, Florida's Fourth District Court of Appeal reversed the trial court's dismissal of a fraud claim against a pharmaceutical sales representative. The *Albertson* court recognized that a plaintiff who ingested a drug prescribed by her doctor could maintain a cause of action for fraud directly against the sales representative where the sales representative was alleged to have misrepresented material facts concerning the safety of the drug at issue "well-knowing that the safety *vel non* of [the drug] was not as he represented."[34] Because *Albertson* was an appeal from an order granting a motion to dismiss there was no reason to discuss the facts supporting the fraud claim. Here, in contrast, and consistent with the standards for determining whether remand is appropriate the Court is required to go beyond the bare allegations in the complaint and consider the affidavits and other matters on file in determining whether there is a "reasonable basis for predicting that [Florida] law might impose liability on the facts involved."

---

[32] *Id.*

[33] 441 So. 2d 1146 (Fla. Dist. Ct. App. 1983).

[34] *Id.* at 1149-1150.

7

As Plaintiff points out, several judges in this district have relied upon *Albertson* in remanding diet drug cases in which Wyeth sales representatives have been named as defendants in similar counts alleging fraud.[35] However, the remand orders in most of these cases,[36] were based on the fact that Wyeth had failed to establish on the facts in those cases that the plaintiffs had no reasonable possibility of stating a valid cause of action against the sales representative. Indeed, in one case, *Little v. Wyeth Laboratories*, the court observed that Wyeth "presented nothing more to this Court than an allegation that the non-diverse individual Defendants were fraudulently joined by Plaintiff."[37]

Here, in contrast to those diet drug cases - and consistent with a number of similar diet drug cases in which courts have refused to remand cases[38] - Wyeth has provided affidavits and other materials, which directly attack the substance of

---

[35] *See, e.g. Little v. Wyeth Laboratories, Inc. et al*, Case No. 99-2244-Civ-T-17F (M.D. Fla. 1999); *Hroncich v. Wyeth*, Case No. 2:03-cv-659-FTM-29SPC (M.D. Fla. 2004); *Parent v. Wyeth*, Case No. 2:03-cv-626-FTM-29SPC(M.D. Fla. 2003); *Wrisely v. Wyeth-Ayerst Laboratories, Inc. et al*, Case No. 99-2246-Civ-T-26C (M.D. Fla. 1999); *Morris v. Wyeth Laboratories Inc. et al*, Case No. 99-2381-Civ-T-26C (M.D. Fla. 1999); *Martin v. Wyeth Laboratories, Inc. et al*, Case No. 99-2454-Civ-T-26A (M.D. Fla. 1999); *Snell v. Wyeth Laboratories, Inc. et al*, Case No. 99-2453-Civ-T-26A (M.D. Fla. 1999); *Klausner v. Wyeth Laboratories, Inc. et al*, Case No. 99-2254-CIV-T-24E (M.D. Fla. 1999); and *Vale v. Wyeth Laboratories, Inc. et al*, Case No. 99-2238-CIV-T-25E (M.D. Fla. 1999).

[36] *Klausner* was remanded because one of the named defendants neither signed the notice of removal nor explicitly stated its consent to removal on the record. The *Wrisely* opinion partly relied on *Klausner*. As Plaintiff does not argue about the issue of consent to removal, neither of the cases squarely apply to this matter.

[37] *Little* at p. 6.

[38] *See, e.g. Kearney v. Wyeth*, et al., Case No. 6:03-cv-288-Orl-31 KRS (M.D. Fla. 2003); *Long v. Wyeth*, et al., Case No. 6:03-cv-421-Orl-31JGG (M.D. Fla. 2003); *Campana* v. American Home Products Corp., Case No. 1:99cv250 MMP (N.D. Fla. 2000); *Lewis v. Wyeth*, et al., Case No. 3:04-cv-81 MCR (N.D. Fla. 2004).

Plaintiff's allegations regarding the representations made by the named sales representatives and when the misrepresentations were allegedly made. Although, the Plaintiff has filed her own affidavits, her evidence does not refute the evidence in Wyeth's affidavits and thus in deciding the motion to remand the Court does not need to resolve factual disputes.

In order to properly establish a claim for fraud, a plaintiff must allege: (1) a misrepresentation of material fact; (2)(a) knowledge of the representor of the misrepresentation, or (b) representations made by the representor with knowledge as to either their truth or falsity, or (c) representations made under circumstances in which the representor ought to have known, if he did not know, of the falsity thereof; (3) an intention that the representor induce the other to act on it; and (4) resulting injury to the party acting in justifiable reliance on the representation.[39]

While the Plaintiff has set forth in the Complaint[40] conclusory allegations against the sales representatives that track these elements, when these allegations are pierced by the affidavits filed by the parties, it is evident that even if Plaintiff's allegations are deemed true, they are insufficient to establish claims under Florida law against the sales representatives for fraud.

Plaintiff relies upon the affidavit of Dr. Scott A. Rodger - the physician who allegedly prescribed Redux to Plaintiff - to support her claim that the named sales

---

[39] Albertson at 1149-1150.

[40] Doc. 2 at p. 56.

representatives can be held liable for fraud based on the representations made to Plaintiff's physician.[41] In addition to the affidavit of Dr. Rodger, Plaintiff has also filed various records from Dr. Rodger's office, select pages from the 1998 edition of the Physicians' Desk Reference ("PDR"), and detailing notes logged by the defendant sales representatives in 1996 and 1997.[42]

In his affidavit, Dr. Rodger stated that "[d]uring the course of prescribing Redux, Wyeth drug salespeople told me to not worry about the bad press that Redux was getting and continued to encourage me to keep writing prescriptions [...] If I was aware of the dangers that Redux posed to the health of my patients as reflected in the 'black box'[43] warning contained in the 1998 PDR, I would never have prescribed Redux. The warnings contained in the black box warning were not communicated to me at the time of prescribing Redux to Ms. Sobkowski in 1996."[44]

Although, Dr. Rodder's affidavit fails to identify by name the "Wyeth salespeople," who allegedly made the representations, the Court will assume that

---

[41] Doc. 9, Plaintiff's Memorandum, Attached Exhibit.

[42] *Id.* Presumably, this is all the material that Plaintiff could possibly offer this Court in her effort to defeat Wyeth's claim of fraudulent joinder in this case. As Plaintiff herself stated in her Motion for Remand, "liability depositions relevant to this case have been taken long ago. Experts have been chosen by the lawyers on both sides and deposed multiple times. All that remains is to depose treating physicians and a few other fact witnesses." *See* Doc. 9 at p.5.

[43] According to Plaintiff, the FDA recommends pharmaceutical companies to provide a "black box" warning to emphasize the risks that might be associated with the use of a given drug. *See* Doc. 2 at ¶¶130-141. This black box warning appears near the description of the drug in the PDR. Based on the materials offered by Plaintiff, the first PDR black box warning was published in 1998.

[44] *Id.*

the allegations in Dr. Rodger's affidavit refers to the sales representatives named in this case. However, even with this assumption, the facts alleged in Dr. Rodger's affidavit fail to support Plaintiff's claims against the sales representatives for fraud for several reasons.

First, nothing in Dr. Rodger's affidavit or the other information filed by Plaintiff suggests that the sales representatives had special knowledge about Redux, which they withheld from Dr. Rodger. Rather, Dr. Rodger avers that the sales representatives told him not to worry about the bad press, as one would expect of anyone who sells a product that has received less than favorable treatment from news media.

Second, Dr. Rodger does not affirmatively allege the month or even the year he was told by the sales representatives to disregard the "bad press." The omission in Dr. Rodger's affidavit of the dates and year in which the representations were made by sales representatives is notable in view of the fact that according to the "detailing statement," attached to Dr. Rodger's affidavit, the sales representatives actually visited with Dr. Rodger, *after* he had prescribed Redux to Plaintiff. These detailing statements evidence that the sales representatives' marketing interactions with Dr. Rodger - in which they told Dr. Rodger to ignore the "bad press" - first occurred on July 22, 1997, more than one year after Dr. Rodger prescribed Redux to Plaintiff.[45]

---

[45] The Amended Complaint reveals that Ms. Sobkowski was prescribed Redux on June 21,
(continued...)

11

Finally, the "black box" warnings, attached to Dr. Rodger's affidavit, are in the 1998 PDR, which was not in existence in 1996, the year Plaintiff ingested Redux for approximately a three-month period.

Wyeth, on the other hand, has provided the Court with the affidavits of all three sales representatives to support its position that Plaintiff has no possibility of stating a single cause of action against these non-diverse defendants.

In each of these affidavits, the sales representatives have sworn that: (1) they never sold Redux; (2) they never intentionally misrepresented the safety or efficacy of Redux to any physician; (3) Wyeth was their only source of knowledge and information with respect to Redux; (4) they have no specialized medical or pharmacological  training with which they independently may have evaluated the safety and efficacy of Redux; and (5) Wyeth provided them with the FDA-approved package inserts and other information which were used by the sales representatives in the course of their employment with Wyeth.[46]

Accordingly, considering all of the evidence disclosed in the affidavits, it is evident that the sales representatives did not sell or distribute Redux to any physicians, including Dr. Rodger, and that any representations that were made by the sales representatives to Dr. Rodger were made *after* Dr. Rodger had prescribed Redux and *after* Plaintiff had stopped taking Redux. Therefore, the alleged

---

[45](...continued)
1996 and that she ingested Redux for about ninety (90) days. *See* Doc. 2 at ¶¶5-6.

[46] *See* Wyeth's Memorandum in Opposition to Plaintiff's Motion to Remand, Declarations of Potier, Richards, and Troy, Doc. 20, Exhibits 10, 11, and 12.

misrepresentations by the sales representatives to ignore the "bad press," even if considered to be sufficient to constitute a misrepresentation, cannot be actionable under a fraud theory in view of the fact that Plaintiff could not have relied on the misrepresentation through the information provided by the sales representatives to Plaintiff's physician, Dr. Rodger after the fact. The Court therefore concludes that even drawing all reasonable inferences in favor of the Plaintiff, there is no reasonable basis for predicting that Florida law might impose liability on the sales representatives for fraud.

**B. Negligence**

Similarly, there is no possibility that Plaintiff can prove a negligence claim against the sales representatives. Under the negligence count in her Amended Complaint, Plaintiff repeats the same allegations presented in the fraud count, but adds that the sales representatives owed a duty to Plaintiff "not to exaggerate the efficacy or minimize the risks of the drug they were promoting, distributing, and selling."[47] She also claims that the sales representative "knew or should have known the risks of PPH associated with Redux," and that they "misrepresented [...] the dangers of [...] Redux."[48]

_____

[47] Complaint, Doc. 2 at ¶300.

[48] *Id.* at ¶¶301-302.

13

Relying upon *Bouie v. American General Life and Accident Insurance*[49] and several Florida cases,[50] Plaintiff argues that the sales representatives may be liable under Florida law for their negligent acts even if those acts are committed in the scope of their employment. In *Bouie*, insurance sales agents who sold policies directly to the plaintiff were accused of committing fraud by failing to disclose racial disparities in premiums and benefits. The court held that if the sales agents "were aware of the disparity and intentionally did not disclose it, then [...] plaintiff is equally entitled to recover against the individual defendants as against the insurer."[51]

However, none of the cases cited by Plaintiff nor *Bouie* are instructive because each of these cases was grounded on the supposition that the defendants *knew or should have known* of the risks caused by their "sale" of a given product.

Here, in contrast, the affidavits supplied by both parties demonstrate that the sales representatives did not act in their individual capacities and had no special knowledge of any alleged risks that Redux presented. According to the affidavits of all three sales representatives, they promoted Redux based on information provided

---

[49] 199 F. Supp 2d 1259 (N.D. Fla. 2002).

[50] Plaintiff cites Greenberg v. Post, 19 So. 2d 714, 717 (1944)("It is well settled that an employee may be held personally liable at the suit of a third person for positive negligent acts committed by him even though his employer may likewise be liable for the servant's negligent conduct when exercised within the scope of the employment."); and White-Wilson Medical Center v. Dayta Consultants, Inc. 486 So. 2d 659, 661 (Fla. Dist. Ct. App. 1986)("Individual officers and agents of a corporation are personally liable where they have committed a tort even if such acts are performed within the scope of their employment [...] This is so even if no argument is advanced that the corporate form should be disregarded.")

[51] *Id.* at 1263.

14

by Wyeth, and they did not have any independent knowledge of the danger which Redux allegedly presented at the time they promoted the drug to Dr. Rodger.

This evidence is uncontroverted. Indeed, Dr. Rodger's affidavit and the "detailing statement" attached thereto, actually *confirm* that the sales representatives did not have knowledge of any purported risks presented by Redux while they promoted the product. Without such knowledge and without any suggestion that the sales representatives acted in their individual capacities in promoting the drug, Plaintiff's negligence claim against them has no basis in fact.

In light of the foregoing, there is no possibility that Plaintiff could prove a claim in negligence against the sales representatives based on the facts involved in this case.

**C. Civil Conspiracy**

Plaintiff also has no possibility under Florida law of proving a claim for civil conspiracy against the sales representatives. "A civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy."[52] Under Florida law, it is well settled that neither an agent nor an employee can conspire with his or her corporate principal or employer,[53] unless the

_____

[52] Lipsig v. Ramlawi, 760 So. 2d 170, 180 -181 (Fla. Dist. Ct. App. 2000) *Citing* Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App.) *rev. denied* 717 So. 2d 531 (Fla. 1998).

[53] *See* Richard Bertram, Inc. v. Sterling Bank & Trust, 820 So. 2d 963, 965 (Fla. Dist. Ct.
(continued...)

15

employee has a personal stake "that is separate and distinct from the corporation's interests."[54]

There are no allegations in the Amended Complaint nor averments in the affidavits filed by Plaintiff that even remotely suggest that the sales representatives had a personal stake in their promotion of Redux "separate and distinct" from the interests of Wyeth. Rather, all of the allegations following the conspiracy count in the Amended Complaint reveal that the sales representatives and Wyeth acted with one common goal in mind - to sell Redux.[55] Therefore, because the sales representatives were employees of Wyeth during the time that the alleged conspiracy took place, as a matter of law, they could not have conspired with Wyeth.

## D. Misrepresentation by Seller of Chattel

Plaintiff alleges that she is entitled to relief for "Misrepresentation by Seller of Chattel, Restatement of Torts (Second) §402B or Restatement of Torts (Third): Product Liability §9."[56] Plaintiff cannot possibly prevail on either type of claim under Florida law for the following reasons.

---

[53](...continued)
App. 2002)("It is well settled that neither an agent nor an employee can conspire with his or her corporate principal or employer.") *Accord* Leisure Founders, Inc. v. CUC International Inc., 833 F. Supp. 1562, 1574 (S.D. Fla. 1993)("It is axiomatic [...] that a corporation cannot conspire with its agents or employees.)

[54] Lipsig at 180-181.

[55] Doc. 2. at ¶¶273-285.

[56] *Id.* at p. 52.

First, no Florida court has ever adopted Restatement (Second) of Torts §402B.[57] Under the *Erie*[58] doctrine, a federal court sitting in diversity must apply the substantive law of the forum state. The Supreme Court has held that in a diversity case, a federal court is "not free to engraft onto those state rules exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the state in which the federal court in which the federal court sits."[59] Accordingly, the Court declines to allow Plaintiff to assert liability on a theory never before recognized under Florida law.

Second, even if Florida courts were to apply §402B, the rule applies only to sellers of chattel. Here, although Plaintiff alleges that the sales representatives sold Redux,[60] each of the representatives aver in their sworn declaration that they never sold Redux. These sworn allegations have not been controverted by Plaintiff. Moreover, Dr. Rodger's affidavit and the "detailing statement" attached thereto, reflect that the sales representatives merely encouraged Dr. Rodgers to write prescriptions of the drug.

Further, §402B only applies to sellers "who make public a misrepresentation of material fact." Under the rule, the misrepresentation is made public when the seller announces it to the public at large in order to induce purchase of the

---

[57] *See* Stevens v. Danek Medical, Inc., 1999 WL 33217282 (S.D. Fla. 1999).

[58] Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).

[59] Day & Zimmerman, Inc. v. Challoner, 423 U.S. 3, 4 (1975).

[60] Doc. 2, Complaint at ¶¶286-292.

chattels.[61] Here, it is merely alleged that the misrepresentations by the sales representatives were made directly to Dr. Rodger, and not to the public.[62]

Finally, Plaintiff's purported claims under Restatement of Torts (Second) § 402B and Restatement of Torts (Third), Product Liability §9 fail because they sound in strict liability. Consistent with these provisions of the Restatement, Florida law applies strict liability only to manufacturers of products[63] rather than to promoters. Because it is undisputed that the sales representatives in this case were not in the business of manufacturing Redux, under Florida law, they cannot be held strictly liable for the harm that allegedly resulted from Plaintiff's ingestion of the drug.

## E. Breach of Warranty

Lastly, Plaintiff also has no possibility of proving a claim for breach of implied or express warranty against the sales representatives. Under Florida law, each of these claims requires Plaintiff to demonstrate privity of contract between herself and the sales representatives.[64] Plaintiff does not allege that such privity exists[65] and there has been no evidence submitted by the parties which would suggest that

---

[61] Rest. 2d Torts §402B, comment h.

[62] Complaint, Doc. 2 at ¶¶286-292

[63] See West v. Caterpillar Tractor Company, Inc., 336 So. 2d 80, 87 (Fla. 1976).

[64] See Edgar v. Danek Med., Inc., 1999 WL 1054864 (M.D. Fla. 1999) Citing Kramer v. Piper Aircraft Corp., 520 So. 2d 37, 39 (Fla. 1988); T.W.M. v. American Med. Sys., Inc., 886 F. Supp 842, 844 (N.D. Fla. 1995)("A plaintiff who purchases a product, but does not buy it directly from the defendant, is not in privity with that defendant.") See Also Baker v. Danek Medical, 35 F. Supp. 2d 875, 878 ("Florida courts have required privity between the manufacturer and the consumer of the product in order for the consumer to assert an implied warranty claim.")

[65] Complaint, Doc. 2 ¶¶318-330.

18

privity exists between Plaintiff and the defendant sales representatives.

Accordingly, there is no possibility that Plaintiff could state a claim against the

sales representatives under Florida law for breach of warranty.

In sum, because there is no reasonable basis in the record for predicting that

Florida law might impose liability under any of the purported causes of action raised

by Plaintiff against the sales representatives based on the facts involved in this

case, the Court concludes that for purposes of diversity the sales representatives

should be considered fraudulently joined and therefore may be ignored for purposes

of establishing diversity of citizenship. Therefore, Wyeth's removal of this case was

proper and Plaintiff's Motion to Remand (Doc. 9) is due to be **DENIED**.

## IV. RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that Plaintiff's

Motion to Remand (Doc. 9) be **DENIED**.

**IN CHAMBERS** in Ocala, Florida, on this 17th day of May, 2004.

GARY R. JONES
United States Magistrate Judge

Copies to:
     Honorable Wm. Terrell Hodges
     Senior United States District Judge

     Counsel of Record

19

# EXHIBIT 6

FILED

03 JUN 20 AM 9: 16

MIDDLE DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARGARET HORNBERGER, and
RICHARD HORNBERGER,

      Plaintiffs,

v.                            Case No. 8:03-cv-724-T-23TGW

AMERICAN HOME PRODUCTS
CORPORATION et al.,

      Defendants.

## ORDER

    Before the Court is the plaintiffs' motion to remand this action (Doc. 12), which

the defendants oppose (Doc 13). The plaintiff is ORDERED TO SHOW CAUSE by

July 3, 2003, why the non-diverse defendants in this action have not been fraudulently

joined. See Sellers v. Foremost Ins. Co., 924 F. Supp. 1116, 1119 (M.D. Ala. 1996).

    ORDERED in Tampa, Florida, on _____ June 20th _____, 2003.

                                                        STEVEN D. MERRYDAY
                                                        UNITED STATES DISTRICT JUDGE

14

# **EXHIBIT 7**

U.S. Food and Drug Administration
Center for Drug Evaluation and Research

| Press Release | Questions and Answers | MEDWATCH | Mayo Clinic |
|---|---|---|---|



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public

08 July 1997                                            Food and Drug
                                                              Rockvid

# FDA PUBLIC HEALTH ADVISORY

**Subject: REPORTS OF VALVULAR HEART DISEASE IN PATIENTS RECEIVING CONCOMITANT FENFLURAMINE AND PHENTERMINE**

Dear Health Care Professional:

The Food and Drug Administration would like to bring to your attention recent reports of valvular heart disease in women treated for obesity with a combination of fenfluramine and phentermine. Fenfluramine and phentermine were approved more than 20 years ago as INDIVIDUAL agents for short-term use in the medical management of obesity. The use of the products concomitantly has never been approved in the United States, although recently, the combination of the two products has been used "off label" by many American health care practitioners for the management of obesity.

Presently there is no conclusive evidence establishing a causal relationship between these two products and valvular heart disease. However, given the seriousness of the reported valvular disease and its rare occurrence in otherwise healthy obese women in this age range, we believe that patients and health care professionals should be notified of this information.

SUMMARY OF REPORTS

As of July 8, 1997, there have been 33 cases reported to FDA of unusual valvular morphology and regurgitation involving the mitral, aortic, and/or tricuspid valves, usually being multivalvular. About half of the women were reported to have pulmonary hypertension with their valvular disease. All 33 patients were American women with a mean age of 43.3 years (range: 35-72), all of whom had received combined fenfluramine and phentermine therapy for between 1 and > 16 months (mean: 10) before presentation with their valvular disease. Echocardiographic confirmation of valvular disease was seen in nearly all of these patients. To date, surgical intervention has been required in six patients; the histopathology of the diseased valves resembled that seen in carcinoid syndrome or ergotamine toxicity. The course of the cardiac valvulopathy in individuals after the drugs are stopped is presently unknown.

FDA will continue close monitoring of reports of adverse events from all sources. We strongly encourage all health care professionals to report any cases of cardiac valvular disease or other serious toxicities associated with the use of fenfluramine, dexfenfluramine, or phentermine to the FDA's MEDWATCH program at 1-800-FDA-1088/fax 1-800-FDA-0178, or to the respective pharmaceutical manufacturers. Of particular interest in such cases would be the dosage and duration of therapy with the drug product(s), whether there were any other medications being taken by the patient on a chronic basis, whether there was any history of pre-existent cardiac disease, the results of the patient's cardiac examination, and the degree of obesity at the time of initial therapy with the drug(s). With such information, the FDA and the medical community will be able to understand better the potential relationship between these drug(s) and the cardiac pathology and make better recommendations on the appropriate use of these products in the medical management of obesity.

The FDA reminds all health care practitioners that the safety and effectiveness of the use of fenfluramine and phentermine in combination have not been established and that serious concerns about the safety of such combined use have been raised. Until further information is available, the FDA recommends that, if practitioners choose to use these products in a manner

AHP-W-00212069*

different from the approved labeling (i.e., in combination with each other, or for durations or at dosages different than those approved), they should follow patients closely with thorough cardiac evaluations, and if signs and symptoms of cardiopulmonary disease develop, further cardiac evaluation should be pursued.

Sincerely yours,

-signed-

Murray M. Lumpkin, M.D.
Deputy Center Director (Review Management)
Center for Drug Evaluation and Research



*July 8, 1997*
*http://www.fda.gov/cder/phenfen.htm*

AHP-W-00212070

# EXHIBIT 8

From:       LaRoux Jooste (May Choong)
To:         USATC1.WAAT01.ALL USAT01, COXC1, GEISELE, HENRYI, ...
Date:       7/8/97 3:28pm

As per Dr. DeVane's voicemail earlier today, please find attached a press release
that was issued relating to the press conference held by the Mayo Clinic this
afternoon.

CC:         JOOSTEL

T540-5961297*

AHP-R-00083189

Contact:       Audrey Ashby

                                                    Wyeth-Ayerst Laboratories
                                                    (610) 971-5823

                                                    Michael Bulger
                                                    Robinson Lerer &
Montgomery
                                                    (212) 484-7413

### Mayo Clinic Case Reports Indicate Need for Further Research

PHILADELPHIA, PA July 8, 1997 -- Wyeth-Ayerst has reviewed the case reports from the Mayo Clinic and is concerned about the potential association of a rare and unusual valvular disorder with the combination use of two separate medications, phentermine and fenfluramine, sometimes referred to as "phen/fen." Because the data from the Mayo Clinic are limited and, therefore, inconclusive, additional scientific investigation must be conducted before a possible association can be confirmed. Since obesity is associated with serious health disorders, patients taking "phen/fen" should be advised to consult with their doctors about any concerns they have

Wyeth-Ayerst is working with Mayo Clinic to develop a rigorous, prospective study which will provide clinical data to properly examine this issue. Because the addition of phentermine to fenfluramine is *not* an FDA-approved use, potential safety concerns related to such a combination have not been systematically evaluated in large, multicenter, placebo-controlled trials. In a recent letter to all prescribers, Wyeth-Ayerst stated that concomitant use of fenfluramine with other weight-loss agents is not recommended. The letter reiterated that fenfluramine is indicated only for short-term use and that the combination of phentermine with fenfluramine has not been adequately studied

Further research is necessary because this data cannot rule out a number of potential biases and other external factors which could influence the findings. For example, all reported cases originated in a limited, specific geographical region, which indicates that the study results may be subject to some as yet undetermined selection bias. Other potential regional factors, such as environmental, lifestyle or occupational links, may have also affected the results. In some cases, the results may have been related to dosage, since some of the patients in question were taking very large doses which are well outside of the recommended dosage range.

-more-

T540-5961298

AHP-R-00083190

Page 2

Obesity is a serious medical condition, which now afflicts one in three adult Americans and has grown at alarming rates in recent years.  Today obesity is the second leading preventable cause of death in America after tobacco use, and is linked to an estimated 300,000 deaths each year  Anorexigens such as fenfluramine can play an important role in treating clinically obese patients when properly prescribed as part of a program that also includes a regulated diet and increased physical exercise.

Although, as stated by the Mayo Clinic, the initial findings are not conclusive, Wyeth-Ayerst is committed to working closely with the Clinic in conducting further research.

# # #

There is a small risk of a serious, potentially life-threatening cardiovascular condition called primary pulmonary hypertension (PPH) associated with the use of prescription weight-loss drugs. PPH is not the same as high blood pressure. In a review of PPH cases where any weight-loss drug was used for more than 3 months, the risk was estimated to be about 23 to 46 cases per 1 million patients per year. In the general population, the yearly incidence of PPH is 1 to 2 cases per million persons  Warning signals of PPH are shortness of breath, chest pain, fainting, and swelling of the legs, ankles, or feet.  *If any of these symptoms occur before starting fenfluramine therapy, or if they occur during therapy, they should be discussed with a health care provider.*

In animals receiving high doses of dexfenfluramine, a related compound, for short periods of time that resulted in brain concentrations approximately 10 times those seen in humans, neurochemical changes in the brain were observed. The dose of dexfenfluramine and the amount in the brain may affect reversibility. The importance of these findings to humans is not known.

Fenfluramine should not be used by people who are allergic to fenfluramine and related compounds, people with diagnosed pulmonary hypertension, or people taking, or within 14 days of discontinuing use of, monoamine oxidase (MAO) inhibitors.

Fenfluramine is not recommended for people who are taking other serotonin reuptake inhibitors (such as Prozac®, Zoloft®, Effexor®), taking drugs for migraine therapy (such as Imitrex® or dihydroergotamine), under 18 years of age, using other weight-loss medications, diagnosed with some types of glaucoma, or pregnant or breast-feeding.

There is the possibility of some side effects. The most commonly reported side effects are diarrhea, dry mouth, and drowsiness. These side effects tend to be mild and usually disappear in a few weeks.

reinstant doc

T540-5961299

AHP-R-00083191

# EXHIBIT 9

July 24, 1997

Dear Health Care Provider:

We are writing to advise you of labeling changes being developed with the U.S. Food and Drug Administration (FDA) for two Wyeth-Ayerst products, PONDIMIN® (fenfluramine hydrochloride) tablets C-IV and REDUX™ (dexfenfluramine hydrochloride capsules) C-IV. The revised labeling is the result of heightened concern regarding potential side effects which have been reported with concomitant use of fenfluramine and phentermine ("fen/phen").

A boxed warning will be added to the physician and patient labeling discussing a potentially serious and unusual form of valvular heart disease which has been reported in patients taking fenfluramine and phentermine. The symptoms of this disease may include dyspnea, reduced exercise tolerance and/or lower extremity edema. If patients develop these symptoms during therapy or develop a new heart murmur, physicians are advised to perform a complete cardiovascular evaluation.

The labeling for dexfenfluramine (Redux) will also include new warning language because it is a related chemical compound to fenfluramine.

Evidence of a causal relationship between the treatment of obesity with fenfluramine and phentermine combination therapy and valvular heart disease is inconclusive. Wyeth-Ayerst is initiating scientific studies to supplement currently available data.

The warning will also contain information from the current labeling on the small risk of developing primary pulmonary hypertension (PPH), an often-fatal disorder which has been associated with the use of prescription weight loss medications. PPH has symptoms which are similar to those of cardiac valvular disease.

Wyeth-Ayerst will send you the revised labeling with the boxed warning when the wording is finalized with the FDA.

Concomitant use of Pondimin tablets with other weight-loss agents is not recommended. The addition of phentermine to Pondimin ("fen/phen") is *not* an approved use of Pondimin.

AHP-Q-00135062*

- 2 -

Obesity is a serious medical condition, which now afflicts one in three adult Americans and has grown at alarming rates in recent years.  Antiobesity drugs can play an important role in treating clinically obese patients when properly prescribed as part of a program that also includes a regulated diet and increased physical exercise. We are committed to ensuring that physicians and patients have as much information as possible to make an individualized benefit/risk decision.

Please contact Wyeth-Ayerst Medical Affairs Department at 1-800-934-5556 if you have any questions or concerns about this information.

Sincerely,

Marc W. Deitch, M.D.

# **EXHIBIT 10**

| From: | Bruce Reid |
|---|---|
| To: | USAT01.WAAT01.ALLABDS, USAT01.WAAT01.ALLAADS, USFF... |
| Date: | 7/24/97 12:19pm |
| Subject: | REDUX LABELING UPDATE |

Today, July 24th at @ 10:00 E.S.T., Carrie Smith Cox sent a bulletin broadcast message regarding Redux labeling changes.

In order to help you prepare your communications to your people as a part of the plan of the action, I have attached the text of the message, the Dear HCP letter, boxed warning verbatim, and letter from Joe Mahady to the sales force.

The sales force will receive by GroupWise or CC:mail the following materials after the broadcast:

    Dear HCP letter
    Verbatim
    Joe Mahady letter

They will receive a hard copy of these materials by Federal Express Saturday, July 26.

As per our discussion, please voicemail your people following the broadcast with instructions to contact all top Redux physicians to proactively communicate this information using the verbatim.

Bruce Reid

CC:          allank

AHP-Q-00135061*

<u>**CONFIDENTIAL DRAFT - DO NOT RELEASE**</u>

<u>**SCRIPT FOR RELABELING ANNOUNCEMENT TO SALES FORCE**</u>

This is Carrie Smith Cox, Vice President, Women's Health Care Group, with a message to those selling Redux about some developments related to the recent Mayo Clinic observations. Following the initial reports of cardiac valve disorders described by the Mayo Clinic, additional cases have been received by FDA prompting the agency to request new and increased warning language be included in the label for Pondimin, phentermine, and Redux.

Late last week, FDA requested, and Wyeth-Ayerst has agreed, to include a boxed warning in the physician and patient labeling.  This labeling change reflects heightened concerns about potentially serious side effects that may be associated with the use of these products, particularly the fen-phen combination.  The labeling for Redux will also include this warning because it is a related chemical compound to fenfluramine.  The new language will warn of the possible serious heart valve disorder, which we discussed with you in San Diego.  The boxed warning will also highlight the current labeling information on the potential risk of developing PPH.  This is important because PPH has symptoms which are similar to those of cardiac valvular disease.  The PPH information in the boxed warning is not new information.

The use of antiobesity agents requires a benefit risk decision to be made for each patient, and we believe it is appropriate to provide as much information to physicians and patients as possible.

AHP-Q-00135066*

We are sending you via groupwise and cc:mail our letter to physicians announcing this change, along with a verbatim to help you discuss this issue with your physicians. We ask that you please alert your key prescribers to this labeling change as soon as possible, so they can be prepared prior to potential media coverage. Also, stay focused on the job at hand and stay the course, our core message remains the same and our fundamental strategy for selling Redux remains the same.

We will work with the media to encourage balanced, responsible coverage of this new development, however, keep in mind that the sensational elements of a story often predominate news coverage.

As you well know, antiobesity medications have helped thousands of patients, and the benefit/risk ratio is one that physicians and patients need to carefully evaluate in order to make decisions that best suit the needs of individual patients. Obesity is a serious public health threat, and pharmacological therapies are a valuable treatment option in appropriate patients. Pioneering is never easy, as we are experiencing now, but the goal of turning the tide on the epidemic of obesity is a critical one.

We recognize the challenges you're facing and, we will support you in your sales efforts as we manage the ongoing issues surrounding this category. We will keep you informed of further developments, and thank you for your ongoing support of Redux.

AHP-Q-00135087

# EXHIBIT 11

02/03/04  14:50 FAX 504 596 2847          McCLENGHEY STAFFORD                    ☐002

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
F I L E D

FEB - 2 2004

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

URSURA WESTBROOK, ET VIR.         :     DOCKET NO. 03-1918

VS.                               :     JUDGE MINALDI

WYETH, ET AL.                     :     MAGISTRATE JUDGE WILSON

**JUDGMENT**

For the reasons stated in the Report and Recommendation of the Magistrate Judge previously filed herein and after an independent review of the record, and a *de novo* determination of the issues, and consideration of the objections filed herein, and having determined that the findings are correct under applicable law;

IT IS ORDERED that plaintiffs' motion to remand [doc. # 12] be, and it is hereby DENIED.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that judgment be, and it is hereby entered in favor of defendants, MICHAEL J. WICKS, and KEVIN S. BROWN, dismissing with prejudice plaintiffs, URSURA WESTBROOK and DONALD WESTBROOK's claims against said defendants only.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 2 day of _____, 2004.

JUDGMENT ENTERED
BY
COPY

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

(20)

02/03/04  TUE 13:37  (TX/RX NO 5287) ☐001

U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

DEC 2 2 2003

ROBERT H. SHEMWELL, CLERK
BY_____
            DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| URSURA WESTBROOK, ET VIR. | : | DOCKET NO. 03-1918 |
| VS. | : | JUDGE MINALDI |
| WYETH, ET AL. | : | MAGISTRATE JUDGE WILSON |

### REPORT AND RECOMMENDATION

Before the court is plaintiffs' Motion to Remand [doc. # 12].[1]

#### Background

On September 12, 2003, Ursura Westbrook and Donald Westbrook filed the instant suit in the 14th Judicial District Court for the Parish of Calcasieu, State of Louisiana. Made defendants were: Wyeth, Michael J. Wicks, and Kevin S. Brown. The petition alleges that Ursura Westbrook suffered severe injury to her heart valves due to her use of prescription diet drugs, dexfenfluramine ("redux") and/or fenfluramine ("pondimin"), that were manufactured or promoted by defendants. (Petition, ¶¶ 11-13, 84, 87).

On October 17, 2003, Wyeth removed the case to federal court on the basis of diversity jurisdiction. 28 U.S.C. § 1332. Plaintiffs are Louisiana citizens. (Notice of Removal, ¶ 5). Wyeth is a Delaware corporation, with its principal place of business in New Jersey. Id. at ¶ 6. However, individual defendants, Michael J. Wicks, and Kevin S. Brown, are citizens of Louisiana for purposes of diversity. Id. at ¶ 7. To circumvent the obvious lack of diversity

---

[1] The motion has been referred to the undersigned for decision pursuant to 28 U.S.C. § 636(b)(1)(A).



between plaintiffs and the individual defendants, Wyeth alleged in its notice of removal that plaintiffs have no reasonable possibility of recovery against the non-diverse parties; and thus, their presence should be disregarded for purposes of determining diversity (*i.e.* "fraudulent joinder"). *Id.* Plaintiffs disagree with Wyeth's assessment of their claims against Wicks and Brown. Accordingly, on November 13, 2003, the Westbrooks filed the instant motion to remand alleging lack of subject matter jurisdiction due to incomplete diversity. 28 U.S.C. § 1332.[2]

On November 17, 2003, the undersigned issued a minute entry notifying the parties that if the court found that plaintiffs had reasonable possibility of recovery against Michael J. Wicks, and Kevin S. Brown, then summary judgment would be recommended *sua sponte* in favor of said defendants. Parties were invited to file any additional briefs and/or competent summary judgment evidence addressing the relevant issue(s). The delays have expired, and the matter is now before the court.

### Fraudulent Joinder

Once a case has been removed, the burden lies with the removing party to prove that the court has jurisdiction to decide the claim. *Jernigan v. Ashland Oil Inc.* 989 F.2d 812, 815 (5th Cir. 1993)(citing, *Dodson v. Spliiada Maritime Corp.*, 951 F.2d 40, 42 (5th Cir. 1992)). If jurisdiction is alleged on the basis that non-diverse parties have been fraudulently joined, then the removing party must establish either: "actual fraud in the pleading of jurisdictional facts," or "an inability of the plaintiff to establish a cause of action against the non-diverse party in state court."

---

[2] Plaintiff does not contest that the amount in controversy exceeds the requisite jurisdictional minimum. *See*, 28 U.S.C. § 1332. Moreover, we have reviewed plaintiff's allegations and the Notice of Removal. We are satisfied that plaintiff's claims exceed the jurisdictional minimum.

2

*Travis v. Irby*, 326 F.3d 644 (5th Cir. 2003)(citing, *Griggs v. State Farm Lloyds*, 181 F.3d 694, 698 (5th Cir. 1999)). Here, Wyeth does not dispute that Wicks and Brown are Louisiana citizens. Accordingly, our focus is the second basis for fraudulent joinder. *See, Travis, supra.* In resolving this issue, we must determine,

> whether [plaintiff] has *any possibility of recovery* against the party whose joinder is questioned. If there is arguably a *reasonable basis* for predicting that the state law might impose liability on the facts involved, then there is no fraudulent joinder. This *possibility, however, must be reasonable,* not merely theoretical.

*Travis, supra* (quoting, *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002)(emphasis added; internal citation and quotations omitted)).

The district courts may "pierce the pleadings" and entertain summary judgment-type evidence; but we must also consider "all unchallenged factual allegations" in the light most favorable to the plaintiff. *Travis, supra.* Any contested issues of fact and ambiguities of state law must be resolved in favor of remand. *Id.*

<u>Discussion</u>

Plaintiffs allege that Wicks and Brown were Wyeth sales representatives who promoted Pondimin and/or Redux diet drugs to physicians. (Petition, ¶ 84). Plaintiffs further allege that Wicks and Brown knowingly provided misleading and false information regarding the safety of Pondimin and/or Redux. *Id.* These acts contributed to plaintiffs' damages. *Id.*

In its opposition to remand, Wyeth adduced a copy of a "Blue Form" wherein Ursura Westbrook indicated under penalty of perjury that she was only prescribed, and only consumed Pondimin. (Def. Exh. Q). However, Wicks and Brown never promoted Pondimin. (Def. Exhs. R & S). They also did not leave samples with the physicians. *Id.* Furthermore, Wicks and Brown were not aware of any association between Pondimin and Redux and valvular heart

3

disease until it was first publicized by the media in September 1997. *Id.* In sum, Wicks and

Brown did not breach any duty owed to plaintiffs which could have caused their damages. *See*

*generally, Mundy v. Dept. of Health & Human Res.*, 620 So.2d 811, 813 (La. 1993).[3]

Accordingly, the uncontroverted evidence establishes that plaintiffs do not have a

reasonable possibility of recovery against the individual defendants.[4] Having found that

plaintiffs have no reasonable possibility of recovery against the non-diverse defendants, their

presence must be disregarded for purposes of determining diversity. The remaining parties

(plaintiffs and Wyeth) are completely diverse. We may properly exercise subject matter

jurisdiction. 28 U.S.C. § 1332.

As noted by the Fifth Circuit, "[s]ummary judgment will always be appropriate in favor

of a defendant against whom there is no possibility of recovery." *Carriere v. Sears, Roebuck &*

*Co.*, 893 F.2d 98, 102 (5th Cir.1990). We have found that plaintiffs have no reasonable

possibility of recovery against defendants, Michael J. Wicks, and Kevin S. Brown. Accordingly,

it is appropriate to enter summary judgment in favor of said defendants, dismissing with

---

[3] We further observe that the only duty owed by detailmen is to deliver and explain the new package inserts to the physicians in their territory. *Wallace v. Upjohn Co.*, 535 So.2d 1110 (La. App. 1st Cir. 1988), *writ denied*, 539 So.2d 630 (La. 1989). However, plaintiffs' petition is devoid of any specific allegations that the detailmen failed to provide the product insert to her physician(s) or that they failed to explain the product insert. *See, Griggs v. State Farm Lloyds*, 181 F.3d 694, 699 (5th Cir. 1999)(a petition which fails to state any specific actionable conduct on the part of a non-diverse defendant does not satisfy the liberalized requirements of notice pleading such as to state a valid cause of action). Thus, on its face, plaintiffs' petition does not state a cause of action against the non-diverse defendants.

[4] Donald Westbrook's loss of consortium claim is derivative of Ursura Westbrook's claim; and disposition of the latter claim compels the same disposition of the former. *See, Dumas v. Angus Chemical Co.*, 728 So.2d 441, 452 (La. App. 2d Cir. 1999); *Benavides v. County of Wilson*, 955 F.2d 968, 975 (5th Cir. 1992).

4

prejudice plaintiffs' claims against them.

For the foregoing reasons,

IT IS RECOMMENDED that plaintiffs' motion to remand [doc. # 12] be DENIED.

IT IS FURTHER RECOMMENDED that judgment be entered in favor of defendants, Michael J. Wicks, and Kevin S. Brown, dismissing with prejudice plaintiffs' claims against said defendants only.

Under the provisions of 28 U.S.C. §636(b)(1)(C), the parties have ten (10) business days from receipt of this Report and Recommendation to file any objections with the Clerk of Court. Timely objections will be considered by the district judge prior to a final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING ON APPEAL, EXCEPT UPON GROUNDS OF PLAIN ERROR, THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT.**

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 22d day of December, 2003.

COPY SENT:
DATE: 12/22/03
BY: _____
TO: _____

ALONZO P. WILSON
UNITED STATES MAGISTRATE JUDGE

5

# EXHIBIT 12

03/04/04  16:40 FAX 202 274 7400      ARNOLD & PORTER  LLP                                              ☒002

FP

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CHERYL TURNER,

          Plaintiff,

-vs-

Case No. A-03-CA-466-SS

WYETH INC. f/k/a American Home Products
Corporation; A.H. ROBINS COMPANY,
INCORPORATED; WYETH-AYERST
LABORATORIES DIVISION; WYETH-AYERST
PHARMACEUTICALS, INC.; AMERICAN
CYANAMID CORPORATION; JOAN
KADERKA; ANNETTE JIMENEZ; and SCOTT
MONTGOMERY,

          Defendants.

## ORDER

BE IT REMEMBERED on the 25th day of August 2003, the Court called the above-styled cause for a hearing on Plaintiff's Motion to Remand [#7]. Before the Court are the Plaintiff's Motion to Remand, Defendants' response thereto [#8], and Defendants' [#10, #15, #16] and Plaintiff's [#14] supplements. After the hearing, Defendants filed an Unopposed Motion to Continue All Deadlines Under Federal Rule of Civil Procedure 26 and Local Rule CV-16 [#13]. Having considered the motions, responses, arguments of counsel at the hearing and in their post-hearing submissions, the relevant law and the case file as a whole, the Court now enters the following opinion and orders.

### Factual and Procedural Background

This case involves the Plaintiff's alleged use of the diet drugs fenfluramine and dexfenfluramine ("fen-phen"). The Plaintiff, Cheryl Turner, who resides in Travis County, Texas,

17

03/04/04  15:46 FAX 202 374 7889          ARNOLD & PORTER  LLP                                    @003

opted out of a national class action settlement of fen-phen claims and filed this individual lawsuit. *See* Notice of Removal at 2 and Ex. 2 ("Pet.") at ¶ 2.  She sues several Wyeth-Ayerst entities, including its Wyeth Pharmaceuticals Division, Wyeth Pharmaceuticals, Inc., and Wyeth Holdings Corporation (collectively, "Wyeth"). Pet. ¶¶ 3-8. Wyeth is a Delaware corporation with its principal place of business in New Jersey that allegedly promoted, marketed, manufactured and distributed fen-phen. *Id.*; Notice of Removal at 3.  Turner asserts claims for strict products liability, breach of express and implied warranty, and negligent misrepresentation against Wyeth. Pet. ¶¶ 24-42.  She also sues three Wyeth pharmaceutical sales representatives – Joan Kaderka (now Helmke), Annette Jimenez, and Scott Montgomery – all Texas residents, for alleged misrepresentations they made in their capacities as Wyeth sales representatives. Pet. ¶¶ 9-11.  Turner, who sues all of the defendants jointly and severally, seeks damages for past and future medical expenses, lost wages, pain and suffering, mental anguish, and the physical impairment and disfigurement that she claims she suffered as a proximate result of the Defendants' wrongdoings and actions. Pet. at 14-15.

Turner filed her petition in the 201st Judicial District Court of Travis County, Texas on May 29, 2003.  On July 9, 2003, Wyeth removed the case to this Court on the basis of diversity jurisdiction, alleging the Plaintiff had fraudulently joined Kaderka, Jimenez and Montgomery as defendants in the case.  According to the state court docket, citation had issued to all of the Defendants at the time of removal. On July 31, 2003, Turner filed a motion to remand.

### Analysis

Wyeth removed the case to federal court on the basis of diversity jurisdiction.  For this Court to have diversity jurisdiction over a case, the defendant must prove there is complete diversity among the parties in the case – in other words, the plaintiff is diverse from every defendant. *See* 28 U.S.C.

03/15/03  THU 15:23  [TX/RX NO 5740]

§ 1332; *Strawbridge v. Curtiss*, 3 Cranch 267, 2 L.Ed. 435 (1806). Thus, the primary issue before this Court is whether Kaderka, Jimenez and Montgomery are proper defendants in this case and, consequently, whether this Court has subject matter jurisdiction over the case under 28 U.S.C. § 1332.

Wyeth alleges the sales representatives, Kaderka, Jimenez and Montgomery, were fraudulently joined as defendants, in which case the Court would ignore their Texas citizenship for jurisdictional purposes. To establish the sales representatives, referred to by the parties as "detailers," were fraudulently joined, Wyeth must satisfy the heavy burden of showing there is no possibility Turner could establish a cause of action against Kaderka, Jimenez or Montgomery, or that Turner committed outright fraud in her recitation of the jurisdictional facts. *See Burden v. General Dynamics Corp.*, 60 F.3d 213, 217 (5th Cir.1995); *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 (5th Cir.1981). In evaluating a defendant's assertion of fraudulent joinder, a court must consider all of the factual allegations in the light most favorable to the plaintiff and resolve all of the contested issues of fact in favor of the plaintiff. *Burden*, 60 F.3d at 217.

However, a court may pierce the pleadings to determine fraudulent joinder and, even though the petition may state a claim against the in-state defendant, the case may be removed if the removing defendant demonstrates through summary judgment-type evidence outside the pleadings there is no reasonable basis to predict the plaintiff could establish a claim against the in-state defendant. *Badon v. R J R Nabisco, Inc.*, 224 F.3d 382, 389, 394 (5th Cir. 2000) ("*Badon I*"), *op. after certified question declined*, 236 F.3d 282 (5th Cir. 2000) ("*Badon II*") (holding no controversy exists to construe in favor of nonremoving party when it submits no evidence of contradictory facts in response to the evidence of the removing party); *see also B., Inc.*, 663 F.2d at 549 (affirming the

appropriateness of considering deposition and affidavit evidence). Nevertheless, a court must resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff. *B. Inc.*, 663 F.2d at 549. Thus, Wyeth must show, as a matter of law, "there is no reasonable basis for predicting that [Swinehart] might establish liability on [her] claim against [the detailers] ." *Badon I*, 224 F.3d at 390; *see also Burden*, 60 F.3d at 216 (explaining district courts "do not determine whether the plaintiff will actually or even probably prevail on the merits of the claim, but look only for a possibility that the plaintiff might do so.").

Wyeth contends there is no reasonable possibility Turner could succeed in her misrepresentation claims against any of the three detailer defendants because she has not pled a valid cause of action against Kaderka, Jimenez or Montgomery. Wyeth also contends the allegations Turner has made against each detailer, even if they did constitute a valid cause of action, are refuted by the evidence Wyeth has submitted.

In this case, Wyeth and Turner each urge a different interpretation of Texas substantive law that would in turn lead this Court to opposite conclusions as to whether Turner could conceivably prevail on its misrepresentation claims against Kaderka, Jimenez or Montgomery. Turner contends that because an agent or employee can be held independently liable for his own torts, she can sue the detailers in state court for the injuries she sustains as a result of the detailers' personal misrepresentations. On the other hand, Wyeth claims the detailers do not owe a duty of care to Turner separate and apart from the duty of care Wyeth owes Turner, and therefore, Turner has failed to assert a legally cognizable misrepresentation claim against the detailers.

Turner relies on *Kingston v. Helm*, 82 S.W.3d 755 (Tex. App. – Corpus Christi, 2002, pet. denied), to support her argument Kaderka, Jimenez and Montgomery can be held individually liable

-4-

under Texas law for their misrepresentations. In *Kingston*, the state appellate court discussed at length several decisions of the Texas Supreme Court regarding the individual liability of agents and employees of corporations. The Corpus Christi court noted the general rule in "a corporate officer's acts on the corporation's behalf are deemed to be acts of the corporation," but an exception exists, and a "'corporation's employee is personally liable for tortious acts which he directs or participates in during his employment.'" *Id.* at 758 (citing *Leitch v. Hornsby*, 935 S.W.2d 114, 117-18 (Tex. 1996) and quoting *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984)). According to the *Kingston* court, "the law [in Texas] is well-settled that a corporate agent can be held liable for fraudulent statements and knowing misrepresentations even when they are made in the capacity of a representative of the corporation." *Id.* at 759. The court clarified, however, that the agent can only be held individually liable when he *knowingly participates* in tortious or fraudulent acts. *Id.* (emphasis this Court's own). The appellate court ultimately concluded that an officer of a real estate company who made false representations to the plaintiff with regard to a townhouse the plaintiff purchased could be held individually liable under the Texas Deceptive Trade Practices Act for those knowing misrepresentations. *Id.* at 757, 761.

In this case, although Turner does not allege specific actions on the part of each defendant in the context of stating her causes of action, she makes the following general allegation against all of the defendants:

> All defendants individually and through their agents, representatives and/or employees, negligently misrepresented or omitted to state material facts about the dangers of the subject products containing PPA in that they made such misrepresentations or omissions when they knew or should have known of the falsity of such representations. Alternatively, all defendants made such omissions or representations without exercising reasonable care to ascertain the accuracy of those representations.

-5-

Pet. ¶ 41.  In the "Parties" section of the petition, Turner alleged that each detailer, in his or her

position as a Wyeth sales representative, promoted fen-phen by providing information to Texas

physicians, and while doing so, "affirmatively undertook to provide misleading information relating

to the safety of fen/phen, which the Defendant know or should have known were false." Pet. ¶¶ 9-11.

Turner further alleged each detailer "made such representations with the intent or purpose that the

Plaintiff and others would rely upon them leading to the ingestion and use of said drugs by the

Plaintiff causing the Plaintiff to suffer severe and permanent heart valve damage." Id.

Essentially, Turner alleges the detailers passed information supplied by Wyeth to the

physicians and they know or should have known this information contained misstatements about the

safety of the diet drug.  This does not constitute an allegation of knowing participation in a

misrepresentation on the part of a corporate agent (the detailer).  If Turner had alleged the sales

representatives made up additional misleading information and told it to the doctors to induce them

to prescribe the drugs, the way a realtor might misrepresent the conditions of a piece of property to

make the sale, or if she had alleged the detailers were told of the dangers of fen-phen but

intentionally did not disclose them to the doctors, then she might have stated a claim with a

reasonable chance of success under the exception articulated in Kingston.  Instead, the general rule

applies and because the detailers do not have duty to research and ensure the safety fen-phen separate

from Wyeth's duty, Turner does not have a reasonable probability of success on  her

misrepresentation claims against the detailers under Texas law. See Leitch v. Hornsby, 935 S.W.2d

114, 117 (Tex. 1996) (holding agents can only be held individually liable when they owe an

independent duty of reasonable care to the injured party separate and apart from their employer's

duty); Firestone Steel Products Co. v. Barajas, 927 S.W.2d 608, 613 (Tex. 1996) (holding only those

-6-

who design, manufacture or sell a product have a duty to warn); *see also* Def.'s Supp. to Resp.
(collecting several orders written by Judges Lee Rosenthal and Lynn Hughes of the Southern District
of Texas dismissing claims against pharmaceutical sales representatives on the grounds there is no
reasonable basis to recover against them under Texas law).

Moreover, even if Turner did have a reasonable chance of prevailing on her claims against
the individual detailers, Wyeth has disproved the factual allegations that serve as the basis of her
misrepresentation claims against the detailers with uncontroverted summary judgment type evidence
in the form of the Kaderka's (Heinke's) and Montgomery's sworn declarations.  *See* Notice of
Removal, Ex. Z1 ("Heinke Decl.") & Ex. Z2 ("Montgomery Decl."). In their declarations, the two
detailers refute that they ever intentionally misrepresented the safety or efficacy of fen-phen and
explained it was their job to pass on the FDA-approved information provided to them by Wyeth.
*See* Heinke Decl. ¶¶ 2, 4, 5; Montgomery Decl. ¶¶ 2, 4. Additionally, Montgomery never even
detailed fen-phen. *See* Montgomery Decl. ¶ 3.  And Kaderka swears she did not know of the alleged
correlation between the use of the drug and heart valve damage until the allegation was first
published. *See* Heinke Decl. ¶ 6. Turner made identically general allegations against Jimenez that
she made against the other two detailers. Because Wyeth has presented sworn testimony in the form
of Heinke's and Montgomery's declarations that detailers merely pass on the FDA-information
provided to them by Wyeth, it has satisfied its burden to show Turner has no reasonable probability
of success on her claims against Jimenez either.

If Turner had produced any contradictory evidence, even if it was less credible than Wyeth's,
it would have created a fact issue which the court would have had to resolve in her favor. However,
on a motion to remand, the Court must only resolve fact disputes in a plaintiff's favor when "when

-7-

there exists an actual controversy, i.e. when *both* parties have submitted *evidence* of contradictory facts." *Baden I*, 224 F.3d at 394 (emphasis in original). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts" to support its claims against the non-diverse defendant. *Id.* (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). Because in this case, Wyeth has negated the facts which might form the basis of a state law claim, the Court holds the defendants were fraudulently joined.  The "mere theoretical possibility of recovery under local law" does not preclude removal. *Baden II*, 236 F.3d at 286; *Ross v. Citifinancial, Inc.*, ___ F.3d ___, 2003 WL 22026346, at *3 (5th Cir. Aug. 29, 2003).


In accordance with the foregoing:

   IT IS ORDERED that Plaintiff's Motion to Remand [#7] is DENIED;

   IT IS FURTHER ORDERED that Plaintiff's Unopposed Motion to Continue All Deadlines Under Federal Rule of Civil Procedure 26 and Local Rule CV-16 [#13] is DISMISSED as moot in light of this order.


SIGNED this the ___ day of September 2003.


                                        SAM SPARKS
                                        UNITED STATES DISTRICT JUDGE


-4-

# **<u>EXHIBIT 13</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: DIET DRUGS (Phentermine/ Penfluramine/Dexfenfluramine) PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 1203 |
| THIS DOCUMENT RELATES TO: | FILED  APR 02 2004 |
| BOBBIE AMIKER, et al. v. WYETH, et al. | CIVIL ACTION NO. 03-20343 |
| CAROLYN BREWER, et al. v. WYETH, et al. | CIVIL ACTION NO. 03-20279 |

MEMORANDUM AND PRETRIAL ORDER NO. 3391

Bartle, J.                                    April 2, 2004

        Before the court are the motions of thirty class

members in two separate actions to remand to the appropriate

Mississippi state courts their actions against defendants Wyeth,[1]

the Mississippi physicians who have prescribed Wyeth's diet drugs

Pondimin and/or Redux for them, one physician practice group,

five named sales representatives, and John Does 1-9 -- who appear

to be anonymous Mississippi sales representatives.  The state

court actions were captioned Bobbie Amiker, et al. v. Wyeth, et

al. (Miss. Cir. Ct. Bolivar County filed Dec. 30, 2002) and

Carolyn Brewer, et al. v. Wyeth, et al. (Miss. Cir. Ct. Jones

_____

1.   Wyeth was previously known as American Home Products
Corporation ("AHP").

ENTERED

APR 02 2004

CLERK OF COURT

County filed Dec. 30, 2002).  The plaintiffs in these actions are
all represented by the same counsel.

Plaintiffs originally filed their complaints in
Mississippi circuit courts in December, 2002, more than five
years after Pondimin and Redux were withdrawn from the market in
September, 1997.  The Mississippi federal courts deferred ruling
on plaintiffs' motions, and the cases were then transferred to
this court as part of MDL 1203, the mass tort litigation
involving Wyeth's diet drugs.  No federal claim for relief is
alleged.

                              I.

In brief summary, plaintiffs, all of whom are citizens
of Mississippi, filed suits for injuries sustained as a result of
their use of Pondimin and/or Redux.  The defendant Wyeth, the
manufacturer of these diet drugs, is a party of diverse
citizenship from the plaintiffs.  The defendant physicians who
prescribed Pondimin and/or Redux to plaintiffs, and the defendant
sales representatives who purportedly promoted these drugs are
alleged to be citizens of Mississippi.

The plaintiffs maintain that remand is appropriate
because complete diversity does not exist as required under
28 U.S.C. § 1332(a).  Wyeth counters that the non-diverse
physicians in these matters were fraudulently joined because the
applicable two-year statute of limitations bars plaintiffs'

                             -2-

claims against them.[2]  See MISS. CODE ANN. § 15-1-36 (West 2003).
Plaintiffs respond that the statute of limitations has not
expired against the in-state physicians because plaintiffs
discovered their injuries less than two years prior to filing
their claims.  As for the claims against the in-state sales
representatives, Wyeth maintains that these claims are precluded
as a matter of law in Mississippi.  In response, plaintiffs
assert that the sales representatives are liable under the
learned intermediary doctrine.

<div align="center">II.</div>

This court addressed many of the same issues presented
by plaintiffs' remand motions in Pretrial Order ("PTO") No. 3281
in French, et al. v. Wyeth, et al., CIV.A. No. 03-20353 (E.D. Pa.
Feb. 18, 2004), which is also part of the nationwide diet drug
litigation.  In French, we explained in detail the standards for
removal based on diversity jurisdiction and fraudulent joinder.
See PTO No. 3281 at 2-4.  Because we examined the same legal
issues as they applied to nearly identical facts in French, we
need not revisit them here.

_____

2.  The statute of limitations is not an issue in plaintiffs'
claims against Wyeth, which has waived its right to assert this
defense in return for the plaintiffs' giving up their right to
sue Wyeth for "punitive, exemplary, and multiple damages."
Settlement Agreement § IV.D.3.c; see PTO No. 2625 and PTO No.
2680.

III.

We first turn to the issue of whether the prescribing
physicians, all purportedly Mississippi citizens, and Mission
Primary Care Clinic,[3] the one named physician practice group
located in Mississippi, were fraudulently joined as defendants
for the purpose of destroying diversity of citizenship and
preventing removal.  Plaintiffs have brought claims for medical
negligence against these non-diverse defendants.

Wyeth argues that plaintiffs' complaints do not state
colorable claims against these defendants because plaintiffs'
claims are barred by the Mississippi statute of limitations.  The
statute provides in relevant part:

> For any claim accruing on or before June 30,
> 1998, and except as otherwise provided in
> this section, no claim in tort may be brought
> against a licensed physician, osteopath,
> dentist, hospital, institution for the aged
> or infirm, nurse, pharmacist, podiatrist,
> optometrist or chiropractor for injuries or
> wrongful death arising out of the course of
> medical, surgical or other professional
> services unless it is filed <u>within two (2)
> years from the date the alleged act, omission
> or neglect shall or with reasonable diligence
> might have been first known or discovered.</u>

_____

3.  Mission Primary Care Clinic appears to be the practice group
for Dr. Roe's 1-3, the unidentified prescribing physicians for
plaintiff Sharon Manning.  Dr. Roe's 1-3 are believed to be
Mississippi residents.  For the reasons stated <u>infra</u>, we need not
address the claims against Dr. Roe's 1-3.

-4-

MISS. CODE ANN. § 15-1-36(1) (emphasis added).  For any claim
accruing on or after July 1, 1998, the statute of limitations is
the same for all relevant purposes.[4]

In <u>French</u>, we set forth the standard for when an action
"accrues" under Mississippi law.  <u>See</u> PTO No. 3281 at 6.  In
short, an action accrues when a patient can reasonably be held to
have knowledge of the injury itself, cause of injury, and the
conduct of the medical practitioner.  <u>Fortenberry v. Mem'l Hosp.</u>
<u>at Gulfport, Inc.</u>, 676 So.2d 252, 255 (Miss. 1996); <u>see also</u>
<u>First Trust Nat'l Ass'n v. First Nat'l Bank of Commerce</u>, 220 F.3d
331, 336-37 (5th Cir. 2000); <u>In re Catfish Antitrust Litig.</u>, 826
F. Supp. 1019, 1031 (N.D. Miss. 1993).

Plaintiffs contend that they brought their actions
within two years "from the date the alleged act ... with
reasonable diligence might have been first known or discovered."
MISS. CODE. ANN. § 15-1-36(1).  According to plaintiffs, they could
not have reasonably discovered their purported injuries until
their alleged heart problems were diagnosed after reviewing their
echocardiograms.  Plaintiffs assert that their diagnoses occurred
less than two years prior to filing their complaints.  Wyeth
counters that plaintiffs should have been on notice of their
stated injuries as a result of the widespread publicity

---

4.  The statute of limitations for claims accruing after July 1,
1998 adds tolling provisions for fraudulent concealment and
instances when a foreign object is left in a patient's body.  <u>See</u>
MISS. CODE. ANN. § 15-1-36(2)(a),(b).  Both provisions require a
plaintiff to bring an action within two years of the time when
the alleged injury or fraud should have been discovered, and no
later than seven years after the alleged act of neglect.  <u>See id.</u>

accompanying the withdrawal of the diet drugs from the market in September, 1997. Wyeth further contends that plaintiffs should have known about their alleged injuries at the very latest in March, 2000, after Wyeth's extensive publicity campaign.

As set forth in greater detail in French, there was massive publicity, both locally and nationally, from September, 1997 through March, 2000 concerning Wyeth's diet drugs and their connection to valvular heart disease. In light of this massive publicity, plaintiffs, if they had acted with reasonable diligence, should have had knowledge of their alleged injuries by the end of March, 2000. We thus find that plaintiffs' actions accrued under the Mississippi statute of limitations no later than this time. See e.g., Fortenberry, 676 So.2d at 255. Since plaintiffs did not file their actions until December, 2002, their claims of negligence against the in-state physicians and Mission Primary Care Clinic are time barred.

## IV.

Plaintiffs also maintain that the statute of limitations is tolled against the physician defendants because the physicians have fraudulently concealed facts which would alert plaintiffs about the dangers associated with the use of diet drugs. We previously addressed this issue in PTO No. 3350 in Cockrell, et al. v. Wyeth, et al., CIV.A. No. 03-20626 (E.D. Pa. Mar. 9, 2004). In short, where fraud or concealment of tortious conduct is alleged, Mississippi law specifies that, "the cause of action shall be deemed to have first accrued at, and not

before, the time at which such fraud shall be, or with reasonable diligence should have been, first known or discovered." MISS. CODE. ANN. § 15-1-36 (b). Mississippi law requires that plaintiffs plead with specificity "some act or conduct of an affirmative nature designed to prevent and which does prevent discovery of a claim." Reich v. Jesco, Inc., 526 So.2d 550, 552 (Miss. 1998).

Plaintiffs' complaints are devoid of anything that would suggest that the physician defendants acted to conceal the plaintiffs' alleged injuries. Thus, as we determined in Cockrell, there is "no reasonable basis in fact or colorable ground" supporting plaintiffs' contention that the statute of limitations should be tolled under Mississippi law because of fraudulent concealment. Boyer v. Snap-on Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990); see also Reich, 526 So.2d at 552.

V.

Plaintiffs also assert that the statute of limitations defense is not applicable to the physician defendants under the Settlement Agreement. We disagree. Section IV.D.3.c of the Settlement Agreement states in relevant part:

> With respect to each Class Member who timely and properly exercises the Intermediate Opt-Out right and who initiates a lawsuit against any of the Released Parties within one year from the date on which the Intermediate Opt-Out right is exercised, the AHP Released Parties shall not assert any defense based on any statute of limitations or repose .... A Class Member timely and properly exercising an Intermediate Opt-Out right may not seek punitive, exemplary, or any multiple damages against the AHP Released Parties or the Non-

AHP Released Parties; provided however, as
consideration for being a Non-AHP Released
Party and for receiving the benefit of this
waiver of punitive, exemplary, and multiple
damages, the Non-AHP Released Party must
agree in writing not to assert any defense
based on any statute of limitations or repose
... and provided further that if the Non-AHP
Released Party so agrees, then the Class
Member may not recover more than the total
amount of compensatory damages he or she is
entitled to from all persons or entities in
connection with any claimed injury arising
from his/her use of Diet Drugs, except where
such limitation is inconsistent with
applicable law.

The language of § IV.D.3.c of the Settlement Agreement

is clear in its instruction that any non-AHP released party

retains the benefit of the statute of limitations provided that

the party has not affirmatively waived the benefit in writing.

The physician defendants in this action are clearly non-AHP

released parties.[5]  Plaintiffs fail to contend or provide

---

5.  Non-AHP Released Parties include, *inter alia*:

    All physicians who prescribed, and all pharmacists and
pharmacies who dispensed, Pondimin and/or Redux to the
extent that liability against such physicians, pharmacists
or pharmacies is based on:

    (1)  the prescription or dispensing of Pondimin and/or Redux
        in a manner consistent with the product labeling;
        and/or

    (2)  the prescription or dispensing of Pondimin for any
        period longer than a "few weeks"; and/or

    (3)  the prescription or dispensing of Pondimin and/or Redux
        for concomitant use with Phentermine hydrochloride or
        Phentermine resin; and/or

    (4)  a claim that the physician's or pharmacist's liability
        stems solely from having prescribed or dispensed
        Pondimin and/or Redux; and/or

                      (continued...)

-8-

information that any of these physicians has agreed in writing to waive the statute of limitations.  As such, the in-state physician defendants in these matters retain the benefit of the statute of limitations defense.

<div align="center">VI.</div>

In a further attempt to establish that their claims against their respective physicians and Mission Primary Care Clinic are not time barred, plaintiffs argue that the filing of various class action complaints throughout the country tolled the running of the statute of limitations.  In support of their position, plaintiffs cite Am. Pipe & Constr. Co. v. Utah, 414 U.S. 556 (1974), which held that the filing of a putative class action tolls the running of the statute of limitations on behalf of putative class members against the defendant until a class motion is denied or plaintiffs opt out of the class.  Id. at 561. This argument is totally without merit.  The physician defendants here were not defendants in any identified putative class actions.

---

5. (...continued)

> (5)  a claim that the physician's or pharmacist's liability
>       stems solely from the prescription or dispensing of a
>       defective or unreasonably dangerous product.

Physicians, pharmacists and pharmacies are not Released Parties with respect to any claim based on their independent negligence or culpable conduct, not consisting of conduct described in paragraphs (1)-(5) of this Subsection I.48.e.

Settlement Agreement § I.48.e.

Finally, plaintiffs contend that the court's approval of the National Settlement Agreement and PTO No. 1415 tolled the statute of limitations.  The court is unaware of any language in either of these documents that supports plaintiffs' position in this regard.

Thus, there is no basis for tolling the statute of limitations as to the physician defendants or Mission Primary Care Clinic.

## VII.

Plaintiffs also bring claims in negligence and strict liability against Wyeth's in-state sales representatives.  Wyeth argues that these defendants are fraudulently joined.  We note first that there is no indication in either complaint that any of the plaintiffs, or any of the plaintiffs' physicians, received any drugs from these sales representative defendants.  Further, any allegations of misrepresentation or fraud fall short of what is required under both federal and Mississippi law.  See Fed. R. Civ. P. 9(b); Miss. R. Civ. P. 9(b); Allen v. Mac Tools Inc., 671 So.2d 636, 642 (Miss. 1996); Brabham v. Brabham, 483 So.2d 341, 342 (Miss. 1986).

Plaintiffs cite Swan v. I.P., Inc., 613 So.2d 846, 855-56 (Miss. 1993) to support their contention that the duty to warn extends to the sales representatives through the learned intermediary doctrine.  We disagree.  The learned intermediary doctrine provides that "a manufacturer's duty to warn may be discharged by providing information to a third person upon whom

-10-

it can reasonably rely to communicate the information to the
ultimate users of the product or those who will be exposed to its
hazardous effects." _Id._ at 851 (citations omitted).  In _Swan_,
the court found that there was a material issue of fact as to
whether a polyurethane foam manufacturer was relieved of its duty
to warn because the manufacturer reasonably relied on the
contractor who used its polyurethane foam to warn the person
ultimately exposed to the hazardous effects of the product.  In
the prescription drug context, however, Mississippi courts have
clearly decided that the duty to warn does not extend to sales
representatives.  _See e.g._, _Johnson v. Parke-Davis_, 114 F. Supp.
2d 522, 524-25 (S.D. Miss. 2000).  Thus, plaintiffs' contention
that the sales representative defendants breached their duty to
warn is without substance.

     Furthermore, under Mississippi law, sales
representatives are not "sellers," but rather, employees of the
businesses which are the sellers.  _McCurtis v. Dolgencorp, Inc._,
968 F. Supp. 1158, 1160-61 (S.D. Miss. 1997).  As such, the
employees are not liable for failure to warn.  _See id._
Accordingly, there is "no reasonable basis in fact or colorable
ground supporting the claim against" the sales representative
defendants.  _Boyer_, 913 F.2d at 111; _see also Johnson_, 114 F.
Supp. 2d at 524-25; _In re Rezulin_, 133 F. Supp. 2d 272, 288-90
(S.D.N.Y. 2001).

## VIII.

Finally, plaintiffs bring claims against John Does 1-9, "Dr. Roes" 1-3, and John Doe Woods, M.D., who appear to be either anonymous in-state sales representatives of Wyeth or prescribing physicians whom plaintiffs believe to be citizens of Mississippi. Plaintiffs purportedly name these unidentified defendants in an effort to defeat diversity.  However, the removal statute provides that "the citizenship of defendants sued under fictitious names shall be disregarded."  28 U.S.C. § 1441(a). Thus, for the purposes of determining whether complete diversity exists so that these actions may remain in federal court, the citizenship of these unidentified defendants is irrelevant.

## IX.

For many of the same reasons articulated in French, as well as the reasons detailed herein, Wyeth has met its heavy burden of showing that the above defendants are fraudulently joined.  Accordingly, we will deny the motions of the plaintiffs to remand these actions to the Mississippi state courts and will dismiss the complaints as to these physicians and sales representatives.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS (Phentermine/ Fenfluramine/Dexfenfluramine) PRODUCTS LIABILITY LITIGATION | : : : | MDL DOCKET NO. 1203 |
| THIS DOCUMENT RELATES TO: | : | |
| BOBBIE AMIKER, et al v. WYETH, et al. | : : : | CIVIL ACTION NO. 03-20343 |
| CAROLYN BREWER, et al. v. WYETH, et al. | : : : : | CIVIL ACTION NO. 03-20279 |

## PRETRIAL ORDER NO. 3391

AND NOW, this 2nd day of April, 2004, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1)  the motion of plaintiffs in Bobbie Amiker, et al. v. Wyeth, et al., CIV.A. No. 03-20343 (E.D. Pa.) to remand to the Circuit Court of Bolivar County, Mississippi, is DENIED;

(2)  all claims in Amiker against Forrest Bailey, Susan King, James Pittman, Jewell Norman, Amy Williams, and Gayle Harrell are DISMISSED;

(3)  the motion of plaintiffs in Carolyn Brewer, et al. v. Wyeth, et al., CIV.A. No. 03-20279 (E.D. Pa.) to remand to the Circuit Court of Jones County, Mississippi, is DENIED; and

(4)  all claims in Brewer against defendants Forrest Bailey, Susan King, James Pittman, Jewell Norman, Amy Williams,

Bruce Pruett, M.D., Guy Farmer, M.D., Jacob Edward Ulmer, M.D.,

Dan Overbeck, Susan Moulder, Charles T. Hull, M.D., and Mission

Primary Care Clinic are DISMISSED.

                    BY THE COURT:

                                                            J.

-2-

# EXHIBIT 14

## AFFIDAVIT OF ROBERT VERSCHAREN

Personally appeared before me, the undersigned officer duly authorized to administer oaths, Robert Verscharen, who, being duly sworn, states as follows:

1.    My name is Robert Verscharen.  I am over 21 years of age, and I am suffering from no legal disability.   I make this Affidavit based on my own personal knowledge and experience to the best of my recollection.

2.    I am presently the Vice President Pharmacy Purchasing and Formulary Management for Eckerd Corporation ("Eckerd"), have held such position since 1997.  Eckerd is a national chain operating retail pharmacies in approximately 2,640 locations in twenty states.

3.    Based on a review of documents and other information maintained in the ordinary course of Eckerd's business, I am generally familiar with any relationship Eckerd had with Wyeth or Wyeth Pharmaceuticals, and any Eckerd activities involving Pondimin®, Redux™ and/or phentermine.

4.    Eckerd never marketed nor promoted Pondimin®, Redux™ or phentermine to any doctor or consumer.   In addition, Eckerd never co-promoted Pondimin®, Redux™ and/or phentermine with Wyeth, Wyeth Pharmaceuticals or other any other company or person.

5.   Furthermore, Eckerd never sponsored any co-promotional pieces to enhance provider and public awareness of Pondimin ®, Redux™ and/or phentermine.

6.   Eckerd did not act as an intermediary distributor of Pondimin®, Redux™ or phentermine to any managed health care organizations or pharmacies that were not Eckerd retail pharmacies.  Moreover, Eckerd did not enter into any agreement, formal or informal, with Wyeth or Wyeth Pharmaceuticals to act as an intermediary distributor of Pondimin®, Redux™ and/or phentermine.

7.   Eckerd did not enter into any agreement to commit fraud, misrepresentation or any illegal act related to Pondimin®, Redux™ and/or phentermine, or otherwise, with Wyeth, Wyeth Pharmaceuticals, employees of Wyeth or Wyeth Pharmaceuticals, any phentermine manufacturer or seller (including, but not limited to, Medeva Pharmaceuticals, Inc., Fisons Pharmaceuticals, Celltech Pharmaceuticals, Inc., Goldline Laboratories, Inc., Zenith-Goldline Pharmaceuticals, Inc., Rugby Laboratories, Inc., Eon Labs Manufacturing, Inc. and Ion Laboratories, Inc.), or Indevus Pharmaceuticals, Inc. (formerly known as Interneuron Pharmaceuticals, Inc.).

8.   Eckerd made no misrepresentations to consumers with regard to Pondimin®, Redux™ and/or phentermine.

This _2nd_ day of August, 2003.

Robert *(signature)*

_____
Robert Verscharen

STATE OF FLORIDA              )
                              )        ACKNOWLEDGMENT
COUNTY OF PINELLAS            )

    I, Linda Hendricks, Notary Public for the State of Florida, do hereby certify that the above-named Robert Verscharen, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

    Witness my hand and official seal this the _20th_ day of _August_, 2003.

_Linda M. Hendricks_ *(signature)*
_____
Notary Public for
My Commission Expires: _____

> Linda M Hendricks
> My Commission CC877084
> Expires November 30, 2003

3

# EXHIBIT 15

REBATE/REIMBURSEMENT AGREEMENT

AGREEMENT dated July/October 1, ___, 1997, between TDI Managed Care Services, Inc. d/b/a Eckerd Health Services, ("EHS"), P. O. Box 4688, Clearwater, FL 34618, and Wyeth-Ayerst Laboratories, P.O. Box 7447, Philadelphia, PA 19104-7447 ("Wyeth-Ayerst").

Whereas, Wyeth-Ayerst manufactures and/or markets prescription drugs to pharmacies and desires to encourage cost effective prescribing of such drugs through various payment and services; and

Whereas, EHS provides pharmacy benefit management services, including formulary management services, to Plans; and

Whereas, Twin Dose, Inc. d/b/a Rumsey Pharmacy Services ("RPS"), an affiliate of EHS, operates a mail service pharmacy and in this aspect, other thing operations in pharmacy operations limit cost and reduction within Formularies used by Plans; and

Whereas, Wyeth-Ayerst desires that EHS and/or RPS provide the programs and services described in this Agreement to Wyeth-Ayerst and EHS and/or RPS desire to provide such programs and services to Wyeth-Ayerst in accordance with the terms of this Agreement.

The parties agree as follows:

1.  This Agreement contains the terms and conditions for Wyeth-Ayerst reimbursement payment of rebates to/of EHS (for its own account and/or for the account of RPS) for Wyeth-Ayerst prescription drugs listed on Exhibit C ("Products") on the EHS's, or EHS formulary ("Formulary") and on the Individual Plan Formularies formularies adopted by ("Plan Formulary") of EHS's Client Prescription Drug Plans ("Plan Formulary"), and dispensed to enrollees by RPS or by participating pharmacies in similar ("Members") of EHS's for RPS's Client Prescription Drug Plans ("Members"). Client Prescription Drug Plans ("Plans") shall include managed care organizations or any suspended or organization with which EHS for RPS has entered into contracts to provide administrative and formulary management services in connection with pharmaceutical benefits or mail order pharmacy benefits, as the case may be. Plans shall not include (i) programs or entities which maintain its eligibility criteria; (ii) programs or entities for which RPS for RPS or its client provide only claims processing services; (iii) programs for which Members are required to pay 100% of the cost of the prescription drugs dispensed by participating pharmacies without subsequent reimbursement for a substantial portion of the cost of the prescription drug and which are not associated with a plan or policy of healthcare coverage. Products shall be dispensed by RPS or by pharmacies which have entered into participation agreements with EHS ("Pharmacies"). In order for EHS and/or RPS to be eligible for payments from Wyeth-Ayerst under this Agreement as to any Individual Plan, all  All Members of the Plan shall be subject to the standard Formulary terms set forth in and customized considerations established by this Agreement, contingent upon Plan's capabilities as outlined in Plan's benefit structure. All Plans which are included in this Agreement are listed in Exhibit A and must be designated as Plan Type 1, 2 or 3, which types are defined in Exhibit C, section III. For each Plan co-client sub-Plan of said Plan included in this Agreement in Exhibit A and for any Plan/sub-Plan added in the future upon mutual written consent of both parties, the following information will be supplied to Wyeth-Ayerst by EHS for RPS:

|   |                       |   |                             |
|---|-----------------------|---|-----------------------------|
| a. | Plan Name            | f. | Plan Type                   |
| b. | Plan Address         | g. | Plan Type 1,2 or 3 Designation |
| c. | Plan Number          | h. | Number of Lives             |
| d. | Plan Telephone Number | i. | Rebate Effective Date      |
| e. | Plan Fax Number      | j. | Key Contact Person          |

Any given Plan may be changed from one Plan Type to another should its method of formulary management change, however such movement from one type to another shall occur only on the f



AHP-W-04000059

j.  Total number of Members in EHS of Plans eligible under a Plan's drug with access to the drug benefit program administered by EHS or mail order drug benefit program administered by EHS as the case may be, in said calendar quarter.  Wyeth-Ayerst considers Member Identification confidential and does not wish to obtain the names of Members.

k.  Utilization data to determine Baseline Market Shares (as defined in Exhibit C, Section II.) for those Product/Product Groups, as applicable, listed in Schedule C1.  Said data shall be for the calendar quarter _____ immediately preceding this Agreement and shall be as outlined in 4, a. through d, f., above and shall be segregated by Type 1, Type 2 and, Type 3 Plans.

Nothing in this Agreement shall prohibit Wyeth-Ayerst from submitting EHS, or EHS utilization data to a third party for the purpose of validation where claims, provided that the third party is bound by a confidentiality agreement which restricts the third party from using it. Notwithstanding this subsection, Wyeth-Ayerst is prohibited from disclosing or using, and shall not disclose or use the utilization data or any other information it receives from EHS or EHS under this Agreement, including, but not limited to, other information, utilization information and any other information related to the business of EHS or EHS. In the Pharmacies or in this Agreement, beyond publishing the whole of this as specified under this Agreement without the prior written consent from EHS or EHS or the sites therein.

Wyeth-Ayerst shall supply quarterly IMS market share data and IMS product codes, as defined in Schedule C1, to EHS within four (4) weeks of the close of each calendar quarter during the term of this Agreement.

5.  Products eligible for reimbursement and the amount of each are listed in Exhibit C.  As used in this Agreement, the term "Direct Catalog Price" means Wyeth-Ayerst's published list price of a Product. In the event the Direct Catalog Price for Product(s) changes, Wyeth-Ayerst shall change the reimbursement to EHS for Product(s) by the same proportional amount by which the Direct Catalog Price for Product(s) changed.  Said change shall be effective on the first day of the calendar quarter subsequent to the quarter in which such Direct Catalog Price change becomes effective.  In the event that the Direct Catalog Price change occurs on the first day of the calendar quarter, said changes in reimbursement to EHS shall become effective on that same date.  If the Direct Catalog Price of a Product changes during any such quarter and the new average Direct Catalog Price of the Product for that quarter will be calculated as the average of the Direct Catalog Price of the Product on the first day of the quarter and the Direct Catalog Price of the Product on the last day of the quarter.

Within thirty (30) days (60) days of its receipt of the amounts reported above from EHS, Wyeth-Ayerst shall pay the amount due to EHS.  For its non-payment on/for by the amount of EHS Payment for any whatsoever for that hereunder which is not resolved by EHS within thirty (30) days of the due date must first apply shall accrue interest at the rate of 1.5% per month on the outstanding balance until it is paid.

6.  EHS shall maintain complete and accurate records with respect to the various rebate programs and fees due under this Agreement.  Such records shall include Pharmacies' dispensing records and the amounts paid to Pharmacies for dispensing Products to Members.  _____ Pharmacies and Plans as it relates to this agreement, and of pharmaceutical manufacturers, rebate claims, or other offsets or receipts or reimbursement to EHS and its owning to product or reimbursement claimed or paid.  EHS shall retain such records in the ordinary course of business for no less than three (3) years from the date of creation of the record.  EHS shall further maintain and shall obligate Pharmacies to maintain complete and accurate records relating to the prescribing, dispensing, and sale of Products to Members for a period of three (3) years from the date of creation of the record.  Upon/Within fifteen (15) days of EHS's receipt of a written request from Wyeth-Ayerst, EHS shall make such records available through IMS or, provided that EHS has the contracted right to audit the applicable Pharmacy through the use of a third party designated by EHS, any Pharmacy Pharmacies for inspection by Wyeth-Ayerst representatives or its designated auditors during regular

AHP-W-04000060

business hours except that in no event will information regarding pharmaceutical manufacturers' contents (other than Wyeth-Ayerst), blenders' names and other personal identifiers or information that EHS is otherwise required to keep confidential be disclosed. It It shall be determined through a Wyeth-Ayerst inspection, or otherwise, that all or any part of any reimbursement-rebate actually paid by Wyeth-Ayerst to EHS was not required to be paid under this Agreement, EHS shall refund to Wyeth-Ayerst such overpayment within thirty (30) days of receipt of notice of the overpayment from by Wyeth-Ayerst, or, at Wyeth-Ayerst's option, such overpayment shall be credited against reimbursements subsequently due EHS. If it shall be determined through A Wyeth-Ayerst inspection, or otherwise, that Wyeth-Ayerst has indemnied overpayment due to EHS, Wyeth-Ayerst shall promptly give notice of the underpayment to EHS and with such notice shall pay the amount of the underpayment to EHS. Wyeth-Ayerst shall be obligated to reimburse EHS for Products disposed only as hereinbefore.

Wyeth-Ayerst shall maintain complete financial and other records with respect to the various rebate payment and fees due under this Agreement in a manner consistent with industry norms, product record keeping procedures and the requirements of applicable federal and state laws, rules and regulations. Wyeth-Ayerst shall retain such each record in the ordinary course of business for not less than five (5) years from the date of creation of the record. EHS may reasonably request that such those records of Wyeth-Ayerst that specifically relate to the product rebate payments and fees due under this Agreement. If a review of Wyeth-Ayerst's records reveals that Wyeth-Ayerst has permitted or undervalued any amount to EHS, such sums agree that it shall promptly make any amount remitted to reconcile the amount due.

7.   This Agreement is available for acceptance until October/August 31, 1997. If accepted, it shall commence as of September/October 1, 1997, and unless terminated earlier pursuant to paragraph 8, shall remain in effect until August 31/September 30, 2000.

8.   This Agreement may be terminated:

   a.   With cause/By either party, effective after ten (10) days written notice to the other party, if:

      1.   the other party has committed a material breach of the terms of this Agreement and such breach has not been cured within thirty (30) days of its receipt of a written notice of such breach from the non-breaching party; or

      2.   the other party becomes insolvent, is dissolved or liquidated, makes a general assignment for the benefit of its creditors, files, or has filed against it a petition in bankruptcy, or has a receiver appointed for a substantial part of its assets; or

   b.   By Wyeth-Ayerst, if, if anytime after the execution of this Agreement, Wyeth-Ayerst is required by state or federal law to offer prices, discounts, rebates, free merchandise, samples, or ancomation similar to those set forth in this Agreement to anyone not currently receiving such prices, discounts, rebates, free merchandise, samples, or anomations by giving EHS not less than thirty (30) days prior written notice of such termination.

   c.   For any reason or no reason/Without cause, effective after sixty (60) days written notice to the other party.

   d.   Without cause, immediately upon notice by Wyeth-Ayerst as to any Pharmacy which Wyeth-Ayerst has reason to believe obtains Wyeth-Ayerst products or purported Wyeth-Ayerst products through a secondary (i.e. Alternative) market.

   Upon termination of this Agreement for any reason other than breach by EHS, Wyeth-Ayerst shall be liable for payment of all fees due up to the effective date of termination.

9. Any notice required or permitted to be given by either party to the other shall be given in person or sent by first class mail, postage prepaid, addressed to the other party at its last designated address. Notwithstanding the foregoing, the notice to this Agreement intend that notice to a party shall be deemed to have been given if it is actually received by the party to whom it is sent no matter what made it tend to send the notice.

10. Noncompliance with the above obligations due to force majeure such as an act of God, laws or regulations of any government, war, civil commotion, destruction of production facilities and materials, fire, earthquake, or storm, labor disturbance, shortage of materials, failure of public utilities or common carriers, and any other similar causes beyond the reasonable control of the parties, shall not constitute a breach of contract.

11. Neither party shall have the right to assign this Agreement to a third party without the prior written consent of the other party which consent shall not be unreasonably withheld. Any permitted assignee shall assume all obligations of its assignor under this Agreement. No assignment shall relieve any party of responsibility for the performance of any obligations which have already accrued. This Agreement shall inure to the benefit of and be binding upon each party, its respective successors, and permitted assigns.

12. If any provision of this Agreement is declared or found to be illegal or unenforceable, both parties shall be relieved of all obligations arising under such provision, but if capable of performance, the remainder of this Agreement shall not be affected by such declaration or finding.

13. Wyeth-Ayerst shall comply with all applicable state and federal laws, including those regarding confidentiality and privacy of patient information.

14. This Agreement is not intended to and does not include Products dispensed to any person for which payment may be made, in whole or in part, by Medicare, Medicaid or other state or federal programs. Notwithstanding the forgoing, if EMS or Plan receives capitated or lump sum payments to provide coverage for and/or arrange for the provision of healthcare services to Members who are beneficiaries of Medicare/Medicaid or other state or federal programs, and if Wyeth-Ayerst is required to pay the state or federal government a rebate for such Member, rebates and administrative fees shall be payable by Wyeth-Ayerst for Products dispensed to such Members provided that EMS and Plan disclose and report all payments under this Agreement to the extent required by state or federal laws.

15. Notwithstanding any other provision in this Agreement to the contrary, the rebates prices set forth herein or in any subsequent Agreement shall not apply to Products dispensed from any facility located within the State of Maine, unless such facility is exempt from Section 6 of the Act to Improve Access to Pharmaceuticals (22 M.R.S.A. § 2684 et seq.).

16. No rebate shall be payable by Wyeth-Ayerst, or billed by EMS to Wyeth-Ayerst, for any Products dispensed to any Member for which EMS, or EMS client, Plan may or any other person or entity received or could direct directly or indirectly from Wyeth-Ayerst another separate contracted arrangement. Should a dispute arise as to the appropriate resolution of such dispute parties shall undertake in a good faith effort to resolve by the parties involved to resolve the dispute however. In the event that Wyeth-Ayerst receives a claim for payment of a fee and/or rebate from a third party based on the dispensing of a Product by a Pharmacy to a Member for which EMS seeks payment of a rebate or fee from Wyeth-Ayerst under this Agreement, the parties shall work diligently and in good faith to determine which entity is actually responsible for the management of pharmacy benefit or mail order pharmacy benefits, or the case may be, for the applicable Plan and Wyeth-Ayerst will pay the applicable fees and/or rebate to the entity that is actually responsible for the management of pharmacy benefit or mail order pharmacy benefits for the applicable Plan. In no case shall Wyeth-Ayerst be required to pay more than one rebate or discount for the same unit of Product.

EMED PAYEG\CONTRACTS\CONTRACTLTD.DOC\VR... OMT\PLS\CONTRACTS\CONTRACTLTD.DOC
JML 521427/05/0107

AHP-W-04000062

17. Any subsequent amendment or modification of this Agreement shall be in writing and signed by the parties or signed by the party against whom enforcement of such amendment or modification is sought.

18. Except as otherwise provided herein both parties agree to treat this Agreement as confidential and proprietary and not to disclose to third parties any terms or conditions or other information concerning this Agreement without the prior written consent of the other party throughout the duration of this Agreement and for a period of two (2) years following the Effective Date of any expiration or termination.

19. The parties hereto will not utilize any patented trade named, trademarked, service marked, or copyrighted material belonging to the other party except as expressly permitted by this Agreement or otherwise in writing.

**TDI MANAGED CARE SERVICES, INC.**
**D/b/a ECKERD HEALTH SERVICES**                    **WYETH-AYERST**

By _____               By _____

Title  V.P. Clinical Services                    Title:  Director, National and Zone
                                                           Contracting

Date _____             Date _____

                                          By _____

                                          Title _____

                                          Date _____

**EXHIBIT A**

**List of Plans included in this Agreement**

NEFSD_DAT.SK.N\CONTRACT\CNTRD\EHS\ERDA.DOC NEFSD_DAT.SK.N\CONTRACT\CNTRD\EHS\ERDA.DOC
N/A MM.DD\mm.dd.yy

AHP-W-04000063

**EXHIBIT B**

*Specimen Pharmacy Agreement*

I:\WEB_DATA\NCONTRACTS\CERTBUCK1MDK.DOC\WEB_DATA\N.CONTRACTS\CERTBUCK1MDK1CERTBUCK1.DOC
N/A 12/13/96(1v2)

AHP-W-04000064

**EXHIBIT C**

1.  The Wyeth-Ayerst pharmaceuticals listed below are included in this Agreement.  The package size listed shall be the basis on which the rebate is calculated, notwithstanding the size package from which the prescription was dispensed.

    Within sixty (60) days of the end of each calendar quarter, PBM shall provide to Wyeth-Ayerst a computer-generated quarterly rebate and invoice rebate request consistent with the terms and conditions act forth in Paragraph 4c of the Agreement.

| NDC (0000-) | Product | Package Size |
|---|---|---|



UNITED DATA\ROCHATE\ACBATE\EXHIBITS\WYA EXCHEDULE RATE ALSIONG\WAUPHEND\BUNCHEDAA.DOC
BAA \EXHIBIT\GAA.DOC

AHP-W-04000065



AHP-W-04000066



II.  In order for FMS to be eligible for rebates for any other fees hereunder) based on the dispensing of Products, each of the following criteria must be satisfied as to all Plans during the entire calendar quarter for which FMS seeks a reimbursement hereunder.

In consideration of:

A.  All Members must be being subject to the Formulary created by FMS' Plan's Pharmacy and Therapeutics Committee ("P & T Committee") Guidelines, and the applicable Plan Formulary.

B.  FMS and each Plan must list a minimum of six (6) of the Product Groups listed below according to the criteria listed on the Formulary and Plan Formulary, and Plan accepting and listing on the Formulary adopted by the Plan and on the Plan Formulary with no permitting or dispensing restrictions a minimum of six (6) of the Product Groups listed below according to the criteria listed, and with Product Groups 1 and 3 being included among the selected Product Groups said accepted ___ selections. (For any Product to be rebate eligible for a given Plan, said Product shall be listed in said Plan Formulary.) Any new change from/through of a Product included in the accepted ___ Product Groups, below, which is introduced by Wyeth-Ayerst during the term of this Agreement must shall be added to the Formulary and thereupon applicable Plan Formulary, and Plan Formularies so long as the patent protection for the Product is at least two years.

Product Groups:



1.

AHP-W-04000067



4.   Accessible Agents
Redox and Prodicals must be on the Formulary and Plan Formulary and available to
Members where benefit design includes coverage for this therapeutic class. Rebates will
not be paid on Redox or Prodicals.

C.   As to any Product which as of October 1, 1997, is not listed on the applicable Plan Formulary but
which is subsequently added to the Formulary, EHS must inform Pharmacies and physician's and nursing
Pharmacies and Physician providers, as applicable, of the Formulary status of eay such Product (ii)
included in _____ this Agreement the values or downside communication which may not be included in
the _____ Annual Formulary/Plan Formulary to the extent of this Agreement granting the cost pricing of
the Formulary/Plan Formulary. Any such communication shall not be inconsistent with the
positioning of Products in the Formulary and applicable Plan Formulary.

D.   Unless otherwise required by law or good clinical practice, Agll prescriptions for the above
mentioned Product which are included in the Formulary _____ and applicable Plan Formulary
being dispensed with the Wyeth-Ayerst brand, and no action being taken by
EHS or Plan, including but not limited to telephone calls or written communication to Physician
providers or Pharmacies regarding specific prescriptions, that will adversely affect utilization of
Products which are included in the Formulary or the Plan Formulary, without the written consent
Wyeth-Ayers,

the rebates shown in Schedule C3 shall be paid to EHS for Product usage by Type 2 Plans or Type 3 Plans,
respectively. As the stated dollar amount or percentage of the Direct Catalog Price in accordance with
Paragraph 5 of this agreement.

Wyeth-Ayerst shall maintain complete financial and other records or data with respect to the various rebate programs and fees due under this Agreement in a manner consistent with industry norms, prudent record keeping procedures, and the requirements of applicable federal and state laws, rules and regulations. Wyeth-Ayerst shall retain each such record in the ordinary course of business for not less than three (3) years from the date of creation of the record. EHS and/or EP2 may examine, copy and audit those records of Wyeth-Ayerst that specifically relate to the various rebate programs and fees due under this Agreement. If a review of Wyeth-Ayerst's records reveals that Wyeth-Ayerst has overpaid or underpaid any amount to EHS (for its own account and/or for the account of EP2) each party agrees that it shall promptly make any payment required to reconcile the amount due.

7. The term of this/this Agreement is available for acceptance until August 31, 1997. If accepted, it shall commence as of October/September 1, 1997, and unless terminated earlier pursuant to paragraph 8., shall remain in effect until September 30/August 31, 2000.

8. This Agreement may be terminated:

   a. With consent by either party, effective after ten (10) days written notice to the other party, if:

      1. the other party has committed a material breach of the terms of this Agreement and such breach has not been cured within thirty (30) days of its receipt of a written notice of such breach from the non-breaching party; or

      2. the other party becomes insolvent, is dissolved or liquidated, makes a general assignment for the benefit of its creditors, files, or has filed against it a petition in bankruptcy, or has a receiver appointed for a substantial part of its assets; or

   b. By Wyeth-Ayerst, if, at anytime after the execution of this Agreement, Wyeth-Ayerst is required by state or federal law to offer prices, discounts, rebates, free merchandise, samples, or concessions similar to those set forth in this Agreement to anyone not currently receiving such prices, discounts, rebates, free merchandise, samples, or concessions by giving EHS not less than thirty (30) days prior written notice of such termination.

   c. For any reason or no reason whatsoever, effective after sixty (60) days written notice to the other party.

-13-

AHP-W-040C0069

*add back*

~~d.   If from reven have already upon order by Wyeth-Ayerst or to any Nursery which Wyeth-Ayerst had return or deliver obtained Wyeth-Ayerst products or purported Wyeth-Ayerst products during the same order period from Ayerst's market.~~

*ok*   Upon termination of this Agreement for any reason, Wyeth-Ayerst shall be liable for payment of all fees due up to the effective date of termination.

9.   Any notice required or permitted to be given by either party to the other shall be given in person or sent by first class mail, postage prepaid, addressed to the other party at its last designated address. Notwithstanding the foregoing, the parties to this Agreement hereof that notice to a party shall be deemed to have been given if it is actually received by the party to whom it is sent no sooner when made it used to send the notice.

10.   Noncompliance with the above obligations due to Force majeure such as an act of God, laws or regulations of any government, war, civil commotion, destruction of production facilities and materials, fire, earthquake, or storm, labor disturbances, shortage of materials, failure of public utilities or common carrier, and any other similar causes beyond the reasonable control of the parties, shall not constitute a breach of contract.

*no!*   11.   Neither party shall have the right to assign this Agreement to a third party without the prior written consent of the other party which consent shall not be unreasonably withheld; provided however that as part of a corporate reorganization of J.C. Penney Company, Inc. EHS and/or EPS may assign this Agreement to any subsidiary or affiliate of EHS, EPS or J.C. Penney Company, Inc. without the consent of Wyeth-Ayerst. Any permitted assignee shall assume all obligations of its assignor under this Agreement. No assignment shall relieve any party of responsibility for the performance of any obligations which have already accrued. This Agreement shall inure to the benefit of and be binding upon each party, its respective successors, and permitted assigns.

*no!*   12.   ~~If any provision of this Agreement is declared or found to be illegal or unenforceable, both parties shall be relieved of all obligations arising under such provision, but if capable of performance, the remainder of this Agreement shall not be affected by such declaration or finding. Intentionally deleted.~~

13.   Wyeth-Ayerst shall comply with all applicable state and federal laws, including those regarding confidentiality and privacy of patient information.

728

AHP-W-04000070

O.K.

14. This Agreement is not intended to and does not include Products dispensed to any person for which payment may be made, in whole or in part, by Medicare, Medicaid or other state or federal programs. Notwithstanding the foregoing, if EHS or a Plan receives capitated or lump sum payments to provide coverage for and/or arrange for the provision of healthcare services to Members who are beneficiaries of Medicare/Medicaid or other state or federal programs, and if Wyeth-Ayerst is not required to pay the state or federal government a rebate for such Member, rebates and administrative fees shall be payable by Wyeth-Ayerst in accordance with this Agreement, provided that EHS or EPS, as the case may be, and Plan disclose and report all payments under this Agreement to the extent required by state or federal laws.

15. Notwithstanding any other provision in this Agreement to the contrary, the rebates/prices set forth herein or in any subsequent agreement shall not apply to Products dispensed from any facility located facilities in the State of Maine, unless said facility is exempt from Section 6 of the Act to Improve Access to Pharmaceuticals (32 M.R.S.A. § 13801 et seq.).

16. No rebates shall be payable by Wyeth-Ayerst on billed by EHS or Wyeth-Ayerst for any Products dispensed to any Member for which EHS or EHS client, Pharmacy or any other party or entity received or under direct disconnection from Wyeth-Ayerst under a separate contractual arrangement. Should a dispute arise as to the appropriate recipient of such discount/rebate, a good faith effort shall be made by the parties involved to resolve the dispute however, in no event shall Wyeth-Ayerst be required to pay more than one rebate or discount for the same unit of Product. In the event that Wyeth-Ayerst receives a claim for payment of a fee and/or rebate from a third party based on the dispensing of a Product by a Pharmacy to a Member for which EHS (for its own account or for the account of EPS) seeks payment of a rebate or fee from Wyeth-Ayerst under this Agreement, the parties shall work diligently and in good faith to determine which entity is actually responsible for the management of pharmacy benefits or mail order pharmacy benefits, as the case may be, for the applicable Plan and Wyeth-Ayerst will pay the applicable fees and/or rebates to the entity that is actually responsible for the management of pharmacy benefits or mail order pharmacy benefits, as the case may be, for the applicable Plan.

17. Any subsequent amendment or modification of this Agreement shall be in writing and signed by the parties or signed by the party against whom enforcement of such amendment or modification is sought.

18. Except as otherwise provided herein both parties agree to treat this Agreement as confidential and proprietary and not to disclose to third parties any terms or conditions or other information concerning this Agreement without the prior written consent of the other party throughout the

826

AHP-W-04000071

duration of this Agreement and for a period of two (2) years following the Effective Date of any expiration of termination.

19.   The parties hereto will not utilize any personal trade named, trademarked, service marked, or copyrighted material belonging to the other party except as expressly permitted by this Agreement or otherwise in writing.

AIIP-W-04000072

IN WITNESS WHEREOF, the parties, intending to be legally bound, have executed this Agreement as of the date first written above.

Kysis-Ayerst Laboratories                    TDI Managed Care Services, Inc.
                                             d/b/a Eckerd Health Services

By: _____                By: _____
Name: _____                Name: Robert Varghese
Title: Director, National A Base Contracting  Title: Vice President-Rx Purchaser and
                                                    Furnisher Agreements

        Express Pharmacy Services hereby joins in this Agreement for the purpose of agreeing to carry out the obligations specifically related to EPS that are set forth in this Agreement.

Thrift Drug, Inc.
d/b/a Express Pharmacy Services

By: _____
Name: _____
Title: _____

1826

AHP-W-04000073

**EXHIBIT A**

List of Plans included in this Agreement

1/36

AHP-W-04000074

EXHIBIT A

List of Plans Included in this Agreement

AHP-W-04000075

Exhibit4.doc

AHP-W-04000076

# **EXHIBIT 16**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE DIET DRUGS (PHENTERMINE/FENFLURAMINE/ DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) | MDL NO. 1203 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) ) ) ) | |
| SHEILA BROWN, et al. v. AMERICAN HOME PRODUCTS CORPORATION | ) ) ) | CIVIL ACTION NO. 99-20593 |

# NATIONWIDE CLASS ACTION
# SETTLEMENT AGREEMENT WITH
# AMERICAN HOME PRODUCTS CORPORATION
## ..(AS AMENDED)

Dated:      November 18, 1999

Amended:   November 24, 1999 (First Amendment)
            January 10, 2000 (Second Amendment)
            March 24, 2000 (Third Amendment)
            July 20, 2000 (Fourth Amendment)
            November 21, 2002 (Fifth Amendment)
            January 10, 2003 (Sixth Amendment)

4.   In the event that the Settlement receives Final Judicial Approval, no additional attorneys' fees or litigation expenses shall be paid for benefits conferred on those individuals who accepted the AJO.

5.   The Parties shall recommend that the Court enter an Order precluding a Class Member's individual attorney from recovering a fee in connection with the recovery of the $3,800 cash benefit provided by Section IV.A.2.e or the $6,800 cash benefit provided by Section IV.A.1.d, which is greater than twenty percent (20%) of such amount.   This twenty percent (20%) fee for a Class Member's individual attorney shall not be affected by fees paid to Class Counsel or Common Benefit Attorneys, pursuant to the Court's order.

F.   **OTHER PROVISIONS**

1.   Any information provided by or regarding a Class Member or otherwise obtained pursuant to this Agreement shall be kept confidential and shall not be disclosed except to appropriate persons to the extent necessary to process Claims or provide benefits under this Agreement or as otherwise expressly provided in this Agreement.   All Class Members shall be deemed to have consented to the disclosure of this information for those purposes.

2.   This Settlement Agreement shall be binding on the successors and assigns of the Parties.

3.   The Parties to the Settlement, including AHP, the Released Parties, or any Class Member, shall not seek to introduce and/or offer the terms of the Settlement Agreement, any statement, transaction or proceeding in connection with the negotiation, execution or implementation of this Settlement Agreement, any statements in the notice documents appended to this Settlement Agreement, stipulations, agreements, or admissions made or entered into in connection with the fairness hearing or any finding of fact or conclusion of law made by the Trial Court, or otherwise rely on the terms of this Settlement, in any judicial proceeding, except insofar as it is necessary to enforce the terms of the Settlement.   If a Class Member who has timely and properly exercised an Opt-Out right seeks to introduce and/or offer any of the matters described herein, in any proceeding, the restrictions of this Section shall not be applicable to AHP and the Released Parties with respect to that Class Member.

4.   Neither this Agreement nor any exhibit, document or instrument delivered hereunder nor any of the statements in the notice documents appended to this Settlement Agreement or in